# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BETTY CLAYTON, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  **Civil Action No. 11-1889-RDM** |
| | ) |
| DISTRICT OF COLUMBIA and | ) |
| DISTRICT OF COLUMBIA NATIONAL | ) |
| GUARD, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Betty Clayton sues Defendants the District of Columbia ("the District" or

"D.C.") and the District of Columbia National Guard ("DCNG"), alleging that her career civil

service job was converted into a non-career position and that she was subsequently terminated,

both in retaliation for reporting sexual harassment, mismanagement, waste and abuse at the

DCNG.  She also alleges that she was transferred to a non-career position and terminated

because of her sex and, while still employed, was not accorded the same authority as her male

predecessor.  An earlier version of Plaintiff's complaint was dismissed in part, and she has since

filed a Second Amended Complaint alleging claims under the D.C. Whistleblower Protection

Act, the D.C. False Claims Act, D.C. common law, the Due Process clause of the Fifth

Amendment, and Title VII.

Defendants now move to dismiss Plaintiff's Second Amended Complaint in part.  The

District moves to dismiss Plaintiff's due process and Title VII claims (Counts Five, Six and

Seven), but not the remaining claims (Counts One through Four), Dkt. 47-1 at 12, and the DCNG

moves to dismiss all of the claims brought against it (Counts Six and Seven), Dkt. 56-1 at 23.

For the reasons explained below, the District's motion is **GRANTED** in part and **DENIED** in

part, and the DCNG's motion is converted in part to a motion for summary judgment pursuant to

Rule 12(d) and **DENIED** without prejudice.

## I. BACKGROUND

According to the Second Amended Complaint (Dkt. 45, "Complaint"), the allegations of

which are taken as true for purposes of the pending motions to dismiss, *Chalabi v. Hashemite*

*Kingdom of Jordan*, 543 F.3d 725, 726 (D.C. Cir. 2008), Clayton was appointed Director of D.C.

Government Operations at the DCNG around June of 2008. Dkt. 45 ¶ 5. One of her

responsibilities in that position was to "investigate and discipline potential wrongdoing at the

DCNG as well as [to] report fraud, waste and abuse." *Id.* ¶ 11. Clayton alleges that she did just

that. Among other things, she asserts that she reported a sexual harassment complaint made by

an administrative assistant against Major General Errol R. Schwartz, who was the Commanding

General of the DCNG, to the D.C. Human Resources Equal Employment Opportunity Officer in

April 2010. Dkt. 45 ¶¶ 14-21. Clayton also alleges that she repeatedly took action to report and

discipline a District employee working at the DCNG for misuse of District resources and

violations of District employment policies. *Id.* ¶¶ 22-48. She further alleges that she objected to

or reported several other instances of misuse or mismanagement of District funds and property

and other policy violations. *Id.* ¶¶ 49-64.

According to Clayton, DCNG officials responded to her reporting activities by

threatening to remove her from her position. Clayton alleges that General Schwartz threatened

her with termination of her employment on four occasions in 2009 and 2010. Dkt. 45 ¶ 68. On

one of those occasions, Clayton claims that General Schwartz confronted her after she reported

the sexual harassment allegation against him, threatened to terminate her employment, and stated

2

"'we'll see who's sitting in that seat on October 1st.'" *Id.* ¶ 69.  Clayton also alleges that the

DCNG "attempted to block all proposed disciplinary action" against a D.C. employee who

worked at the DCNG and that she faced "threats of potential repercussions if she continued to

investigate" that employee. *Id.* ¶ 37.

In May of 2010, Clayton alleges that the DCNG staff sought the advice of the D.C.

Human Resources Department's General Counsel "regarding General Schwartz's administrative

authority over the employees of the Government Operations Division," including Clayton. *Id.* ¶

70.  In an August 27, 2010 letter, D.C. Attorney General Peter Nickles offered his Office's views

"on whether the Government Operations Division of the [DCNG] is a District of Columbia

agency, and if so, whether the Commanding General . . . can direct the agency head of that

Division to initiate personnel actions against District employees who are assigned to work at the

DCNG." Dkt. 56-3 at 2.[1]  Among other things, he opined that "the Mayor of the District of

Columbia exercises personnel authority over" the Government Operations Division of the

DCNG. Dkt. 56-3 at 2.  The letter also noted, however, that "according to the DCNG's

organizational chart, it appear[ed] that the Director of the Government Operations Division,"

though "a District employee," was also in General Schwartz's "chain of command." *Id.*  The

opinion letter authorized General Schwartz to "confer with the Mayor" about personnel matters

involving District employees that "rise to the level where it impacts the readiness of the National

Guard," as well as to "participate in the hiring process" of Government Operations Division

employees and to "discuss with District officials whether administrative action should be filed

against an employee." *Id.* at 3.  The letter, moreover, noted that "[a]s for matters that pertain

---

[1]  The Complaint refers extensively to this opinion letter. *See, e.g.*, Dkt. 45 ¶¶ 80-85.  Because
the letter has thus been incorporated by reference into the Complaint, the Court may consider it
at the pleadings stage. *See Maib v. FDIC*, 771 F. Supp. 2d 14, 17 (D.D.C. 2011).

exclusively to the National Guard," the Director of the Government Operations Division "has an informal, dotted-line relationship with the Commanding General." *Id.*

A month later, Clayton received a letter reclassifying her position.  While she had previously been a member of D.C.'s Career Service, from which employees may not normally be terminated without cause (*see* D.C. Code § 1-608.01), she was reassigned to the Management Supervisory Service, from which employees may be terminated without cause (*see* D.C. Code § 1-609.54).  Dkt. 45 ¶ 74.  She was terminated without cause on October 26, 2010, effective November 11, 2010.

Clayton filed this lawsuit on October 26, 2011.  In her initial complaint, she alleged violations of the D.C. Whistleblower Protection Act, D.C., Code § 1-615.51 *et seq.* and the D.C. False Claims Act, D.C. Code § 2-381 *et seq.*, common law wrongful termination, and due process violations.  Clayton was granted leave to file an amended complaint that included additional factual allegations on May 15, 2012.  On March 23, 2013, Judge Roberts (now Chief Judge) of this Court granted the DCNG's motion to dismiss for lack of subject matter jurisdiction and granted in part the District's motion to dismiss for failure to state a claim.  Dkt. 34.  Clayton moved for leave to file a Second Amended Complaint, which re-alleged her prior claims and added claims for retaliation and sex discrimination under Title VII of the Civil Rights Act of 1965, 42 U.S.C. 2000e *et seq.*  Dkt. 40.  The Court granted the motion in part and denied it in part, allowing Clayton to re-plead her D.C. Whistleblower Protection Act and D.C. False Claims Act counts and her as-applied due process challenge to her reassignment and termination against the District but denying her leave to re-allege those claims that the Court had previously dismissed.

With respect to the Title VII claims that Clayton sought to add, the DCNG argued that the Court should deny her leave to assert those claims against it on the ground that the DCNG was purportedly not her employer and thus adding those claims would be futile.  Dkt. 43 at 1. The Court disagreed, holding that the DCNG had failed "to carry its burden of proving that it would be futile to allow Clayton to amend her complaint by adding Title VII claims."  Dkt. 44 at 10.

On December 5, 2013, the District moved to dismiss Clayton's Title VII claims, as well as her as-applied due process claim.[2]  Dkt. 47.  On February 24, 2014, the DCNG moved to dismiss all of the claims against it for lack of subject matter jurisdiction and for failure to state a claim.  Dkt. 56.  Among other issues, the DCNG argues that Clayton failed to exhaust administrative remedies against the federal government.  In considering this issue, the Court concluded that the exhaustion defense might raise factual issues better considered on summary judgment, and, accordingly, directed that the parties submit supplemental briefs and additional materials relevant to that defense.  Supplemental briefing on this issue was completed on April 9, 2015.  Dkt. 69.

## II. LEGAL STANDARD

On a motion to dismiss for failure to state a claim, the Court must "treat 'the complaint's factual allegations as true'" and must grant Plaintiffs "'the benefit of all inferences that can be derived from the facts alleged.'"  *Brown v. Whole Foods Mkt. Grp. Inc.*, 789 F.3d 146, 151 (D.C. Cir. 2015) (citation omitted).  Although "detailed factual allegations" are not necessary, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, "a complaint must contain sufficient factual matter,

---

[2]  This motion was granted as conceded after Clayton failed to file a timely opposition. *See* January 7, 2014 Minute Order.  However, the Court subsequently granted Clayton's motion for reconsideration and reinstated the claims challenged in the District's motion.  Dkt. 55 at 5.  The District's motion to dismiss is therefore ripe for resolution on the merits.

accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The Court need not accept as true either a "legal conclusion couched as a factual allegation" or an inference drawn by the plaintiff if such inference is unsupported by the facts set out in the complaint. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citations and internal quotation marks omitted). The Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted).

On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden to establish jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Because subject matter jurisdiction is a requirement of Article III as well as federal statutes, "no action of the parties can confer subject-matter jurisdiction upon a federal court." *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (internal quotation marks omitted). When deciding a motion to dismiss under Rule 12(b)(1), the Court may consider "the complaint standing alone"; alternatively, it may consider the "complaint supplemented by undisputed facts evidenced in the record," and, if necessary, "the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## III.   ANALYSIS

### A.   The District's Motion to Dismiss

The District moves to dismiss the surviving as-applied due process challenge to its termination of Clayton (Count V of the Complaint), Clayton's Title VII retaliation claim (Count VI), and Clayton's Title VII sex discrimination claim (Count VII). The Court will consider each in turn.

1.  ***Clayton's As-Applied Due Process Claim***

In Count V of her Complaint, Clayton alleges that she had a protected property interest in her employment as a Career Services employee and that her transition to at-will, Management Supervisory Service status was a pretext intended to facilitate her termination in retaliation for her reporting activities.  Dkt. 45, ¶¶ 110-111.  Chief Judge Roberts previously dismissed Clayton's facial challenge to D.C. Code section 1-609.58, but, because the District did not challenge the adequacy of her as-applied challenge, he did not rule on the legal sufficiency of that claim.  Dkt. 34 at 22 n.12.  That issue is now before the Court.

To state a due process claim, Clayton must allege that she was deprived of life, liberty or property without due process of law.  *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014).  If Clayton establishes that she was deprived of a protected property interest, the Court must then determine "whether the procedures used by the Government in effecting the deprivation 'comport with due process.'"  *Id.* (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).

The District argues that Clayton's as-applied challenge fails as a matter of law because the District's decision to reclassify Clayton was mandatory, not discretionary.  Dkt. 47-1 at 6. According to the District, whether the reclassification was pretextual is thus irrelevant—once the District determined that Clayton's position as Director of the Governmental Operations Division at the DCNG qualified for the Management Supervisory Service and not the Career Service, D.C. law compelled the District to reclassify Clayton.  *See Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998) ("[T]he state of mind of local officials who enforce or comply with state or federal regulations is immaterial to whether the local government is violating the Constitution if the local officials could not act otherwise without violating state or federal law.").

7

Clayton responds that the specific statutory provision pursuant to which she was reclassified—D.C. Code section 1-609.58—does not apply to her.  In her view, that provision applies only to employees who were reclassified from the Career Service to the Management Supervisory Service when the Career Service was created in 1998, which was roughly ten years before Clayton was hired.  Dkt. 50 at 2.  Clayton argues that because the Career Service still exists and section 1-609.58 did not compel her reclassification, the District had no legal obligation to reclassify her and, therefore, she has stated a due process claim based on her reclassification and eventual termination.  *Id.* at 4-5.

Whether section 1-609.58 properly applies to Clayton, however, is beside the point. Pursuant to D.C. Code sections 1-609.52 and 1-614.11(5), "*any*" employee of the District "whose functions include responsibility for project management and supervision of staff and the achievement of the project's overall goals and objectives" "*shall* be in the Management Supervisory Service."  D.C. Code § 1-609.52 (emphasis added); D.C. Code § 1-614.11(5) (emphasis added).  The position of Director of the Governmental Operations Division at the DCNG appears to meet these criteria; in any event, Clayton has not argued that it does not. Thus, D.C. law requires that the Director of the Governmental Operations Division "be in" the Management Supervisory Service.  Because Clayton held that position while purportedly classified as a Career Service employee, her reclassification was compelled by law.  Whether Clayton was reclassified through the arguably applicable mechanism set out in section 1-609.58 or simply by operation of section 1-609.52, she could not legally remain in the Career Service while in her position as Director of the Governmental Operations Division.[3]

---

[3]  Clayton has cited no case or other authority, and the Court has found none, holding that the District has discretion to allow employees who are erroneously classified to the Career Service to remain in that classification despite the mandate of D.C. Code section 1-609.52.

8

This conclusion suggests that Clayton was misclassified when, in 2008, she was hired for her position and classified as a Career Service employee.  The District may have acted improperly when it offered a candidate a protected employment status that was inconsistent with D.C. law—all the more so if, as Clayton alleges, she in fact negotiated for that status before she was hired (Dkt. 45 ¶ 6).  But it is difficult to see how the District deprived Clayton of a protected property interest when it corrected its error and reclassified Clayton to the Management Supervisory Service.  D.C. law did not create such an interest: even though Career Service employees hold a property interest in their employment by virtue of their statutory classification (*see Fonville v. District of Columbia*, 448 F. Supp. 2d 21, 26-27 (D.D.C. 2006)), Clayton was ineligible for that classification, *see Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (property interest created only where employee has a "*legitimate* claim of entitlement" to continued employment) (emphasis added).  And to the extent Clayton asserts a property interest derived from a contractual agreement that she would be classified to the Career Service, such an agreement in contravention of D.C. law would be unenforceable.  *See McMahon v. Anderson, Hibey & Blair*, 728 A.2d 656, 658-59 (D.C. Ct. App. 1999) (illegal contracts unenforceable).

Clayton does not take issue with the proposition that at-will employees, like those properly classified in the Management Supervisory Service, ordinarily lack a property interest in continued employment for purposes of the Due Process clause of the Fifth Amendment.  Any argument to the contrary, moreover, would run headlong into the Supreme Court's decision in *Bishop v. Wood*, 426 U.S. 341, 345 n.8 (1976), which held that, if an employee holds her "'position at the will and pleasure of the city,' . . . [s]he ha[s] *no* property interest."  To be sure, Clayton has previously argued that, even if employed at will, she was protected from wrongful termination under D.C.'s "public policy" exception to the at-will doctrine.  Dkt. 29-1 at 24.  But

Chief Judge Roberts previously concluded that the "public policy" exception is not applicable on the facts alleged.  Dkt. 34 at 20.  Moreover, even if this "narrow" exception applied, *see Liberatore v. Melville Corp.*, 168 F.3d 1326, 1329 (D.C. Cir. 1999), not every state law cause of action gives rise to a property interest for purposes of the Due Process clause, *see, e.g.*, *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 768-69 & n.15 (2005) (states free to create causes of action against police for failure to enforce restraining order even though there is no constitutionally cognizable property interest in enforcement).  Indeed, those courts that have previously considered the issue have uniformly held that "the [public policy] exception does not create a property right." *Campbell v. Purtle*, 184 F.3d 991, 993 n.3 (8th Cir. 1999) (collecting cases); *Summers v. City of McCall*, ___ F. Supp. 3d ____, 2015 WL 417763, at *14 (D. Idaho Jan. 29, 2015); *Harrison v. Owens*, No. 11-2215, 2014 WL 3101266, at *7 (D.S.C. July 7, 2014); *see also Bennett v. Watters*, 260 F.3d 925, 929 (8th Cir. 2001) ("The right not to be discharged in violation of the State's public policy is not a property interest for procedural due process purposes.  It is a substantive right, the violation of which gives rise to a substantive claim under state law."); *Clark v. Modern Grp., Ltd.*, 9 F.3d 321, 331-32 (3d Cir. 1993) ("The public policy exception to the doctrine of employment at-will does not exist . . . to protect the employee.  Rather, it is the protection of society from public harm . . . that undergird[s] an at-will employee's common-law action for wrongful discharge.").  In any event, because Clayton does not argue that the "public policy" exception gives rise to a property interest for purposes of the Due Process clause, the point can be taken as conceded.

Because Clayton did not have a protected property interest in her erroneous classification to the Career Service and the District was compelled by law to reclassify her to the Management

Supervisory Service once it acknowledged its error, her as-applied due process challenge fails as a matter of law.

### 2. *Clayton's Title VII Retaliation Claim*

In Count VI of her Complaint, Clayton alleges that she was the victim of adverse employment actions, including her eventual termination, based on her role in reporting a sexual harassment claim made against General Schwartz in 2010.  Title VII prohibits retaliation against employees who have "opposed" an unlawful employment practice or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).  In turn, when an employee is subjected to harassment that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment . . . Title VII is violated."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted).  Thus, if Clayton has plausibly alleged that she was retaliated against as a result of "opposing" or "participat[ing] in an investigation" of workplace sexual harassment, she has stated a retaliation claim under Title VII.

Clayton's allegations satisfy this standard.  According to the Complaint, an administrative assistant to General Schwartz "made a sexual harassment complaint to Ms. Clayton against General Schwartz."  Dkt. 45 ¶ 14.  The Complaint alleges that Clayton was then contacted by a master sergeant, who served as the DCNG federal Equal Employment Opportunity ("EEO") officer.  *Id.* ¶ 15.  The master sergeant "asked Ms. Clayton . . . whether 'General Schwartz'[s] administrative assistant had informed Ms. Clayton that she had filed sexual harassment charges against [General Schwartz],'" *id.*, and he told her that he, General Schwartz and a number of others "'had been huddled in the General's office most of the day, trying to determine who the administrative assistant had informed of the filing since she refused to discuss the issue with the federal EEO officer,'" *id.* ¶ 16.  According to the Complaint, "Ms.

Clayton was then pressured by the investigators to not file or report the sexual harassment allegations made by" the administrative assistant. *Id.* ¶ 17.

Despite this pressure, Clayton avers that she did report the allegation to the District's EEO officer and "provided aid and assistance to [the administrative assistant] in the sexual harassment matter." *Id.* ¶ 18. "Shortly after" she did so—around mid-April 2010—she alleges that General Schwartz "verbally threatened [her] employment" and told her, "'we'll see who's sitting in that seat on October 1st.'" *Id.* ¶¶ 19-20. Approximately one month later, General Schwartz sought an opinion from the D.C. Human Resources Department's General Counsel regarding General Schwartz's authority over the employees of the Government Operations Division, including Clayton. *Id.* ¶ 70. The D.C. Attorney General issued an opinion on August 27, 2010, and Clayton was reassigned to the Management Supervisory Service on September 27, 2010, and notified of her termination on October 26, 2010.

The District argues that these allegations cannot state a claim for retaliation under Title VII because Clayton's protected activity—reporting the administrative assistant's sexual harassment claim—occurred roughly six months before Clayton was fired. In the District's view, a gap of more than "3-4 months" between protected activity and adverse action cannot "support an inference of causation." Dkt. 47-1 at 9. The District relies on cases in which plaintiffs argued unsuccessfully that the temporal proximity of their protected activity to an adverse action, without more, was sufficient to state a plausible claim under Title VII. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) ("[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality . . . uniformly hold that the temporal proximity must be 'very close'"); *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (finding causation but

noting that "viewed in isolation," complaint filed more than two years before adverse

employment action "would not establish the close temporal proximity we have previously

required to give rise to an inference of causation") (internal quotation marks and citation

omitted); *Glenn v. Bair*, 643 F. Supp. 2d 23, 42-43 (D.D.C. 2009) (no causation where "plaintiff

provide[d] no direct evidence of a causal relationship" and at least six months elapsed between

protected activity and adverse action); *McDowell v. N. Shore Long-Island Jewish Health Sys.,

Inc.*, 788 F. Supp. 2d 78, 83 (E.D.N.Y. 2011) (finding no causation where "the alleged retaliatory

act occurred more than three months after the alleged protected activity, and nothing in the

complaint aside from the temporal proximity between these two events shows a retaliatory

motive").

These cases are inapposite.  Here, Clayton does not rely "mere[ly]" (*Breeden*, 532 U.S. at

273) on the fact that she made a sexual harassment complaint and was terminated some months

later to support an inference of causation.  Instead, she alleges several additional facts that render

her allegation of causation plausible.  For example, as discussed above, Clayton alleges that

"days after" she reported the sexual harassment complaint, "General Schwartz confronted Ms.

Clayton in her office, threatened to terminate her employment, and stated, 'we'll see who's

sitting in that seat on October 1st.'"  Dkt. 45 ¶ 69.  About a month later, on May 20, 2010,

General Schwartz's staff allegedly "solicited the advice of the D.C. Human Resources

Department's General Counsel regarding General Schwartz's administrative authority over the

employees of the Government Operations Division."  *Id.* ¶ 70.  General Schwarz purportedly

repeated his threat ("we'll see who's sitting in that seat on October 1st") on or around September

13, 2010, which was shortly after the D.C. Attorney General issued his opinion.  *Id.* ¶ 73.

Finally, Clayton alleges that Neil Albert, the City Administrator and the official who notified her

of her termination, is a personal friend of General Schwartz, and that Albert and Schwartz

discussed Clayton's "continued employment with Defendants." *Id.* ¶ 77.  "Construing the

complaint liberally and giving [Clayton] the benefit of all inferences that can be derived from the

facts alleged," *Browning v. Clinton*, 292 F.3d 235, 240 (D.C. Cir. 2002) (internal quotation

marks omitted), the Complaint plausibly alleges that Defendants retaliated against Clayton for

reporting the sexual harassment complaint and that this retaliation led to Clayton's eventual

reclassification and termination.

### 3.  *Clayton's Title VII Sex Discrimination Claim*

Clayton also alleges that she was "terminated from employment because of her gender"

and that she "received different treatment from similarly situated employees outside the

protected class." Dkt. 45 ¶¶ 128-29.  According to the Complaint, "Ms. Clayton's predecessor,

Anthony Devassey, a male, continued in his tenure as a Career Service employee," while

Clayton "was forced to be reclassified." *Id.* ¶ 130.  Additionally, Devassey "was permitted to

dictate his own incentive awards to employees," while "in the case of Ms. Clayton, the employee

incentive awards were dictated to her." *Id.* ¶ 131.

The District argues that these allegations are insufficient to state a claim under Title VII.

It observes that Devassey was himself terminated in 2008 (Dkt. 45 ¶ 25) and that Devassey was

not similarly situated to Clayton, in any event, because he served as Director of D.C.

Government Operations before the August 2010 opinion from the D.C. Attorney General

clarified the scope of the Director's responsibilities.  Dkt. 47-1 at 12.  Thus, according to the

District, Clayton has not alleged a claim based on disparate treatment.  *Id.*

Neither of these facts, however, requires dismissal of Clayton's sex discrimination claim

at this point in the proceeding.  The Complaint does, as the District emphasizes, allege that

Devassey was also terminated.  Dkt. 45 ¶ 25.  But that fact does not show, as the District would

have it, that Clayton and Devassey received the same treatment.  According to the Complaint,

Clayton was reclassified as an employee in the Management Supervisory Service, while

Devassey remained in the Civil Service throughout his tenure.  *Id.* ¶ 130.  As a result, unlike

Clayton, Devassey could only be discharged for cause.  The District has cited no authority

suggesting that reassignment of a tenured civil service employee to a non-tenured position fails

to rise to the level of an "adverse employment action."   Indeed, removal of an important benefit

like tenure appears to fall well within the range of sanctions that are cognizable under Title VII.

*See, e.g.*, *Okruhlik v. Univ. of Ark.*, 395 F. 3d 872, 879 (8th Cir. 2005) ("An official denial of

tenure is an adverse employment action for purposes of evaluating a retaliation claim.");

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (university professor established

*prima facie* sex discrimination case based on denial of tenure).

      The District argues that the difference between its treatment of Clayton and Devassey

resulted from the fact that the District did not realize the Director of Government Operations

position was properly classified within the Management Supervisory Service until it received the

D.C. Attorney General opinion in 2010.  Dkt. 47-1 at 12-13.  That contention, however, conflates

two distinct steps in adjudicating a Title VII claim.  The plaintiff merely bears the burden of

alleging that she was treated less favorably than a "'similarly situated male employee'" and

suffered a "materially adverse consequence[ ]" as a result.  *Teneyck v. Omni Shoreham Hotel*,

365 F.3d 1139, 1150 (D.C. Cir. 2004) (quoting *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344

(3d Cir. 1999); *Forkkio v. Powell*, 305 F.3d 1127, 1131 (D.C. Cir. 2002).  The burden then shifts

to the defendant to show a "legitimate, nondiscriminatory reason" for the differential treatment.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Here, the District may

eventually be able to demonstrate that the Attorney General opinion provided the

nondiscriminatory reason for the difference in treatment between Clayton and Devassey, but Clayton is not required to anticipate and rebut that defense at the pleadings stage.

Moreover, simply articulating a legitimate, nondiscriminatory reason to reclassify Clayton will "not end the matter." *Id.* at 806. Instead, Clayton will have an opportunity to show that the District's asserted reason is in fact a pretext, and that the actual reason she was terminated was her sex. *See id.* Even where an employer acts pursuant to or consistently with its legitimate policies when it takes an adverse action against an employee, its selective enforcement of those policies may be evidence of discrimination in violation of Title VII. *See Baker v. Macon Res. Inc.*, 750 F.3d 674, 677 (7th Cir. 2014) ("selective enforcement or investigation of a disciplinary policy can . . . show pretext"); *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 96-97 (2d Cir. 1994) (recognizing existence of Title VII claim for selective enforcement of company policies). If, for example, the DCNG or the District long recognized that the position of Director of the Government Operations Division was misclassified, but only raised the issue in 2010 based on animus toward Clayton, she might still be able to show that her reclassification was motivated by a discriminatory intent. In any event, to the extent the District contends that its receipt of the 2010 Attorney General opinion was the necessary predicate for reclassifying Clayton's position, *see* Dkt. 47-1 at 13, evidence going beyond the pleadings and the opinion will be required to prove that fact: the opinion contains no mention of the Career Service, the Management Supervisory Service, or the criteria for assignment of employees between these classifications.

In short, Clayton has plausibly alleged that she suffered an adverse employment action to which a male employee in her role was not subjected, and the District has not established as a matter of law that its action was actually motivated by a legitimate, nondiscriminatory purpose.

16

The District is therefore not entitled to dismissal of Clayton's claim for sex discrimination at this juncture.

## B.  The DCNG's Motion to Dismiss

As explained in Chief Judge Roberts's opinion granting Clayton leave, in part, to file her Second Amended Complaint, only two claims remain against the DCNG—a claim for retaliation and a claim for sex discrimination, both of which are brought under Title VII.  Dkt. 44 at 11. The DCNG now moves to dismiss those remaining claims for lack of subject matter jurisdiction, for failure to exhaust administrative remedies, and for failure to state a claim against the DCNG. The Court will, again, consider each contention in turn.

### 1.  *Subject Matter Jurisdiction*

The DCNG first argues that the Court lacks subject matter jurisdiction because the United States purportedly has not waived sovereign immunity as to Title VII claims against the DCNG. Dkt. 56-1 at 8-9; *see Gust v. United States*, 789 F. Supp. 2d 58, 62 (D.D.C. 2011) ("If sovereign immunity has not been waived, federal courts lack subject matter jurisdiction over the claims."). Clayton responds that Title VII waives sovereign immunity as to these claims.  Dkt. 60 at 11-12. Although the DCNG appears to abandon its jurisdictional argument in its Reply, Dkt. 62, the Court must still satisfy itself that it has subject matter jurisdiction before addressing the merits of the DCNG's other arguments.  *See, e.g.*, *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179 (D.C. Cir. 1984) ("When subject-matter jurisdiction is questioned, the court must, of course, satisfy itself of its authority to hear the case.").

Section 717 of Title VII expressly prohibits discrimination both in the "military departments as defined in section 102 of title 5" and "in executive agencies as defined in section 105 of title 5," 42 U.S.C. § 2000e-16(a), and it permits an aggrieved party who has exhausted his or her administrative claims to "file a civil action" against "the head of the department, agency,

or unit, as appropriate," *id.* at § 2000e-16(c).  D.C. Code section 49-301, in turn, states that the

Commanding General of the DCNG "shall be considered to be an employee of the Department

of Defense."  D.C. Code § 49-301(b); *see also* 34 Fed. Reg. 15,411 (1969) ("The Secretary of

Defense . . . is authorized and directed to supervise, administer and control the Army National

Guard and the Air National Guard of the District of Columbia . . . while in militia status.").

Because an "executive agency" is defined in 5 U.S.C. § 105 to include any "executive

department . . . Government corporation, [or] independent establishment," the DCNG qualifies

as an "executive agenc[y]" subject to the waiver of sovereign immunity contained in Section

717.  The DCNG suggests some ambiguity surrounds its precise status within the federal

government, but even its cited authority acknowledges that DCNG is either a "military force of

the United States," a "federal agency," or an "independent establishment[] of the United States,"

*O'Toole v. United States*, 206 F.2d 912, 917 (3d Cir. 1953) (holding that Federal Tort Claims

Act waived sovereign immunity as to claims against the DCNG)—any of which would bring the

DCNG within the waiver of sovereign immunity found in Title VII.  The Court therefore

concludes that it has subject matter jurisdiction over the Title VII claims against the DCNG.

### 2. *Exhaustion of Administrative Remedies*

The DCNG next argues that Clayton failed to comply with the requirement that a Title

VII plaintiff seeking to sue the federal government must consult with an Equal Employment

Opportunity counselor within 45 days of the alleged discriminatory event giving rise to the

claim.  *See* 29 C.F.R. § 1614.105(a)(1).  This and other "administrative time limits created by the

EEOC . . . function[] like statutes of limitations."  *Bowden v. United States*, 106 F.3d 433, 437

(D.C. Cir. 1997).  Thus, failure to comply with the time limits in section 1614.105 is an

affirmative defense to a Title VII action against the federal government, although those limits

"are subject to equitable tolling, estoppel, and waiver."  *Id.*; *see also Brown v. Marsh*, 777 F.2d

8, 13 (D.C. Cir. 1985) (in Title VII actions, failure to exhaust administrative remedies is an affirmative defense).

In light of the fact that "the defendant bears the burden of pleading and proving" failure to exhaust administrative remedies, *Bowden*, 106 F.3d at 437, the Court issued a Minute Order on February 18, 2015, noting that "it may be appropriate to convert" the DCNG's motion to dismiss "to a motion for summary judgment with respect to the issue of exhaustion of administrative remedies" and directing the parties to submit supplemental briefs "attaching any additional material" relevant to the issue. Feb. 18, 2015 Minute Order. Upon review of the parties' supplemental filings, the Court concludes that summary judgment is not warranted at this time.

Pursuant to section 1614.105(a)(2), "[t]he agency . . . shall extend the 45-day time limit" in paragraph (a)(1) "when the [complainant] shows that he or she was not notified of the time limits and was not otherwise aware of them." *Id.* A plaintiff who shows that she was not notified pursuant to that paragraph, moreover, is permitted to sue notwithstanding a failure to comply with the time limits set out in section 1614.105(a). *See Harris v. Gonzales*, 488 F.3d 442, 444-45 (D.C. Cir. 2007) (reversing grant of summary judgment to defendant where plaintiff raised an issue of fact as to notification under section 1615.105(a)(2)). In *Harris*, the Court of Appeals adopted an objective test for assessing the adequacy of notice under paragraph (a)(2). That test asks "(1) whether notification of the time requirements was provided, and (2) whether the notification was reasonably geared to inform the complainant of the time limits." *Harris*, 488 F.3d at 445 (citation and internal quotation marks omitted).

In a declaration attached to her brief, Clayton states that she was never notified about the 45-day time limit to contact an EEO counselor and that she "cannot recall ever seeing" posters

advising of that limit "anywhere in the DCNG."  Dkt. 69-1 ¶¶ 3-5.  Her testimony—which the

DCNG has not yet had an opportunity to rebut—does not conclusively establish that Clayton is

entitled to bring suit without having complied with the 45-day requirement.  It is possible that the

DCNG will be able to present evidence showing that its notification procedures satisfied the

*Harris* requirements.  It has not done so yet, however, and Plaintiff's declaration—like the

declaration in *Harris*—is sufficient to raise a factual issue as to the adequacy of the DCNG's

notification regarding the EEOC time limits.  *See id.* at 445.  For this reason, the Court cannot

grant summary judgment on the ground of Plaintiff's alleged failure to exhaust administrative

remedies.[4]

   **3.  *Whether the DCNG and the District Are Joint Employers***

   The DCNG finally argues that Clayton was not an "employee" of the DCNG and,

therefore, cannot bring suit against it under Title VII.  *See* 42 U.S.C. § 2000e-16 ("All personnel

actions affecting *employees* or applicants for *employment* . . . in military departments [or] in

executive agencies . . . shall made be free from discrimination based on . . . sex . . . .") (emphasis

added); *cf.* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for *an*

*employer* to discriminate . . . because [an employee or applicant for employment] has opposed

any practice made an unlawful employment practice by this subchapter.") (emphasis added).

The parties do not dispute that Clayton was an employee of the District.  Clayton argues,

however, that she was also an employee of the DCNG.  In her view, the District and the DCNG

---

[4]  The DCNG submitted several exhibits in an effort to show that Clayton did not consult with an
EEO counselor within 45 days after her termination.  *See* Dkt. 67.  Clayton appears to argue that
the Court should not consider these exhibits because they were not submitted with sworn
affidavits attesting to their authenticity.  Dkt. 69 at 3-4.  The Court need not address the question
whether the DCNG's exhibits are properly before it because, even if they were, Clayton has
raised an issue of material fact that precludes summary judgment.

were "joint employers for Title VII purposes," and thus can both be held liable for the alleged

employment discrimination.  Dkt. 60 at 1.

The parties have addressed this issue before.  In its opposition to Clayton's motion for

leave to file her Second Amended Complaint, the DCNG argued that an amendment to add the

Title VII claims against it would be futile because the proposed amended pleading did not allege

that Clayton was an "employee[], applicant[] for employment, [or] former employee[]" of the

DCNG.  Dkt. 43 at 4.  Concluding that Clayton's Second Amended Complaint alleges "sufficient

facts to show that Clayton was either an employee of the DCNG or a joint employee of the

District and the DCNG," Dkt. 44 at 9-10, Chief Judge Roberts rejected the DCNG's argument

and granted Clayton leave to amend.  Among other things, the Court observed that the Second

Amended Complaint alleges that DCNG personnel influenced Clayton's hiring and performance

evaluation and had the power to "initiate" disciplinary proceedings against her.  *Id.* at 11; *see*

Dkt. 45 ¶¶ 7, 10, 13, 83-84.  The Court also noted that the Second Amended Complaint alleges

that Clayton reported to both District and DCNG personnel during her employment and that "DC

Government Operations"—of which Clayton was director—"is simultaneously a Directorate

within Joint Force Head Quarters, DC National Guard and an agency of the Government of the

District of Columbia."   Dkt. 45 ¶ 9.

As courts have repeatedly observed, Title VII offers no meaningful definition of

"employee" or "employer."  *See, e.g.*, *Junio v. Livingston Parish Fire Dist.*, 717 F.3d 431, 434

(5th Cir. 2013); *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 371 (2d Cir. 2006).  The

Supreme Court, accordingly, has instructed that courts should look to "traditional agency law

principles."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (construing identical

definition of "employee" under ERISA).  In drawing the line between "independent contractors"

and "employees," the Court of Appeals has thus applied a multi-factor and non-exhaustive test. *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979).  First and foremost, courts must consider "the employer's right to control the 'means and manner' of the worker's performance," including both the "result to be achieved" and "the details by which that result is achieved."  *Id.* at 831-32.  Beyond this, *Spirides* identified eleven other factors—ranging from the "kind of occupation" and "skill" required to who "furnishes the equipment used and the place of work" to "whether the worker accumulates retirement benefits" and the "whether the 'employer' pays social security taxes"—all of which must be considered, along with any other circumstances, in defining the work relationship.  *Id.* at 832.

The Court of Appeals, however, "has suggested in dictum that" the *Spirides* test, which was adopted to distinguish between independent contractors and employees, ought not control in "'joint employment' discrimination cases like this one."  *Harris v. Attorney General*, 657 F. Supp. 2d 1, 9-10 (D.D.C. 2009).  As the Court of Appeals explained in *Redd v. Summers*, 232 F.3d 933, 937-38 (D.C. Cir. 2000), it "has never invoked *Spirides* to resolve an issue of joint employment," and it expressed "doubt whether the *Spirides* test is suited to" that purpose.  *Id.*  In contrast to the *Spirides* test, the Court of Appeals noted that the Third Circuit applied a "fairly standard formulation" of the "joint employment test" in *NLRB v. Browning-Ferris Industries of Pennsylvania*, 691 F.2d 1117, 1123 (3d Cir. 1982).  *Redd*, 232 F.3d at 938.  The *Redd* court nonetheless went on to apply the *Spirides* test because the parties had not argued the issue in that case and, indeed, simply agreed that *Spirides* should apply.  *Id.*

The *Browning-Ferris* decision, unlike *Spirides*, addressed a classic question of joint employment.  Browning-Ferris contracted with a third party broker to provide tractors and drivers to haul its trailers between sites.  *Browning-Ferris*, 691 F.2d at 1119.  It paid the broker,

and the broker paid the drivers.  In addition, Browning-Ferris directed the trucks to particular

areas and retained the authority to approve the drivers before they were allowed to haul

Browning-Ferris trailers, and it "'effectively discharged and rehired drivers.'"  *Id.* at 1120.

Against this background, the Third Circuit held that "where two or more employers exert

significant control over the same employees—where from the evidence it can be shown that they

share or co-determine these matters governing essential terms and conditions of employment—

they constitute 'joint employers' . . . ."  *Id.* at 1124.  That determination, however, is fact-

dependent and turns on the "context" of the case.  *Id.*

Although the Court of Appeals has yet to go beyond the dictum in *Redd* to decide

whether the *Browning-Ferris* test should apply in joint employment cases, that dictum is

convincing, and, accordingly, the Court concludes that the *Browning-Ferris* test is better suited

than the *Spirides* test to resolve claims of joint employment.  *See Cole v. Harvey*, 471 F. Supp.

2d 46, 50 (D.D.C. 2007) (same).  But, even if the *Spirides* test were applicable, the result at this

stage of the proceedings would be the same, since the *Browning-Ferris* test "is not terribly

distinct from the primary consideration in the *Spirides* test."  *Dean v. Am. Fed'n of Government

Emps.*, 549 F. Supp. 2d 115, 122 (D.D.C. 2008); *Harris*, 657 F. Supp. 2d at 10.  Both involve a

core inquiry regarding the degree to which the purported "employer" or "joint employer"

exercised control over the worker's performance and the terms and conditions of his or her

engagement.  Here, under either test, it is evident that Clayton's allegations are sufficient to put

these core questions in dispute and to require further factual development prior to their

resolution.  As described above, Clayton alleges that DCNG officials had substantial authority

over—and in fact played significant roles in—her hiring and supervision.  Even more to the

point, Clayton alleges that General Schwartz repeatedly threatened her "with termination of her

employment." *Id.* ¶ 68.  It is plausible to infer from these allegations that Clayton was subject to the control of the DCNG. [5]

In renewing its contention that Clayton's Title VII claims against the DCNG fail to allege that Clayton was an employee of the DCNG, however, the DCNG shifts its focus.  In addition to arguing that Clayton was subject to the control of the Mayor, and not the DCNG, the DCNG contends that "Clayton [does] not allege[ ] that a financial relationship or a contractual relationship existed between the DCNG and her or between the DCNG and the District of Columbia for [her] services."  Dkt. 56-1 at 11.  In the DCNG's view, this absence of an allegation that it directly (through payments from the DCNG to Clayton) or indirectly (through payments from the DCNG to the District) compensated Clayton for her services is "fatal to her claims against the DCNG."  *Id.*  It maintains that an "economic connection" is an antecedent requirement for finding an employment relationship that must be satisfied before the Court evaluates the extent to which a given defendant exerted control over the plaintiff.  Dkt. 62 at 4.  The DCNG thus urges the Court to follow the several circuits that have adopted a strict "remuneration" test as a condition for a finding that a defendant was an employer under Title VII.  *See Juino*, 717 F.3d at 435 ("The Second, Fourth, Eighth, Tenth and Eleventh Circuits have adopted the threshold-remuneration test," while "the Sixth and Ninth Circuits view remuneration

---

[5]  A review of other opinions from this District, moreover, underscores that whether a defendant qualifies as a joint employer under these tests is a fact-intensive inquiry that can rarely be resolved at the pleadings stage.  *See, e.g.*, *Brown v. Corr. Corp. of Am.*, 603 F. Supp. 2d 73, 79 (D.D.C. 2009) ("[d]etermining whether [defendants] were plaintiff's joint employers" is a "factual issue" that is "plainly inappropriate to resolve on a motion to dismiss"); *Coles v. Harvey*, 471 F. Supp. 2d 46, 51 (D.D.C. 2007) (finding that plaintiff pleaded sufficient facts to establish joint employment status but allowing defendant to raise issue "after a more complete factual record has been developed through discovery"); *Miles v. Univ. of D.C.*, No. 12-cv-378, 2013 WL 5817657, at *10 (D.D.C. Oct. 30, 2013) ("[t]aking the plaintiff's nonconclusory allegations as true . . . the Court cannot determine with certainty that [defendants] were not joint employers of the plaintiffs").

as only one, nondispositive factor in conjunction with the other common law agency test factors.").

None of the out-of-circuit cases the DCNG cites, however, applied the "remuneration" test to evaluate an alleged joint employer relationship. Two involve plaintiffs who were volunteers. *See Junio*, 717 F.3d at 432 (volunteer firefighter); *O'Connor v. Davis*, 126 F.3d 112, 113 (2d Cir. 1997) (unpaid student intern). The third considered a claim brought by a male prospective member of a voluntary women's rodeo association, which paid no wages but merely provided "an opportunity to compete for prize money furnished by sponsors." *Graves v. Women's Professional Rodeo Ass'n*, 907 F.2d 71, 71 (8th Cir. 1990). These cases address the distinct—and vexing—issue of how to treat an employment discrimination plaintiff who is arguably not an employee of anyone.

Here, in contrast, Clayton *was* paid—the parties do not dispute that she was compensated by the District, even though she worked with DCNG personnel and her duties focused on the DCNG and its relationship with the District. Dkt. 45 ¶¶ 7-11. In this respect, she appears more akin to an employee of an independent contractor than a volunteer. And the fact that an employee of a government contractor is paid by the contractor and not the contracting agency does not categorically preclude a finding that the agency is a joint employer of the employee. *See, e.g.*, *Brown*, 603 F. Supp. 2d at 79 (plaintiff was employed by independent contractor hired by District of Columbia); *Coles*, 471 F. Supp. 2d at 51 (plaintiff employed by independent contractor hired by Department of the Army). Even if the Court were to apply the strict "remuneration" standard adopted by several circuits, then, it is not clear that doing so would preclude Clayton's claims against DCNG as a matter of law.

The DCNG would distinguish Clayton's situation from that of an employee of an independent contractor because the DCNG does not pay the District for Clayton's services.  This theory finds some support in *Dean v. American Federation of Government Employees*, 549 F. Supp. 2d 115 (D.D.C. 2008).  In that case, the court denied the plaintiff's motion for reconsideration after it granted summary judgment in favor of the defendant labor union, which represented employees of a government agency.  The union unquestionably employed the plaintiff, but it argued it was not an "employer" for purposes of Title VII because it employed fewer than fifteen people.  *Id.* at 117.  The plaintiff countered that the union employed nearly twenty "stewards"—individuals employed by the agency who were permitted to spend a portion of their paid time on union business.  *Id.* at 117-18.  The district court rejected the plaintiff's argument that the union and the agency were joint employers of the stewards.  It concluded that the joint employment test applied in cases involving employees of independent contractors was inapposite.  *Id.* at 121.  The court reasoned that the stewards dedicated only a small percentage of their paid time to union activities, and, "[e]ven more significantly," their compensation came only from the agency—the union was not even an "indirect source of the compensation stewards receive[d] for their union work."  *Id.* at 121-22.  Finally, the court went on to state that "[e]ven if" it were to apply the *Browning-Ferris* test, it would conclude based on the evidence submitted in connection with the defendant's motion for summary judgment that the union did not retain sufficient control of the terms and conditions of stewards' employment to be considered a joint employer.  *Id.* at 123.

Dean* suggests that the financial relationship between the employer who directly pays a Title VII plaintiff and an asserted joint employer may, at least at times, determine whether a court should go on to reach the *Browning-Ferris* test.  *Dean*, however, arose in a very different

context, and it is not at all evident why the financial relationship between the employer who pays the worker's salary and the other purported joint employer should be treated as dispositive in all circumstances.  And, even if such a rule applies in some circumstances, it seems a particularly poor fit for considering the status of those who work at the DCNG, which exists to serve both national and local interests.  Thus, although the President serves as the Commander-in-Chief of the National Guard of the District of Columbia, D.C. Code § 49-409, and the Commanding General is "considered to be an employee of the Department of Defense," *id.* § 49-301, the Mayor of the District of Columbia may "call on the" National Guard to aid in the suppression of riots in the District, *id.* § 49-103.  Moreover, the financial relationship between the District and the National Guard is not as clear cut as the DCNG suggests.  The Commanding General, for example, is required to "transmit to the Mayor of the District of Columbia an estimate of the amount of money required for the next ensuing fiscal year to pay the expenses authorized by" the provisions of the D.C. Code governing the DCNG, and the Mayor, in turn, is required to include those figures in "his annual estimates of appropriations for the District."  *Id.* § 49-905.

The pleadings and incorporated documents only underscore that the relationship between the District and the DCNG is unique, complex, and, at times, imperfectly understood by personnel affiliated with both entities.  *See, e.g.*, Dkt. 56-3 at 2 (proposing draft memorandum of understanding to "clarify the reporting relationship between the DCNG and the [DC Government Operations] Division"); *see also* Dkt. 45 ¶ 9 (allegation that document provided to Clayton when she was hired characterized "DC Government Operations" as "simultaneously a Directorate" within DCNG and an "agency" of the District); *id.* ¶ 70 (alleging that General Schwartz's staff sought guidance regarding administrative authority over employees of Government Operations Division).  Given the unique and multidimensional relationship between the District and the

DCNG, the Court concludes that it is premature to reach any conclusions, without any factual record, regarding the financial or other ties between the District and the DCNG.  Thus, even if the rule adopted in *Dean* did apply here, DCNG would not be entitled to dismissal of Clayton's Title VII claims at the pleadings stage.

## IV.   CONCLUSION

For the foregoing reasons, the District's Motion to Dismiss is **GRANTED** as to Count V of the Complaint and **DENIED** as to Counts VI and VII.  DCNG's Motion to Dismiss is converted in part to a motion under Rule 56 and **DENIED** without prejudice.  An appropriate Order accompanies this Memorandum Opinion.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: August 4, 2015