# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BETTY CLAYTON**

*Plaintiff*,

v.

**DISTRICT OF COLUMBIA,** *et al.*

*Defendants.*

**Civil Action No. 1:11-cv-01889-RDM**

## PLAINTIFF'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING

JOSEPH, GREENWALD & LAAKE, P.A.

　/s/　Levi S. Zaslow　　　　　　　　
Timothy F. Maloney (Bar No. 416522)
tmaloney@jgllaw.com
Levi S. Zaslow (Bar No. MD29101)
lzaslow@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
301.220.2200 (T)
301.220.1214 (F)
*Counsel for Plaintiff Betty Clayton*

# TABLE OF CONTENTS

I. Introduction ...........................................................................................................................1

II. Statement of Material Facts .................................................................................................1

    a. Ms. Clayton is hired as the Government Operations Director of DCNG .....................................1

        1. The unique supervisory structure of DC and DCNG supervision ............................................2

    b. Ms. Clayton's employment performance was exemplary throughout her tenure. ...............4

    c. Ms. Clayton's attempts to discipline Charlotte Clipper .......................................................8

    d. Ms. Clayton assists Tamara Jones in her sexual harassment complaint against General Schwartz and both she and Ms. Jones are met with hostility and repeated threats to their employment ...............................................................................................................................11

    e. General Schwartz repeatedly threatens Ms. Clayton's employment following her aid and assistance to Ms. Jones in her sexual harassment complaint against him ...........................18

    f. Upon a request from General Schwartz, DC initiates a legal opinion explaining its power of Government Operations Division Personnel, and further highlighting the complex relationship between DC and DCNG .....................................................................................19

        1. The Attorney General's opinion did not change any policy or standing procedure concerning termination of the Government Operations Director's employment ...........................................22

    g. Ms. Clayton's position is converted from Career Service to Management Supervisory Service, unlike her male predecessor, Anthony Devassey ..................................................23

    h. After conferring with General Schwartz, DC terminates Ms. Clayton's employment, but each purported decision-maker denies responsibility .......................................................25

    i. Summary of involvement by "Decision-Makers .................................................................31

    j. Ms. Clayton is replaced by a male subordinate employee who, to DC's knowledge had less experience...........................................................................................................................33

III. Legal Standard ...................................................................................................................34

IV.  Analysis ...........................................................................................................................34

    a. District of Columbia...........................................................................................................36

        1. Ms. Clayton set forth a claim for retaliation under Title VII...............................................37

        2. Ms. Clayton set forth a claim for retaliation under the DC Whistleblower Protection Act ......43

        3. Ms. Clayton set forth a claim for retaliation under Title VII...............................................45

    4. DC's purported reason for the converting Ms. Clayton's position is pretextual.......................46

    5. DC's purported reason for terminating Ms. Clayton's position is pretextual...........................49

    6. Whether DC violated the DC False Claims Act is a question of fact for the jury....................57

   b. District of Columbia National Guard...................................................................................59

V.  Conclusion ......................................................................................................................................75

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BETTY CLAYTON** | |
| *Plaintiff,* | |
| v. | **Civil Action No. 1:11-cv-01889-RDM** |
| **DISTRICT OF COLUMBIA,** *et al.* | |
| *Defendants.* | |

<u>**PLAINTIFF'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING**</u>

## I.     Introduction.

Ms. Clayton participated and assisted in a sexual harassment complaint against General Schwartz, Ms. Clayton's supervisor and the Commanding General of the District of Columbia National Guard ("DCNG").  In response, Ms. Clayton's employment, like the employment of the commanding general's accuser, was repeatedly threatened.  Ms. Clayton's employment was terminated, but it is undisputed that Ms. Clayton was an exemplary employee with an excellent work record.  Defendants' reasons for the termination are plainly pretextual.

Both the District of Columbia and DCNG deny responsibility and essentially point the finger at each other.  In fact, each putative decision-maker denies any responsibility.  Given the pattern, threats, contradictory denials by each "decision-maker," and the timeline displaying the threats, there are disputes of material fact and summary judgment should be denied.

## II.     Statement of Material Facts.

### a.     Ms. Clayton is hired as the Government Operations Director of DCNG.

In the 2007-2010 timeframe Colonel Ronald Stamps was the Human Resources Officer (HRO) for DCNG.  Stamps Depo., at 12:8-17 (**Ex. 1**).  He was directing human resources and

oversaw personnel, budget, and financing. Stamps Depo., at 12:19-13:6 (**Ex. 1**). He oversaw both federal and DC employees. Stamps Depo., at 13-14 (**Ex. 1**). In the 2008 timeframe he reported directly to the commanding general. Stamps Depo., at 19, 21 (**Ex. 1**).

After the former Director of Government Operations, Anthony Devassey, was removed, a board of DCNG personnel was convened to make a recommendation on the hiring of a replacement. Stamps Depo., at 28-29; 32-33 (**Ex. 1**). Either General Schwartz or General Ricket advised Colonel Stamps to draft the hiring notice. Stamps Depo., at 39 (**Ex. 1**). Ms. Clayton applied for the position and was qualified. Stamps Depo. Ex. 1 (**Ex. 2**) . Ms. Clayton was, without a doubt, the best of the applicants. Ricket Depo., at 23:13-15; 29:21-30:7 (**Ex. 10**); Ricket Depo. Ex. 3 (**Ex. 11**). The District of Columbia also acknowledges that Ms. Clayton was qualified for the position of Government Operations Director of the DCNG. Brown, DC Corp. Designee Depo., at 22:5-17 (**Ex. 12**). Ms. Clayton's first interview was with a panel of DCNG employees. Clayton Depo., at 10-11 (**Ex. 14**). After her initial interview, she had a follow-up interview with General Schwartz. Clayton Depo., at 13-15 (**Ex. 14**).

On or about March 13, 2008 Colonel Stamps advised Ms. Clayton that she was selected to the position, contingent upon DC approval. Stamps Depo. Ex. 2 (**Ex. 3**). Ms. Clayton formally accepted the position by written correspondence on March 26, 2008. Stamps Depo. Ex. 3 (**Ex. 4**); Clayton Depo. Exs. 1-3 (**Ex. 15-17**). Charlotte Clipper, the DC Human Resources Specialist for the Government Operations Division of the DCNG confirmed Ms. Clayton's hire on June 3, 2008. Stamps Depo. Ex. 4.[1] (**Ex. 5**) Ms. Clayton was hired as a career service

---

[1] Colonel Stamps noted that he had a hard time getting Ms. Clipper to do the notification, likely because she was attempting to keep Mr. Devassey in that position. Stamps Depo., at 40-41 (**Ex. 1**). Colonel Stamps later confirmed that Ms. Clipper was working behind the scenes to help Mr. Devassey obtain a work visa and DCNG was being billed for his personal attorneys to obtain a visa. Stamps Depo., at 42-43 (**Ex. 1**). This was an extremely unusual situation. Stamps Depo., at 43 (**Ex. 1**).

employee.  Brown, DC Corp. Designee Depo., at 19:7-12 (**Ex. 12**); Ricket Depo., at 27:22-28:9 (**Ex. 10**).  Colonel Stamps forwarded Ms. Clayton's acceptance of the position to DC, Stamps Depo., at 45:22-46:1 (**Ex. 1**), and DC formally processed and appointed Ms. Clayton to the position.  Stamps Depo., at 30 (**Ex. 1**).  When Ms. Clayton accepted the position, she likewise understood it was a Career Service position.  Clayton Depo., at 152:6-9; 222:10-23 (**Ex. 14**).

                1.        **The unique supervisory structure of DC and DCNG supervision.**

In 2008, right around the time of Ms. Clayton's hire, Errol Schwartz became the commanding general of DCNG, the highest ranking official in the agency.  Schwartz Depo., at 25:4-10 (**Ex. 20**). Prior to this, since 2003, General Schwartz was the Adjutant General, the second highest ranking official at DCNG.  Schwartz Depo., at 24:13-15 (**Ex. 20**).  He retired on February 21, 2017 when the President accepted his resignation.  Schwartz Depo., at 9:13; 10:1-11:11 (**Ex. 20**).

DCNG essentially consists of three components: the Air Force, the Army, and DC government employees.  Schwartz Depo., at 25:11-27:6 (**Ex. 20**). The relationship between DC employees and the DCNG is a complex one.  For example, Colonel Stamps confirmed his understanding from the 2008-2010 timeframe was that the DC Government Operations is simultaneously a Directorate within Joint Force Head Quarters, DC National Guard and an agency of the Government of the District of Columbia.  Stamps Depo., at 62:21-63:9 (**Ex. 1**).

Moreover, Ms. Clayton reported to the Commanding General – General Schwartz.  Ricket Depo., at 30:14-31:1(**Ex. 10**).  General Schwartz likewise confirmed that, at the time Ms. Clayton was employed at the DCNG, she reported directly to him.   Schwartz Depo., at 73:11-13 (**Ex. 20**).  Moreover, while she was employed to work at the DCNG, he continued to be her supervisor at the time of her termination.  Schwartz Depo., at 75:5-11(**Ex. 20**).  Brender Gregory,

the DC Director of Human Resources, also confirmed that Ms. Clayton's reporting authority was to General Schwartz, the Commanding General, and Neil Albert, the DC City Administrator. Gregory Depo., at 95:19-25 (**Ex. 33**). DC's Corporate Designee confirmed that both before and after the Attorney General's opinion letter Ms. Clayton reported to both the commanding general and the mayor and city administrator. Thompson, DC Corp. Designee Depo., at 61:13-16; 62:21-63:17(**Ex. 38**). DC confirmed that both before and after the opinion, the commanding general was free to confer on personnel decisions, could participate in disciplinary actions, and even initiate it. Thompson, DC Corp. Designee Depo., at 63:18-65:5 (**Ex. 38**).

It was commonplace for federal employees to supervise employees of the District of Columbia government. Schwartz Depo., at 29:6-13.[2] (**Ex.20**) General Schwartz previously approved, and literally signed off on, incentive awards for DC employees. Schwartz Depo. Ex. 24A (**Ex. 28**). The Government Operations Division utilized DOD letterhead for this purpose. *Id.* DCNG obtains its funding from the DC Council. *E.g.* Schwartz Depo. Ex. 25A (**Ex. 29**).

> **b.** **Ms. Clayton's employment performance was exemplary throughout her tenure.**

Ms. Clayton reported to the Commanding General, General Schwartz, up until the time of her termination. Schwartz Depo., at 73:11-13; 75:5-11 (**Ex. 20**); Ricket Depo., at 30:14-31:1(**Ex. 10**); Gregory Depo., at 95:19-25 (**Ex. 33**). General Schwartz appraised and reviewed Ms. Clayton's employment performance, Schwartz Depo., at 69:12-70:20 (**Ex. 20**), and completed her performance review. Schwartz Depo. Ex. 9.[3] (**Ex. 21**) General Schwartz testified that his performance evaluation of Ms. Clayton was accurate. Schwartz Depo., at 75:12-16 (**Ex. 20**).

---

[2] The DC Corporate Designee observed that this was an unusual arrangement for DC employees to receive employment evaluation from non-DC employees. Brown, DC Corp. Designee Depo., at 134:14-19 (**Ex. 12**).
[3] He did not stop appraising and reviewing the Government Operations Director until *after* Ms. Clayton was no longer employed there. Schwartz Depo., at 72:11-17 (**Ex. 21**).

General Schwartz confirmed that:

- Ms. Clayton has a "rare ability to converse at any level in a clear, concise and meaningful manner." Schwartz Depo., at 75 (**Ex. 20**).

- Ms. Clayton "is in constant dialogue with members of the District of Columbia D.C. City Counsel and other members of the D.C. governing body to discuss the overall health and well-being of D.C. Operations within her purview." Schwartz Depo., at 76 (**Ex. 20**).

- Ms. Clayton "prepares documents for the D.C. National Guard (DCNG) that lend themselves to the effective and efficient operations of D.C. Operations within the D.C. National Guard." Schwartz Depo., at 76-77 (**Ex. 20**).

- Mrs. Clayton "has been very effective in presenting DCNG issues to sustain operations and achieve satisfactory results." Schwartz Depo., at 77 (**Ex. 20**).

General Schwartz specifically testified that "Mrs. Clayton did a great job as the Director of D.C. Government Operations." Schwartz Depo., at 77:16-18 (**Ex. 20**). In fact, he awarded her the highest possible rating, a flawless 5 out 5 in every performance review category. Schwartz Depo., at 77:19-78:5 (**Ex. 20**); Schwartz Depo. Ex. 9 (**Ex. 21**). These included perfect, "Significantly Exceeds Expectations," marks in each of the categories: Communication, Customer Service, Dependability, Flexibility/Adaptability, Initiative, Integrity and Trust, Job Knowledge, Professionalism, Resource Usage, Teamwork, Conflict Management, Leadership, Managing People, Operations Planning and Evaluating, and Strategic Planning. Schwartz Depo. Ex. 9 (**Ex. 21**); Schwartz Depo., at 75:17-78:5; 79:21-93:21 (**Ex. 20**).

General Schwartz admitted that Ms. Clayton's performance was the top possible and significantly exceeded expectations:

> Q All right. That is because you believed
> when you filled this out that her performance was the

top possible, and that she consistently and
significantly exceeds expectations, and that she had
exceptional accomplishments that were obvious to
management and peers. Is that correct?
**A That's correct.**

Schwartz Depo., at 78:6-12 (**Ex. 20**).  **Moreover, although General Schwartz did not**

**complete a performance evaluation for the 2010 timeframe, he confirmed that for the**

**remainder of Ms. Clayton's employment at DCNG, she continued to perform at the highest**

**level:**

Q That remained her performance not only for
this evaluation period, from October 1, 2008 to
September 30, 2009, but she continued to perform at
that very high level, the top level, all throughout the
remainder of her employment at the D.C. National Guard.
Isn't that correct?
**A I'm not sure what you mean by "the**
**remainder."**
Q Well, for the rest of the time that she
worked at the Guard until she left?
**A Okay.**
Q Is that accurate?
**A That is fine.**
Q I don't want you to say, "that is fine."
**A Yeah.**
Q Is it true?
**A Well, I don't have a document to show what**
**I wrote after this.**
Q All right. But is it your belief that that
is true, that her performance continued to be excellent
as you stated here?
**A I had no issue with her performance.**
Q Well, beyond not having an issue with her
performance, did her performance continue to be at a
top level, at the highest level possible, as you stated
here?
**A Through my lens, is that correct.**
Q Yes, your lens being your perspective.
Correct?
**A That's correct.**

Schwartz Depo., at 78:13-79:20 (**Ex. 20**).

Likewise, General Schwartz's Chief of Staff, and the second highest official at the DCNG during this time frame, General Kenny Ricket, also expected Ms. Clayton to get a good appraisal because she was "an excellent employee." Ricket Depo., at 33:4-11 **(Ex. 10)**. General Ricket agreed with the ratings and comments submitted by General Schwartz. Ricket Depo., at 33-38 **(Ex. 10)**. Colonel Stamps also had no complaints and never received any complaints about Ms. Clayton's job performance. Stamps Depo., at 126:16-127:7 **(Ex. 1)**.

Likewise, DC had no complaints about Plaintiff's performance. Brown, DC Corp. Designee Depo., at 110:2-4 **(Ex. 12)**. DC also concedes that Ms. Clayton had no negative employment appraisals, the only employment appraisal was "overwhelmingly positive," "she was never placed on a performance improvement plan, [it] did not formally counsel her to improve performance, and [it] did not start any grievances or discipline." Thompson, DC Corp. Designee Depo., at 35:6-36:3 **(Ex. 38)**.

DC further acknowledged that Ms. Clayton's "performance consistently and significantly exceeds expectations; expectations, exceptional accomplishments obvious to managers and peers" and obtained a rating of 5/5 in all applicable categories: communication, customer service, dependability, flexibility/adaptability, initiative, integrity and trust, job knowledge, professionalism, resource usage, teamwork, conflict management, leadership, managing people, operations planning and evaluating, and strategic planning. Thompson, DC Corp. Designee Depo., at 90:2-97:9 **(Ex. 38)**. Thus, Ms. Clayton's job performance received a perfect rating and was "significantly exceeding expectations." Thompson, DC Corp. Designee Depo., at 97:10-13 **(Ex. 38)**.

Ms. Clayton did not receive any negative reviews from any supervisors. Thompson, DC Corp. Designee Depo., at 98:1-3 **(Ex. 38)**. There are no memoranda or other writings showing

that Ms. Clayton was no longer significantly exceeding expectations at any time.  Thompson, DC Corp. Designee Depo., at 98:4-13 (**Ex. 38**).  If there had been, they would have been included in her employment file.  Thompson, DC Corp. Designee Depo., at 98:15-21 (**Ex. 38**).

Ms. Clayton also had a positive reputation for truthfulness and honesty.  General Ricket confirmed that Ms. Clayton is "pretty straightforward, she tells the truth."  Ricket Depo., at 74:1-2 (**Ex. 10**).  General Schwartz acknowledges that Betty Clayton is credible, has a strong and good reputation for truthfulness and veracity, and is a truthful person.  Schwartz Depo., at 221:4-222:6 (**Ex. 20**).  No party suggests otherwise.

      **c.**      **Ms. Clayton's attempts to discipline Charlotte Clipper.**

Pursuant to charges set forth by Ms. Clayton, Stamps Depo., at 100-101(**Ex. 1**), Colonel Stamps was appointed to conduct an AR15-6 investigation of Ms. Clipper.  Stamps Depo., at 94-96 (**Ex. 1**); Stamps Depo. Exs. 6-7 (**Ex. 7-8**).  The investigation was approved by General Ricket, *id.*, and concerned a variety of misconduct by Ms. Clipper.  Stamps Depo., at 94-101 (**Ex. 1**). Ms. Clayton provided information and responses to Colonel Stamps, which he found to be complete, accurate, and appropriate.  Stamps Depo., at 107-111 (**Ex. 1**).  Colonel Stamps recommended discipline against Ms. Clipper.  Stamps Depo. Exs. 6-7 (**Ex. 7-8**); Stamps Depo., at 94-101 (**Ex. 1**).  Ms. Clayton did not receive a copy of the investigative report.  Instead, it could not be released until approved by General Ricket.  Stamps Depo., at 148-151 (**Ex. 1**).  At the conclusion of the investigation, in February 2010, General Ricket reviewed and approved of Colonel Stamps' findings and reports, as did General Schwartz.  Stamps Depo. Ex. 8 (**Ex. 9**); Stamps Depo., at 101-102 (**Ex. 1**).

During the intervening period, Ms. Clayton repeatedly attempted disciplinary action against Ms. Clipper, including progressive discipline, Clayton Depo., at 65:4-13 (**Ex. 14**), and

attempted to fire her at least nine different times. Clayton Depo., at 14-18 (**Ex. 14**). However, each time she received interference. Clayton Depo., at 65-69 (**Ex. 14**). Ms. Clayton did, however, suspend Ms. Clipper on multiple occasions. Clayton Depo., at 74:17-75:6 (**Ex. 14**).

However, Derrick Savoy, who DC designated as a corporate representative, advised Ms. Clayton that she cannot take administrative action against Ms. Clipper until he completed his investigation. Clayton Depo., at 214:11-22 (**Ex. 14**); Clayton Depo. Ex. 39 (**Ex. 19**). Ms. Clayton's understanding was that the investigation was still ongoing in the 2009/2010 timeframe. Clayton Depo., at 215:3-6 (**Ex. 14**). In fact, it did not close until 2013. Clayton Depo., at 215:1-2 (**Ex. 14**).

DC has taken different position on Ms. Clipper. It is apparently DC's position that Ms. Clipper did not violate any rules, regulations, or procedures of the District of Columbia. Brown, DC Corp. Designee Depo., at 59:5-8 (**Ex. 12**). Nor, according to DC, did she engage in behavior that was inappropriate or against the policies of DC. Brown, DC Corp. Designee Depo., at 58:21-59:2 (**Ex. 12**). Nevertheless, DC, somewhat paradoxically, admits that Ms. Clayton took actions to stop Ms. Clipper's inappropriate conduct. Brown, DC Corp. Designee Depo., at 59:9-14 (**Ex. 12**).

The investigation against Clipper was conducted by the DCNG, through Colonel Ronald Stamps. Brown, DC Corp. Designee Depo., at 70:1-14 (**Ex. 12**). DC does not take a position on the DCNG's investigation against Ms. Clipper and whether his report was accurate or inaccurate. Brown, DC Corp. Designee Depo., at 70:15-72:16 (**Ex. 12**). *See also* Brown, DC Corp. Designee Depo., at 72:20-74:4 (**Ex. 12**). In fact, DC was clear that the "investigation was conducted by someone outside of the District of Columbia Government, and we cannot confirm

or deny any of his legal conclusions." Brown, DC Corp. Designee Depo., at 71:11-14 (**Ex. 12**).

*See also* Brown, DC Corp. Designee Depo., at 72:20-74:4 (**Ex. 12**).

General Schwartz admitted that if someone brought fraud, waste, and abuse or sexual harassment to Ms. Clayton's attention she would have a duty to report it. Schwartz Depo., at 95:5-11 (**Ex. 20**). Regarding, the Clipper findings, General Schwartz's testimony was totally incredible. He claimed to have no idea of the allegations, findings, or conclusions related to the Clipper case. Schwartz Depo., at 124-128 (**Ex. 20**). However, early on in the process, at least as far back as August 2008, the DC Office of the Inspector General informed General Schwartz about the allegations and actually *referred* them to him for investigation. Schwartz Depo. Ex. 18A (**Ex. 22**). Between Colonel Stamps' two investigative reports, in June and July 2009, Colonel Thomas Forrest, a JAG attorney, conferred with DC and was closely interested in and discussing the status of Ms. Clipper's employment and status. Schwartz Depo. Ex. 23A (**Ex. 26**). Ms. Clayton advised at that time that she "briefed General Schwartz and General Ricket on this issue." *Id.* Further, at the conclusion of the investigation, in February 2010, Brigadier General Kenny Ricket, a direct report to General Schwartz, delivered to him Colonel Stamps' investigative report. Schwartz Depo. Ex. 19 (**Ex. 23**). General Schwartz signed General Ricket's Memorandum to him. *Id.* In July 2010, Ms. Clayton copied General Schwartz on her proposal to the DC CFO's office to reassign Ms. Clipper away from DCNG. Schwartz Depo. Ex. 23B (**Ex. 27**). Further, in February 2011, after the termination of Ms. Clayton, General Schwartz apparently created a memorandum *directing* Herman Preston, Ms. Clayton's successor, to investigate all of the matters previously investigated related to Ms. Clipper. Schwartz Depo. Ex. 29 (**Ex. 30**); 188:7-189:9 (**Ex. 20**).

**d.  Ms. Clayton assists Tamara Jones in her sexual harassment complaint against General Schwartz and both she and Ms. Jones are met with hostility and repeated threats to their employment.**

Tamara Jones made a sexual harassment complaint against General Schwartz.  Sharpe, DC Corp. Designee Depo., at 10:4-16 (**Ex. 43**).  Ms. Jones reported this to Ms. Clayton, who immediately reported it.  Ms. Clayton also referred the matter to a DC HR specialist.  Clayton Depo., at 117:16-118:2 (**Ex. 14**).  Ms. Clayton immediately went downtown personally and met with and reported this to DC OHR in January 2010.  Clayton Depo., at 118:3-20 (**Ex. 14**); Clayton Depo. Ex. 28 (**Ex. 18**).  After being assisted by Ms. Clayton, DC OHR accepted Ms. Jones' allegation on January 14, 2010.  Sharpe Depo. Ex. 3, at 6 (**Ex. 44**).  Sharpe, DC Corp. Designee Depo., at 11-12 (**Ex. 43**).

Melissa Sharpe was the DC Corporate Designee related to the Tamara Jones sexual harassment complaint against General Schwartz.  Ms. Sharpe not only was the designee but she also personally worked on Ms. Jones's complaint.  Sharpe, DC Corp. Designee Depo., at 7:14-16 (**Ex. 43**).  Ms. Sharpe was the intake officer and also the assigned investigator.  Sharpe, DC Corp. Designee Depo., at 10:20-11:2 (**Ex. 43**).

On January 14, 2010, after Ms. Clayton's reporting and meeting with DC HR, Ms. Jones alleged that:

> Sexual Assault against Major General Errol R. Schwartz. I do not recall that date of the incident except that it took place sometime in mid-early 2008[4] In his office In which he inappropriately touch my buttocks and tried to kiss me. I was fearful of reporting the incident for feet my husband (a disabled vet with the DCNG) would retaliate and that I may face reprisal[.]  I also had not gotten my citizenship as yet. The incident that pushed me to tell Mrs[.] Clayton and file this complaint is the Commanding General called me to his office and asked me whether I has told anyone of the incident and whether I was going to try to get him fired.  He

---

[4] The date is a typographical error.  In the Questionnaire, Ms. Jones stated that all incidents occurred within 365 days of the filing.  Sharpe Depo. Ex. 3, at 4.  Likewise, in her Charge of Discrimination, Ms. Jones stated the incidents occurred between June 1 and December 30, 2009.  Sharpe Depo. Ex. 4, at 1.

the[n] intimated that over the past 6 years he has been fighting similar cases and that not were successful. This took place on 15 December 2009.

Sharpe Depo. Ex. 3, at 6 (**Ex. 44**). Sharpe, DC Corp. Designee Depo., at 11-12 (**Ex. 43**). In the Intake Questionnaire regarding an issue with General Schwartz's assistant, Barbara Wood, Ms. Jones also noted that Major Roland Lane stated that the Commanding General (General Schwartz) relayed that tension "would not be tolerated," threatened that "they would both be fired," and that if not resolved "a way would be found to get rid of either party." Sharpe Depo. Ex. 3, at 6 (**Ex. 44**). Indeed, Ms. Jones was specifically afraid of reprisals by reporting the sexual harassment matter to DCNG. Sharpe Depo. Ex. 3, at 2 (**Ex. 44**).

General Ricket had also heard that there were complaints of inappropriate relationships and an affair or affairs by General Schwartz within DCNG. Ricket Depo., at 56:2-21 (**Ex. 10**). Strangely, although General Schwartz was the highest ranking officer at the DCNG, he claimed to have no idea of the protocols to deal with Ms. Jones's sexual harassment complaints. Schwartz Depo., at 200:16-201:4 (**Ex. 20**).

DC acknowledges that Ms. Clayton provided aid and assistance to Ms. Jones in the sexual harassment matter. Sharpe, DC Corp. Designee Depo., at 41-43 (**Ex. 43**); Sharpe Depo. Exs. 3, at 5; 6, at 2 (**Ex. 44**). Brown, DC Corp. Designee Depo., at 36:8-11 (**Ex. 12**). Further, it concedes that it is appropriate and the duty of the agency head to provide assistance in relation to EEO complaints. Sharpe Depo., at 48:6-49:6 (**Ex. 43**). Other than the assistance provided by Ms. Clayton, DC provided no further assistance to Tamra Jones in any way. Brown, DC Corp. Designee Depo. II, at 21:2-23:16 (**Ex. 12**); Sharpe, DC Corp. Designee Depo. at 43:22-44:8 (**Ex. 43**). The record reflects no investigation or action by DC related to the merits of the Jones complaint. Brown, DC Corp. Designee Depo., at 51 (**Ex. 12**).

Upon these complaints, DCNG attempted to persuade Ms. Jones away from pursuing her complaints. For example, when Ms. Jones's husband, Andre Jones, recounted the allegations to military personnel, they attempted to avoid the filing. On January 18, 2010, Captain Gladys Lanier of the DCNG attempted to bury the allegations in exchange for obtaining an apology from General Schwartz and confirming Ms. Jones's employment was safe: "Lt Jones, I was wondering if you wanted to try a different approach to this. I suggest that if possible that the General would agree to meet with me and your wife on this matter and get an appology [sic] from him as well as her job being secured, will this be sufficient?" Sharpe Depo. Ex. 7, at 2 **(Ex. 48)**.

Ms. Jones thereafter made clear to DCHR that DCNG was repeatedly attempting to intervene in this sexual harassment matter. Sergeant Martin likely discussed the Jones allegations with General Schwartz. Ricket Depo., at 59:9-15 **(Ex. 10)**. Notably, Sergeant Martin was aware, "from the very outset," that Ms. Jones did not want him involved in "assisting" her. Sharpe Depo. Ex. 9, at 2 **(Ex. 50)**. Sergeant Martin of the DCNG requested Ms. Jones go to his office "immediately," questioned her regarding the sexual assault allegations, and after Ms. Jones stated she did not want to speak with him continued to ask her "a slew of questions." Sharpe Depo. Ex. 7 **(Ex. 48)**, at 1. In January, **Sergeant Martin even called Ms. Clayton out by name, questioning whether Ms. Clayton was "advising" Ms. Jones**. *Id.* After Ms. Jones explained to Sergeant Martin that she would not speak with him, he approached her less than a week later and was again questioning her about the incidents. *Id.* Ms. Jones felt "pressured and uncomfortable, bordering on harassment." *Id.* Troublingly, after receiving this e-mail from Ms. Jones, DC did not speak with Sergeant Martin about its contents. Sharpe Depo., at 25:7-14 **(Ex. 43)**. Sergeant Martin claimed to Colonel Stamps, clearly falsely, that he was either providing guidance or provided guidance to Ms. Jones. Stamps Depo., at 66:22-67:2 **(Ex. 1)**.

Ms. Clayton discussed and provided aid and assistance to Ms. Jones in both January 2010 and April 2010. Clayton Depo. Ex. 28 (**Ex. 18**); Clayton Depo., at 114:8 (**Ex. 14**). Ms. Jones reported to Ms. Clayton that "she had been assaulted by GEN Schwartz, that he and his staff were harassing her about it, that SGT Martin had been trying to force her to disclose to him what she knew or what she recalled, and she needed some assistance." Clayton Depo., at 115:5-10 (**Ex. 14**). Ms. Clayton calmed the crying Ms. Jones down, advised of her rights as she understood them and offered assistance. Clayton Depo., at 115:24-116:8 (**Ex. 14**). Ms. Jones further stated that Major Lane threatened her as well, including her employment. Clayton Depo., at 116:12-18 (**Ex. 14**). Ms. Jones also explained that Sergeant Martin told her that "you have to come to me" for EEO matters. Clayton Depo., at 116:22-117:5 (**Ex. 14**).

Ms. Jones permitted Ms. Clayton to refer the matter to a DC HR specialist or EEO officer, which Ms. Clayton did right then. Clayton Depo., at 117:16-118:2 (**Ex. 14**). Ms. Clayton immediately went downtown and met with and reported this to DC OHR. Clayton Depo., at 118:3-20 (**Ex. 14**); Clayton Depo. Ex. 28 (**Ex. 18**).

Thereafter, Sergeant Martin and Colonel Dickens approached Ms. Clayton and stated that they "have been huddling with the general, Forrest, Tall, Dickens, and I to see who would get to talk to you about an allegation of sexual harassment." Clayton Depo., at 119:25-120:3 (**Ex. 14**). Sergeant Martin pressed Ms. Clayton for details, specifically asking if Ms. Jones reported the harassment to her. Clayton Depo., at 120:8-22 (**Ex. 14**). Similar to the threats to Ms. Jones, on his way out, Sergeant Martin said to Ms. Clayton "I never lose a case." Clayton Depo., at 120:24-25 (**Ex. 14**).

Ms. Sharpe prepared the Charge of Discrimination on Ms. Jones's behalf on April 8, 2010. Sharpe, DC Corp. Designee Depo., at 16:15-22 (**Ex. 43**); Sharpe Depo. Ex. 4

**(Ex. 45)**. The Charge specifically alleges sexual harassment and threatened retaliation by

General Schwartz:

> I believe I have been discriminated against in the terms, conditions and privileges
> of my employment on the bases of my sex (female/sexual harassment/hostile
> work environment) and retaliation for the following reasons:
>
> **SEXUAL HARASSMENT**
>
> From June 2009 thru August 2009, the Commanding General subjected me to
> unwelcome comments and inappropriate touching, which I perceived as sexual
> harassment, I asked the Commanding General to discontinue this behavior, which
> he did.
>
> **RETALIATION**
>
> In or around October 2009, I filed an internal EEO Complaint against a co-
> worker. In November or December 2009, the Commanding General asked me if I
> was going to report him too and try to get him fired. In December 2009, I was
> denied training for which I was already registered, that would have afforded me
> the required credentials for an upcoming promotion. I believe the denial of my
> training was in retaliation for filing my EEO Complaint.

Sharpe Depo. Ex. 4 **(Ex. 45)**; Sharpe, DC Corp. Designee Depo., at 15:15-17:5 **(Ex. 43)**.

At the latest, on April 26, 2010, DC delivered to Sergeant Chris Martin and DCNG

correspondence related to the Jones sexual harassment Charge and the Charge itself. Sharpe

Depo. Ex. 5 **(Ex. 46)**; Brown, DC Corp. Designee Depo., at 47-48 **(Ex. 12)**.

On May 10, 2010, Ms. Jones e-mailed OHR, confirming that she had disclosed the

harassment to Ms. Clayton, and also that she had been intimidated and harassed to not pursue it.

Sharpe Depo. Ex. 6 **(Ex. 47)**. Ms. Sharpe never contacted Ms. Clayton or any of the other

witnesses. Sharpe, DC Corp. Designee Depo., at 22:17-21 **(Ex. 43)**. Likewise, she never

contacted General Schwartz regarding the allegations. Sharpe, DC Corp. Designee Depo., at

23:19-21 **(Ex. 43)**. Instead, Chris Martin of the DCNG contacted DC OHR at least four times

after that.  Sharpe Depo. Ex. 8 (**Ex. 49**) (noting two messages and one phone call); Sharpe, DC Corp. Designee Depo., at 31:3-6 (**Ex. 43**) (phone call); Sharpe Depo. Ex. 9, at 2 (**Ex. 50**).

For example, on May 20, 2010 Ms. Sharpe spoke with Sergeant Chris Martin.  Sharpe, DC Corp. Designee Depo., at 27:13-16 (**Ex. 43**) ; Sharpe Depo. Ex. 8 (**Ex. 49**).  She did not discuss Ms. Jones' concerns about his repeated attempts to be involved in the counseling process.  Sharpe, DC Corp. Designee Depo., at 25:7-14 (**Ex. 43**).  DCNG, through Sergeant Chris Martin, contacted DC OHR after being served by phone and e-mail and alleged that DC OHR did not have jurisdiction to investigate the Jones sexual harassment complaint against General Schwartz.  Sharpe, DC Corp. Designee Depo., at 17:22-18:3; 19:12-20:16 (**Ex. 43**).

Further, DCNG, said it requires a "written request for [Sergeant Martin] to act in the capacity of an EEO Counselor" in the Jones matter.  Sharpe Depo. Ex. 9 (**Ex. 50**); Sharpe, DC Corp. Designee Depo., at 31:14-32:4 (**Ex. 43**).  DC confirmed that it has never seen a situation where another agency was requesting to act in the capacity of an EEO counselor.  Sharpe, DC Corp. Designee Depo., at 32:10-13 (**Ex. 43**).  This was an "unusual request" and DC had never received a request like that before or after this incident.  Sharpe, DC Corp. Designee Depo., at 32:14-18 (**Ex. 43**).

DC invited DCNG to submit a motion to dismiss.  Sharpe Depo. Ex. 9 (**Ex. 50**).  Nothing was done on Ms. Jones's sexual harassment complaint between June 2010 and December 2010.  Sharpe, DC Corp. Designee Depo., at 39:15-18 (**Ex. 43**).  Instead, on December 6, 2010, DC simply dismissed the complaint.  Sharpe Depo. Ex. 10 (**Ex. 51**); Sharpe, DC Corp. Designee Depo., at 39-40 (**Ex. 43**).

DCNG designated Annette Jonson as its corporate designee related to all EEO or other complaints relating to the terms and conditions of Tamara Jones.  Johnson, DCNG Corp.

Designee Depo., at 12:15-18 (**Ex. 52**); Johnson Depo. Ex. 1 (**Ex. 53**). Despite the numerous state and federal employees working at DCNG, the DCNG has no policies or procedures related to state employees making EEO complaints. Johnson, DCNG Corp. Designee Depo., at 40:11-22 (**Ex. 52**).

Contrary to the documented evidence in this matter, DCNG incorrectly claimed that Sergeant Martin advised that *he* "forwarded" Ms. Jones to the DC government and "connected her with the proper persons with the DC government." Johnson, DCNG Corp. Designee Depo., at 23:17-19; 24:13-25:2 (**Ex. 52**). In fact, DCNG's policy is that for EEO matters, if it's a DC government employee, that matter would be handled by the DC government. Johnson, DCNG Corp. Designee Depo., at 31:20-32:2 (**Ex. 52**). DCNG's policy would be to refer them to the DC government for action. Johnson, DCNG Corp. Designee Depo., at 33:9-21; 36:21-37:3 (**Ex. 52**). After re-direct by counsel, the corporate designee also claimed that the National Guard Bureau directed DCNG to forward Ms. Jones to the DC government for action. Johnson, DCNG Corp. Designee Depo., at 59:15-60:3 (**Ex. 52**). Nevertheless, contrary to both policy and the advice of the National Guard Bureau, as discussed above, instead of allowing the DC government to handle the EEO matter, Sergeant Martin repeatedly involved himself in the sexual harassment matter against General Schwartz – even in an "unusual" manner.

DCNG apparently purged all records related to the Jones sexual harassment complaint. Ms. Johnson would be the one to be aware if it had any complaints or records related to Tamara Jones. Johnson, DCNG Corp. Designee Depo., at 18:6-19:5 (**Ex. 52**). Ms. Johnson maintains hard and electronic files of complaints from 2010-2017, and the files are *not* routinely destroyed. Johnson, DCNG Corp. Designee Depo., at 45-48 (**Ex. 52**). The files include not only formal complaints made with the DCNG but also complaints to other agencies or even phone calls with

complaints.  Johnson, DCNG Corp. Designee Depo., at 49:17-50:11(**Ex. 52**).  The files are maintained by the "state equal employment manger."  Johnson, DCNG Corp. Designee Depo., at 51:5-7 (**Ex. 52**).  Sergeant Martin was previously the state equal employment manager.  Johnson, DCNG Corp. Designee Depo., at 41:21-42:2 (**Ex. 52**).

Ms. Johnson specifically searched the files for the name Jones.  Johnson, DCNG Corp. Designee Depo., at 47:1-6 (**Ex. 52**).  It is clear that, at the very least, the Charge, correspondence, and e-mail communications were received from or exchanged with DC.  Sharpe, DC Corp. Designee Depo. Exs. 5, 9, 10 (**Ex. 46, 50-51**)).  Yet DCNG makes the incredible claim that it now has *no* files or records related to the Jones complaint.  Johnson, DCNG Corp. Designee Depo., at 15:21-16:12; 17:10-17; 18:13-19:5 (**Ex. 52**).  The inescapable conclusion is that the file was destroyed.

      **e.**      **General Schwartz repeatedly threatens Ms. Clayton's employment following her aid and assistance to Ms. Jones in her sexual harassment complaint against him.**

After Ms. Clayton provided aid and assistance to Ms. Jones in her sexual harassment matter against General Schwartz, he distinctly threatened her employment three times – each time with a notable event attached to it.  General Schwartz threatened Ms. Clayton's employment in January 2010, April 2010, and September 2010, stating "we'll see who is sitting in that seat in October."  Clayton Depo., at 134:4-137:17 (**Ex. 14**); *See also* Plaintiff's Responses to DC Interrogatories, No. 5 (**Ex. 62**).  The threat in or about January 2010 was shortly after Ms. Jones initiated her sexual harassment complaint; the threat in or about April 2010 was shortly after DC OHR prepared and delivered the Charge to DCNG and Ms. Clayton provided further assistance to Ms. Jones; and the September 2010 threat was after the DC OAG opinion and just prior to or after the change of Ms. Clayton's employment from Career Service to Management Supervisory.

Ms. Clayton also made at least one contemporaneous report of General Schwartz's threat. General Ricket specifically recalls that in the spring of 2010 Ms. Clayton reported to him General Schwartz's threat that "we'll see who's sitting in that seat in October." Ricket Depo., at 72:21-73:9 (**Ex. 10**). Ms. Clayton reported this particular threat to General Ricket the same day it happened. Ricket Depo., at 77:18-78:6 (**Ex. 10**). General Ricket recalls that the statement stood out and he was surprised and startled by it. Ricket Depo., at 73:17-22 (**Ex. 10**). Indeed, he believed Ms. Clayton was still performing well in her job. Ricket Depo., at 78:14-17 (**Ex. 10**). General Ricket confirmed that Ms. Clayton is "pretty straightforward, she tells the truth." Ricket Depo., at 74:1-2 (**Ex. 10**).

### f. Upon a request from General Schwartz, DC initiates a legal opinion explaining its power of Government Operations Division Personnel, and further highlighting the complex relationship between DC and DCNG.

General Schwartz requested an opinion letter from the DC Attorney General, Peter J. Nickles related to his authority over DC employees. Thompson, DC Corp. Designee Depo., at 17:20-18:1; 23:11-15 (**Ex. 38**). See also AG Opinion letter (**Ex. 60**). Despite acknowledging that DC personnel issues were in DC's, and Ms. Clayton's, purview, General Schwartz had no explanation for why he was questioning to the DC Attorney General about Ms. Clayton's disciplinary authority or his own authority over DC government personnel. Schwartz Depo., at 222:7-224:7 (**Ex. 20**).

On August 27, 2010, Attorney General Nickles, observed that "there is no statute that establishes [the Government Operations Division for the DCNG] as an independent or subordinate agency of the Mayor or the District of Columbia." Attorney General Opinion, at 1 (**Ex. 60**). The Attorney General pointed out a number of aspects of the Government Operations Division for the DCNG that are linked to District of Columbia government, such as a right of

appeal to the D.C. Office of Employee Appeals and budgeting. Attorney General Nickles also recognized, however, that, pursuant to "DCNG's organizational chart, it appears that the Director of the Government Operations Division, a District employee, is in your chain of command." Attorney General Opinion, at 1. Later, however, the opinion noted that "the Division Director is in the chain of command of the Mayor and the City Administrator" of the District of Columbia. Attorney General Opinion, at 2.

Further highlighting this unique situation is that the Attorney General opined that it is the Mayor who may exercise supervisory authority over D.C. employees of the DCNG. Attorney General Opinion, at 2. While recognizing this, the Attorney General also noted that the Commanding General of the DCNG may participate in the hiring process and confer on disciplinary actions. *Id.* This is especially noteworthy because Ms. Clayton, as the Director of the Government Operations Division for the DCNG, had no direct supervisors within the D.C. government and there was no statute or regulation so governing. As such, the D.C. Attorney General's opinion supports the conclusion that Ms. Clayton, the Director, was a unique employee in terms of her relationship and employment with the D.C. government and the DCNG.

In fact, both before and after the AG opinion letter Ms. Clayton reported to both the commanding general and the mayor and city administrator. Thompson, DC Corp. Designee Depo., at 61:13-16; 62:21-63:17 **(Ex. 38)**. Likewise, DC confirmed that both before and after the opinion, the commanding general was free to confer with DC on personnel decisions, could participate in disciplinary actions, and even initiate it. Thompson, DC Corp. Designee Depo., at 63:18-65:5 **(Ex. 38)**.

The DC Director of Human Resources, Brender Gregory, also observed that Attorney General Nickles advised that General Schwartz should have the opportunity to confer with the

District on personnel matters. Gregory Depo., at 54:6-13 (**Ex. 33**). General Schwartz could confer with any District official, including Neil Albert. Gregory Depo., at 55:11-14 (**Ex. 33**). Ms. Clayton's direct supervisor was Mr. Albert and she had a "quasi" relationship with General Schwartz as head of the National Guard where she was stationed. Gregory Depo., at 94:11-25; 114:23-115:8 (**Ex. 33**). However, as her direct supervisor, Ms. Gregory stated that Mr. Albert retained the authority to terminate Ms. Clayton. Gregory Depo., at 98:11-14; 122:21-23; 134:3-12 (**Ex. 33**).

Despite Ms. Clayton being the director of the very agency at issue, she was not sent a copy of the Attorney General's opinion. *See* Attorney General Opinion, at 3 (Clayton not cc'd on opinion); Thompson, DC Corp. Designee Depo., at 25:11-20 (**Ex. 38**). DC has no explanation for this:

> Q This opinion discussed the relationship
> between the District of Columbia and the District of
> Columbia National Guard. Isn't that right?
> **A Yes.**
> Q You understand that Betty Clayton was the
> director of the Government Operations Division of the
> D.C. National Guard at the time this opinion was
> issued. Isn't this right?
> **A Yes.**
> Q All right. Given that this directly
> pertained to Ms. Clayton's position, her role in
> relationship with the federal government, her role in
> relationship with General Schwartz himself, does the
> District of Columbia have any contention as to why she
> was not included on that distribution list?
> **A No.**

Thompson, DC Corp. Designee Depo., at 27:7-22 (**Ex. 38**).

Further, in the proposed Memorandum of Understanding ("MOU") attached to the AG Opinion letter, it was clear that Ms. Clayton was anticipated to *not* be the representative of the Government Operations Division for DCNG. The MOU, prepared by DC, contained a

notification space for the authorized representatives of DCNG and DC. Although DC indicated that General Schwartz was the authorized representative for DCNG, it specifically left blank the space for the authorized representative on behalf of the Government Operations Division. Ex. 40, Attorney General Opinion, MOU; Thompson, DC Corp. Designee Depo. Ex. 12 (**Ex. 40**); Thompson, DC Corp. Designee Depo., at 28:1-29:10.[5] (**Ex. 38**) DC has no contention as to why it did not list Ms. Clayton as the authorized representative of the Government Operations Division. *Id.* The inference is clear. In fact, a prior Memorandum of Understanding in August 2009 specifically listed Betty Clayton as the point of contact for the Government Operations of DCNG. Schwartz Depo. Ex. 30, at 6 (**Ex. 31**).

1. **The Attorney General's opinion did not change any policy or standing procedure concerning termination of the Government Operations Director's employment.**

In its papers, the defense suggests that the Attorney General's opinion letter constituted some type of change in authority or shift in policy. This is simply not so. For example, the prior Government Operations Director, Anthony Devassey, was initially terminated by the then-commanding general of DCNG, General Wherley, on April 11, 2008 upon the expiration of his H1-B Visa. Gregory Depo. Ex. 11 (**Ex. 36**). However, the termination by DCNG was deemed ineffective. Gregory Depo. Ex. 11 (**Ex. 36**).

On April 21, 2008, Brender Gregory "rescinded" General Wherley's termination letter and placed Mr. Devassey on administrative leave. Gregory Depo. Ex. 11 (**Ex. 36**); Gregory Depo. Ex. 12 (**Ex. 37**). After investigation, on May 2, 2008 Ms. Gregory observed that DCNG had no obligation to extend his visa. Gregory Depo. Ex. 12 (**Ex. 37**). At that point, *DC Human Resources* terminated Mr. Devassey's employment, effective May 14, 2008. Gregory Depo. Ex.

---

[5] Neither is Ms. Clayton listed as a signatory to the Memorandum of Understanding. *Id.*, at 29:11-30:5 (**Ex. 38**).

12 (**Ex. 37**).  Thus, the suggestion that the Attorney General's opinion letter constituted any change in policy over the supervisory or termination authority of DC over the Director of the Government Operations Division is simply false.[6]

       **g.**     **Ms. Clayton's position is converted from Career Service to Management Supervisory Service, unlike her male predecessor, Anthony Devassey.**

Ms. Clayton's predecessor as Government Operations Director, Anthony Devassey, was also "hired" by DCNG.  Brown, DC Corp. Designee Depo., at 105:3-12 (**Ex. 12**).  He too was a career service employee, not management supervisory.  Brown, DC Corp. Designee Depo., at 106:16-22 (**Ex. 12**).  Notably, the provision of law purporting to require Ms. Clayton's conversion from CS to MSS was in place at the time Mr. Devassey was hired.  Brown, DC Corp. Designee Depo., at 107:15-18 (**Ex. 12**).  *See also* D.C. Code § 1–609.58.  Herman Preston, a "senior analyst" who ultimately took Ms. Clayton's position and was a DC corporate designee, noted that he never saw any paychecks or information indicating that any Government Operations Division employees were management supervisory – all were career service.  Preston Corp. Designee Depo., at 80:12-81:1 (**Ex. 54**).

On September 27, 2010, the District of Columbia converted Ms. Clayton's employment from Career Service to Management Supervisory Service.  Gregory Depo. Ex. 6 (**Ex. 35**).  The notice specifically advised that Ms. Clayton would no longer have career service protections, she would be at-will, and that if she declined to accept the transfer, she might be transferred to a vacant career service position – although if no positions were available, her employment would

---

[6]In the May 2, 2008 letter, Ms. Gregory is clear that DC is the terminating authority because it "rescinded" General Wherley's termination letter and issued its own termination.  Interestingly, and tellingly, she notes that she referred questions about "appropriate reporting relationships" and the status of DC employees working at DCNG.  Gregory Depo. Ex. 12 (**Ex. 37**).

be terminated. Gregory Depo. Ex. 6 (**Ex. 35**). DC issued a second notification the following day, this time citing the Attorney General's opinion to General Schwartz as its basis. Gregory Depo. Ex. 5 (**Ex. 34**). DC admits that there is nothing in the Attorney General's letter requiring Ms. Clayton to be converted from CS to MSS. Thompson, DC Corp. Designee Depo., at 83:2-6 (**Ex. 38**). Nobody stated that it was required. Thompson, DC Corp. Designee Depo., at 83:7-13 (**Ex. 38**). Interestingly, DC has no contention as to *who* made the decision to convert Ms. Clayton's employment from CS to MSS. Thompson, DC Corp. Designee Depo., at 84:11-13 (**Ex. 38**).

Likewise, Ms. Gregory signed the written notification to Ms. Clayton informing her of the conversion, but does not recall who made the decision to convert her to MSS. Gregory Depo. , at 27:12-28:9; 48:10-24 (**Ex. 33**). She does not know why the position was not converted prior to September 28, 2010 or whether Ms. Clayton's position was looked at specifically. Gregory Depo., at 49:7-13; 50:5-24 (**Ex. 33**). Mr. Albert, Ms. Clayton's purported supervisor, denied involvement in the decision to transfer her position from CS to MSS, Albert Depo., at 15:25-16:3 (**Ex. 55**), and was not aware of any review of positions at the DCNG took place to consider whether to transfer positions from CS to MSS. Albert Depo., at 18:12 (**Ex. 55**). Nevertheless, Ms. Gregory confirmed that she would not convert the employment from CS to MSS without discussing it with Mr. Albert. Gregory Depo., at 141:11-15 (**Ex. 33**). DC *assumed* that the decision to terminate Ms. Clayton's employment was made after the conversion but does not know that to be a fact. Thompson, DC Corp. Designee Depo., at 117:8-16 (**Ex. 38**).

Although the defense suggests that Ms. Clayton voluntarily "chose" to accept her conversion to MSS, the District is clear that there was really no such choice at all. There were no vacant CS positions in the Government Operations Division and if there are no such vacant

positions then the employee will be terminated.  Thompson, DC Corp. Designee Depo., at 85:1-15 (**Ex. 38**); Gregory Depo. Ex. 6, at 1, 3 (**Ex. 35 and 33**).  Thus, the District conceded that Ms. Clayton's "choice" was really no choice at all: either accept the conversion to MSS or be terminated.  Thompson, DC Corp. Designee Depo., at 86:16-87:3 (**Ex. 38**).

> **h.**      **After conferring with General Schwartz, DC terminates Ms. Clayton's employment, but each purported decision-maker denies responsibility.**

On October 26, 2010, without any progressive discipline or formal warning, DC, via City Administrator Neil Albert, terminated Ms. Clayton's employment, effective November 10, 2010. Albert Depo. Ex. 3 (**Ex. 56**).  Mr. Albert had no reason to believe that Ms. Clayton's job performance was anything less than satisfactory and did not even make any inquiry into her job performance.  Albert Depo., at 53:6-13(**Ex. 55**).  Ms. Clayton was in the protected CS status for two years prior to being converted to MSS, and was terminated just one month after the conversion.  Thompson, DC Corp. Designee Depo., at 43:15-44:1 (**Ex. 38**).  Ms. Clayton was not a security risk to the federal government, DC, or the DCNG.  Thompson, DC Corp. Designee Depo., at 56:10-22 (**Ex. 38**).

As of September 2010, Brender Gregory served as Director of the District of Columbia Department of Human Resources. Gregory Depo., at 7:2-7:7(**Ex. 33**). As a mayoral appointee, her day-to-day supervisor was the City Administrator, Neil Albert. Gregory Depo., at 9:13-16 (**Ex. 33**).  Ms. Clayton and Mr. Albert acted as the personnel supervisors for all District employees working at the National Guard. Gregory Depo., at 17:9-14 (**Ex. 33**).  As her direct supervisor, Mr. Albert retained the authority to terminate Ms. Clayton. Gregory Depo., at 98:11-14; 122:21-23; 134:3-12 (**Ex. 33**).  Ms. Gregory did not make the decision about whether to terminate directors.  Gregory Depo., at 39:4-7 (**Ex. 33**). Instead, it was the decision of the mayor

and/or the city administrator whether to terminate a director. Gregory Depo., at 36:18-20; 98:11-14 (**Ex. 33**).[7]

Neil Albert was the City Administrator of DC Government from June 2009 through December 2010. Albert Depo., at 7:8-12 (**Ex. 55**). He was responsible for the day-to-day operations of the city government. Albert Depo., at 8:13-14 (**Ex. 55**). Other than at his deposition, he doesn't believe he ever met with Ms. Clayton. Albert Depo., at 10:19-23 (**Ex. 55**).

Mr. Albert confirms signing the letter terminating Ms. Clayton's employment. Albert Depo., at 19:20 (**Ex. 55**). However, he paradoxically denied making the decision to terminate her employment. Albert Depo., at 19:21-24 (**Ex. 55**). He further claimed that he was not even aware of who did make the termination decision. Albert Depo., at 20:3-5 (**Ex. 55**). While acknowledging signing the termination letter, he claimed that he has "no recollection" of Ms. Clayton's termination. Albert Depo., at 30:23-32:21 (**Ex. 55**).

Mr. Albert admitted that there must be a "justifiable reason" to terminate Ms. Clayton's employment. Albert Depo., at 21: 4:9 (**Ex. 55**). He does not recall any "investigation" bearing on the decision to terminate Ms. Clayton's employment. Albert Depo., at 21:25-22:12 (**Ex. 55**). He admitted to being involved in "high-level" decisions, Albert Depo., at 66: 10-12(**Ex. 55**), and terminating one of the approximately 72 DC government directors was a "high-level decision." Albert Depo., at 67:21-24 (**Ex. 55**). Nevertheless, he claimed not know why she was being terminated or who was involved in the decision. Albert Depo., at 21:10-15 (**Ex. 55**). The day after Ms. Clayton received the termination notice, she asked Barry Kreiswirth of the City Administrator's Office why she was terminated. He advised that she needed to speak with Mr.

---

[7] The termination was likely *processed* by a Human Resources Advisor for the Executive Office of the Mayor, Michael Scott, but he had not authority to terminate Ms. Clayton's employment. Gregory Depo., at 124:11-21 (**Ex. 33**).

Albert. Clayton Depo., at 191:13-21 (**Ex. 14**). Ms. Clayton called Mr. Albert on several occasions but he never took her call. Clayton Depo., at 191:22-24 (**Ex. 14**).

Mr. Albert surmises that Brender Gregory may have given him the letter to sign but he cannot recall any other instance where he was simply handed a termination letter to terminate someone's employment. Albert Depo., at 33:6-17 (**Ex. 55**). He does not recall any other instances where a termination letter was supposedly only provided to him in which he had no involvement. Albert Depo., at 36:20-24 (**Ex. 55**). The other termination in which he was involved he engaged in significant discussion when he carried out the termination. Albert Depo., at 34:25-35:7 (**Ex. 55**).

These circumstances are plainly unusual. In fact, Mr. Albert is not aware of any other circumstances in which a DC agency director was transferred from CS to MSS and terminated a month, or even a year, later. Albert Depo., at 56:8-16 (**Ex. 55**).

Mr. Albert denied recalling any involvement by DCNG in the termination of Ms. Clayton. Albert Depo., at 22:16-18 (**Ex. 55**) . However, although he could not recall any involvement by DCNG, he admitted that does not mean it didn't happen. Albert Depo., at 25:5-9(**Ex. 55**).[8] He is familiar with General Schwartz. Albert Depo., at 10:24-11:2 (**Ex. 55**). He doesn't remember any specific dates of meetings, but he had "interacted with General Schwartz" in his role as agency head of the DCNG in 2010. Albert Depo., at 37:21-38:7 (**Ex. 55**) . Indeed, General Schwartz and Mr. Albert specifically conferred and General Schwartz claimed that he was not able to gain "cooperation" from Ms. Clayton. Gregory Depo., at 60:12-17 (**Ex. 33**). Ms.

---

[8] Likewise, DC assumes that there were no oral communications between DC and DCNG decision-makers regarding the termination of Ms. Clayton but concedes that if there were, it would not know about them. Thompson, DC Corp. Designee Depo., at 117:17-118:6 (**Ex. 38**).

Gregory specifically recalls Mr. Albert telling her this. Gregory Depo., at 61:2-8; 93:19-22; 99:24-100:1 **(Ex. 33)**.[9]

DC claims that the mayor at the time, Mayor Adrian Fenty, was the decision-maker to terminate Ms. Clayton's employment with the District. Thompson, DC Corp. Designee Depo., at 32:1-3 **(Ex. 38)**. DC also contended that Mayor Fenty and Neil Albert communicated regarding the termination of Ms. Clayton. Thompson, DC Corp. Designee Depo., at 33:15-19 **(Ex. 38)**. This is not correct.

Mayor Fenty denied any involvement or knowledge of the decision to terminate Ms. Clayton's employment. Fenty Affidavit, at ¶ 2. Mayor Fenty stated that he has "no personal knowledge or recollection of Betty Clayton," and he "had no involvement in the conversion of Ms. Clayton's position to the Management Supervisory Service or the decision to terminate her employment." Fenty Affidavit, at ¶ 2.

Brender Gregory believes that General Schwartz would have conferred with DC officials related to the termination of Ms. Clayton's employment. Gregory Depo., at 57:25-58:6 **(Ex. 33)**. However, General Schwartz claimed to "have no idea" why or how Ms. Clayton was terminated. Schwartz Depo., at 162:15-21 **(Ex. 20)**. According to General Schwartz's testimony, one day Ms. Clayton was present and the next she was simply gone. Schwartz Depo., at 162:22-163:2 **(Ex. 20)**. However, General Ricket specifically recalls that in the spring of 2010 Ms. Clayton reported to him one of General Schwartz's threats, that "we'll see who's sitting in that seat in October." Ricket Depo., at 72:21-73:9 **(Ex. 10)**. Ms. Clayton reported this to General Ricket the same day that threat happened. Ricket Depo., at 77:18-78:6 **(Ex. 10)**.

---

[9] As discussed herein, it is clear that the "cooperation" was not employment performance related and not related to the Clipper matter. The only non-cooperation between Ms. Clayton and General Schwartz was her association with Ms. Jones in the sexual harassment matter.

Although DC denied communications between it and DCNG related to the termination of Ms. Clayton's employment, its only basis for stating that is that it was advised as such by its attorneys. Thompson, DC Corp. Designee Depo., at 36:16-37:9 (**Ex. 38**). Nevertheless, despite counsel's incorrect advice to its corporate representative, the DC Human Resources Director, Brender Gregory, was clear that there were communications between Mr. Albert and General Schwartz. Despite their denials, Ms. Gregory specifically recalls Mr. Albert informing her that General Schwartz stated that he was not able to gain "cooperation" from Ms. Clayton:

> 12 **Q All right. Did Attorney General Nickles**
> 13 **say that he heard Ms. Clayton wasn't cooperating with**
> 14 **General Schwartz?**
> 15 A I believe it was Neil Albert who raised
> 16 the issue that the General had some concerns about
> 17 his ability to gain cooperation.
> * * *
> 2 **Q Well, Neil Albert, you said, expressed**
> 3 **concern that Ms. Clayton wasn't following General**
> 4 **Schwartz's directives?**
> 5 A Yes.
> 6 **Q All right. Do you recall specifically**
> 7 **that he said that?**
> 8 A Yes.
> 9 **Q All right. He said that General**
> 10 **Schwartz told him that?**
> 11 A Yes.
> 12 **Q Did he say how he came to learn that**
> 13 **from General Schwartz?**
> 14 A From the conversation they had with him.

Gregory Depo., at 60:12-61:14 (**Ex. 33**). Ms. Gregory later again reiterated that:

> 19 **Q Okay. Well, you said that Neil Albert**
> 20 **expressed that General Schwartz said there was issues**
> 21 **cooperating with Ms. Clayton. Right?**
> 22 A Yes.

Gregory Depo., at 93:19-22 (**Ex. 33**) She elaborated again:

> 12 **Q All right. Did Mr. Albert express the**
> 13 **same thing to you or did he say a different thing?**

14 **What was the substance of those conversations?**
15 A Frustration with cooperation.
16 **Q By Ms. Clayton?**
17 A Yes.
18 **Q Do you recall that specifically?**
19 A Yes.
20 **Q How many times did he say that?**
21 A I don't know.
22 **Q Was it the same thing that General**
23 **Schwartz was relaying, these issues to him?**
24 A I think it all had to do with the same
25 thing, the resistance to assume cooperation with
1 General Schwartz as well as with Neil Albert.

Gregory Depo., at 99:12-100:1 (**Ex. 33**). Ms. Gregory again explained:

24 **Did Neil Albert indicate there were multiple**
25 **conversations between him and General Schwartz?**
Page 137
1 A I don't recall him mentioning the number
2 of conversations they had.
3 **Q Were you part of any conversations**
4 **between the two?**
5 A No.
6 **Q Did he actually say there were**
7 **conversation or are you assuming there were**
8 **conversations?**
9 A He said there were conversations.
10 **Q Okay. And that was about General**
11 **Schwartz's concerns about Ms. Clayton?**
12 A Yes.
13 **Q And her cooperating?**
14 A Yes.
15 **Q Can you elaborate a little bit on what**
16 **you mean by cooperating. I know it's been several**
17 **years.**
18 A As I recall, it had to do with their
19 ability to jointly work together on issues and who
20 was responsible for what personnel matters or
21 decisions.

Gregory Depo., at 136:24-137:21 (**Ex. 33**). The purported "cooperation" issue was not related to

Ms. Clipper. Gregory Depo., at 137:22-24 (**Ex. 33**).

As described above, Ms. Clayton's performance was *flawless* from the time she started as the Government Operations Director through the time of her termination. *Supra*, at § II.b. She was perfect in all relevant categories: Communication, Customer Service, Dependability, Flexibility/Adaptability, Initiative, Integrity and Trust, Job Knowledge, Professionalism, Resource Usage, Teamwork, Conflict Management, Leadership, Managing People, Operations Planning and Evaluating, and Strategic Planning. Schwartz Depo. Ex. 9 (**Ex. 21**); Schwartz Depo., at 75:17-78:5; 79:21-93:21 (**Ex. 20**). Her employment performance was top possible and exceeded expectations from the start through the time of her termination. Schwartz Depo., at 78:6-12 (**Ex. 20**); Schwartz Depo., at 78:13-79:20 (**Ex. 20**).

The only area that Ms. Clayton was not "cooperating" with General Schwartz and his staff were their attempts to pressure her and Ms. Jones to not report and press the sexual harassment matter. *See supra*, at § II.d. Indeed, as a result of her lack of "cooperation" by not silencing Ms. Jones's sexual harassment complaint against General Schwartz, he directly threatened her employment. *See supra*, at § 2.e.

DCNG has no contention one way or the other as to the reason for Ms. Clayton's position being reclassified from CS to MSS. Forrest, DCNG Corp. Designee Depo., at 142:17-143:1(**Ex. 58**). DCNG also has no position as to the reason for Ms. Clayton's termination. Forrest, DCNG Corp. Designee Depo., at 143:2-6 (**Ex. 58**).

i.      **Summary of involvement by "Decision-Makers."**

Terminating a DC government agency director is a "big deal" and is a "high-level decision." Gregory Depo., at 74:2-6 (**Ex. 33**); Albert Depo., at 67:21-24 (**Ex. 55**). Despite this being a significant event, each putative "decision-maker" denied any involvement in the decision

to terminate Ms. Clayton's employment.  The following chart displays the finger-pointing and

circular denials of the decision-makers:

| Purported Decision-Maker | Involvement? |
|---|---|
| **Brender Gregory, Director of DC Office of Human Resources** | Did not make the decision to terminate Ms. Clayton's employment, Gregory Depo., at 39:4-7 **(Ex. 33)**, but it was likely made by the City Administrator (Neil Albert) or the Mayor (Adrian Fenty).  Gregory Depo., at 30:6-9; 36:18-20 **(Ex. 33)**. |
| **Neil Albert, City Administrator** | Did not make the decision to terminate Ms. Clayton's employment and is not aware of who made the decision.  Albert Depo., at 19:21-24; 20:3-5 **(Ex. 55)**. |
| **LaTonya Thompson, DC Corporate Designee** | Claims that Mayor Adrian Fenty was the decision-maker to terminate Ms. Clayton's employment with the District.  Thompson, DC Corp. Designee Depo., at 32:1-3**(Ex. 38)**. |
| **Adrian Fenty, Mayor** | Denies any involvement in, or knowledge of, Ms. Clayton's termination.  Fenty Affidavit, at ¶ 2 **(Ex. 59)**. |
| **General Errol Schwartz, Commanding General of DCNG** | Claims to "have no idea" why or how Ms. Clayton was terminated, Schwartz Depo., at 162:15-21 **(Ex. 20)**, and she was simply present one day and gone the next.  Schwartz Depo., at 162:22-163:2 **(Ex. 20)**. |
| **Lieutenant Colonel Thomas W. Forrest, DCNG Corporate Designee** | DCNG has no position as to the basis for Ms. Clayton's termination.  Forrest, DCNG Corp. Designee Depo., at 143:2-7 **(Ex. 58)**. |

In sum, neither DC nor DCNG can maintain *any* contention as to how or why Ms.

Clayton was terminated.

### j. Ms. Clayton is replaced by a male subordinate employee who, to DC's knowledge had less experience.

After Ms. Clayton was terminated, DC elevated one of her direct reports, Herman Preston. Albert Depo. Ex. 6 **(Ex. 57)**. A contemporaneous e-mail states that "Neil," Mr. Albert, wanted Herman Preston to be appointed interim director. *Id.* However, Mr. Albert also claimed to "have no knowledge" as to who replaced Ms. Clayton, 22:19-22 **(Ex. 14)**.

General Schwartz knows Mr. Preston and gave him a commemorative military coin in recognition for his service. Schwartz Depo., at 37-38 **(Ex. 20)**. He has known him for approximately 30 years. Schwartz Depo., at 38:4-7 **(Ex. 20)**. He would be in communication with him on DCNG matters pertaining to the DC government. Schwartz Depo., at 38:19-39:1**(Ex. 20)**.

As far as the District of Columbia knew, Mr. Preston, a male, had far less experience than Ms. Clayton and was not aware of *any* qualifications he had for the job. Thompson, DC Corp. Designee Depo., at 100:20-111:15 **(Ex. 38)**.[10] Moreover, its basis for the purported promotion of Mr. Preston, that he was purportedly the "deputy director," is simply not true. Mr. Preston, also a DC Corporate Designee, confirmed that he was not the deputy director, there was not such position as deputy director, and he never suggested that to anyone. Preston, DC Corp. Designee Depo., at 15:19-16:13 **(Ex. 54)**.

Incredibly, Mr. Preston did not know whether losing Career service protections was an adverse employment action, did not know what "protected activity" means, and did not know what retaliation in the employment context is. Preston, DC Corp. Designee Depo., at 45:13-46:3 **(Ex. 54)**. Mr. Preston's response was asking if Ms. Clayton's counsel "want a combat

---

[10] Likewise, even if he was qualified, Mr. Preston never conveyed his work performance or history to any decision-makers. Preston, DC Corp. Designee Depo., at 103:18-104:3.

retaliation" and stating that "[r]etaliation in combat is going back after the enemy after you get attacked" – but had "no idea what it is in the civilian."  Preston, DC Corp. Designee Depo., at 46:5-17 (**Ex. 54**).

## III.    Legal Standard.

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895-96, 369 U.S. App. D.C. 122 (D.C. Cir. 2006); *White v. Johnson*, 172 F. Supp. 3d 178, 182 (D.D.C. 2016).  "A fact is 'material' if it is capable of affecting the outcome of the litigation."  *White*, 172 F. Supp. 3d at 182 (citing *Holcomb*, 433 F.3d at 895; *Liberty Lobby*, 477 U.S. at 248).  "A dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*, at 182 (citing *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895).

"Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  As such, only "***If*** the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates that a triable issue of fact exists for trial."  *Symeonidis v.*

*Paxton Capital Group, Inc.*, 220 F. Supp. 2d 478, 481 (D. Md. 2002) (emphasis added). *See also Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 35 (D.D.C. 2000) ("*When the moving party* has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."[11]).

This court has also observed that "[t]he party seeking summary judgment 'bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified.'" *White*, 172 F. Supp. 3d at 182 (citing *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297, 260 U.S. App. D.C. 334 (D.C. Cir. 1987)). "When a motion for summary judgment is under consideration, 'the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.*, at 182 (quoting *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850, 371 U.S. App. D.C. 68 (D.C. Cir. 2006)). *See also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (evidence must be viewed in the light most favorable to the nonmoving party). Thus, "as the Supreme Court and the D.C. Circuit have often emphasized, the Court's role at this juncture is not to weigh evidence or to make credibility determinations. *Wheeler*, 812 F.3d at 1113; *Holcomb*, 433 F.3d at 895; *see also Liberty Lobby*, 477 U.S. at 249 ('[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.')." *White*, 172 F. Supp. at 186 (D.D.C. 2016).

Finally, under Fed. R. Civ. Proc. 56, facts in opposition to a motion for summary judgment need not be presented or produced in an admissible form, but rather facts must be identified that could be put or "converted" into admissible evidence. *Ali v. D.C. Gov't*, 810 F. Supp. 2d 78, 83 (D.D.C. 2011); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo*

---

[11] (emphasis added) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

*S.A. De C.V.*, 69 F. Supp. 3d 175, 192 n. 3 (D.D.C. 2014); *Mallik v. Sebelius*, 964 F. Supp. 2d

531, 546 (D. Md. 2013).

## IV. Analysis.

### a. District of Columbia

As the United States Court of Appeals for the District of Columbia stated in *Jones v.*

*Bernanke*, at this stage in the litigation (i.e., summary judgment), asking whether a Plaintiff

satisfied her *prima facie* burden is "an unnecessary and improper 'sideshow.'" *Jones v.*

*Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (quoting *Brady v. Office of Sergeant at Arms*, 520

F.3d 490, 494 (D.C. Cir. 2008)).

> The Supreme Court long ago held in *United States Postal Service Board of*
> *Governors v. Aikens* that once the employer asserts a legitimate,
> nondiscriminatory reason for its actions, it 'has done everything that would be
> required . . . if the plaintiff had properly made out a *prima facie* case,' so 'whether
> the plaintiff really [established a *prima facie* case] *is no longer relevant.*

*Jones*, 557 F.3d at 678 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715

(1983)) (emphasis added). Once an employer asserts a legitimate, non-retaliatory reason for its

actions, the only question that remains is the "ultimate factual issue in the case"—

"discrimination *vel non*." *U.S. Postal Serv. Bd. of Governors*, 460 U.S. at 715. "Not only is the

*prima facie* case irrelevant at this point, but 'the district court need not—*and should not*—decide

whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*.'" *Jones*,

557 F.3d at 678 (quoting *Brady*, 520 F.3d at 494) (emphasis in original). Although the

*McDonnell Douglas* burden shifting framework still applies, the D.C. Circuit has directed its

district courts "to fast forward to the ultimate question of whether all of the evidence, taken

together, supports an inference of retaliation when the employer has proffered a legitimate, non-

retaliatory reason for the adverse action at issue." *Sledge v. District of Columbia*, 2014 WL 3845798, at *10 (D.D.C. August 6, 2014).

Accordingly, at the summary judgment stage for Title VII retaliation claims when the defendant proffers a legitimate, non-retaliatory reason for its action "the court reviews each of the three relevant categories of evidence—*prima facie*, pretext, and any other—to determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable juror to infer retaliation." *Jones*, 557 F.3d at 679 (citing *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002)). Defendants claim that Ms. Clayton was reclassified and terminated for lawful reasons. Thus, summary judgment for the District cannot be awarded on the ground that Ms. Clayton has not set forth s *prima facie* case, although as discussed herein she has forth such a case. *See Jones*, 557 F.3d at 678.

### 1. Ms. Clayton set forth a claim for retaliation under Title VII.

Title VII "prohibits an employer from retaliating against an employee 'because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must show that: (i) she engaged in protected activity; (ii) she suffered a materially adverse action by her employer; and (iii) a causal connection existed between the two." *Ali v. D.C. Gov't*, 810 F. Supp. 2d 78, 87-88 (D.D.C. 2011) (alteration in original) (citing *Wiley v. Glassman*, 511 F.3d 151, 155, 379 U.S. App. D.C. 122 (D.C. Cir. 2007) (citing *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).

There is a clear pattern of threats and retaliation against Ms. Clayton here. DC admits that Ms. Clayton provided aid and assistance to Ms. Jones in the sexual harassment matter.

Sharpe, DC Corp. Designee Depo., at 41-43 **(Ex. 43)**; Sharpe Depo. Exs. 3, at 5; 6, at 2 **(Ex. 44)**. Brown, DC Corp. Designee Depo., at 36:8-11 **(Ex. 12 and 13)**. Ms. Clayton also referred the matter to a DC HR specialist. Clayton Depo., at 117:16-118:2 **(Ex. 14)**. Ms. Clayton immediately went downtown and met with and reported General Schwartz's sexual harassment to DC OHR in January 2010. Clayton Depo., at 118:3-20 **(Ex. 14)**; Clayton Depo. Ex. 28 **(Ex. 18)**. After being assisted by Ms. Clayton, DC OHR accepted Ms. Jones' allegation on January 14, 2010. Sharpe Depo. Ex. 3, at 6 **(Ex. 44)**. Sharpe, DC Corp. Designee Depo., at 11-12 **(Ex. 43)**. Further, Ms. Clayton was listed as a witness.[12]

Immediately after the reporting of the sexual harassment, Ms. Clayton was faced with pressure and threats from DCNG officials, including their internal meetings with General Schwartz, threatening Ms. Jones' employment, pressuring Ms. Clayton and Ms. Jones to report only to them, specifically trying to determine whether Ms. Clayton was "advising" Ms. Jones, and claiming they "never lose a case." *See supra* § II.d. After Ms. Clayton provided aid and assistance to Ms. Jones in her sexual harassment matter against General Schwartz, he distinctly threatened her employment in January 2010, stating "we'll see who's sitting in that seat in October." Clayton Depo., at 134:4-137:17 **(Ex. 14)**; *See also* Plaintiff's Responses to DC Interrogatories, No. 5 **(Ex. 62)**. In addition to her assisting Ms. Jones, even if Defendants *believed* that Ms. Clayton was involved and assisting her, it is still a relevant protected activity. *Johnson v. Napolitano*, 686 F. Supp. 2d 32, 36 (D.D.C. 2010).[13]

---

[12] *Johnson v. Napolitano*, 686 F. Supp. 2d 32, 36 (D.D.C. 2010) (noting that being identified as a witness in an EEO complaint is a protected activity).

[13] ("A perception theory of retaliation does not rest on whether the employee actually asserts participation in a protected activity; rather, the theory applies so long as the employer believed that the employee was engaged in protected activity.").

Ms. Clayton again went to Ms. Brown in April 2010 related to the status of Ms. Jones sexual harassment complaint. *Id.* Ms. Sharpe finally prepared the Charge of Discrimination on Ms. Jones's behalf on April 8, 2010, which specifically alleged sexual harassment by General Schwartz. Sharpe, DC Corp. Designee Depo., at 16:15-22 (**Ex. 43**); Sharpe Depo. Ex. 4 (**Ex. 45**). At the latest, on April 26, 2010, DC delivered to Sergeant Chris Martin and DCNG correspondence related to the Jones sexual harassment Charge and the Charge itself. Sharpe Depo. Ex. 5 (**Ex. 46**); Brown, DC Corp. Designee Depo., at 47-48 (**Ex. 12 and 13**). Once again, General Schwartz threatened Ms. Clayton's employment in April 2010, stating "we'll see who's sitting in that seat in October." Clayton Depo., at 134:4-137:17 (**Ex. 14**); *See also* Plaintiff's Responses to DC Interrogatories, No. 5 (**Ex. 62**). After this second threat, General Ricket specifically recalls Ms. Clayton reporting to him General Schwartz's threat that "we'll see who's sitting in that seat in October." Ricket Depo., at 72:21-73:9 (**Ex. 10**). Ms. Clayton reported this particular threat to General Ricket the same day it happened. Ricket Depo., at 77:18-78:6 (**Ex. 10**). General Ricket and General Schwartz confirmed that Ms. Clayton is truthful. Ricket Depo., at 74:1-2 (**Ex. 10**); Schwartz Depo., at 221:4-222:6 (**Ex. 20**).

Finally, in September 2010 General Schwartz once again threatened Plaintiff's employment, stating "we'll see who's sitting in that seat in October." Clayton Depo., at 134:4-137:17 (**Ex. 14**); *See also* Plaintiff's Responses to DC Interrogatories, No. 5 (**Ex. 62**). The timing of this threat of retaliation is telling as well. It comes shortly after the August 27, 2010 Attorney General's opinion advising that the general is free to confer and participate in personnel matters related to DC employees at DCNG. It also comes either right before or after Ms. Clayton's position was converted from Career Service to Management Supervisory.

DC also incorrectly suggests that Ms. Jones "came to her only once with a complaint of sexual harassment." DC MSJ, at 41. Instead, Ms. Clayton was clear that she recalled one "issue" or "report" of sexual harassment by Ms. Jones. Clayton Depo., at 161:6-8, 7-19 (**Ex. 14**). This was not referring to the number of discussions or reports by Ms. Clayton.

Finally, DC claims that General Schwartz's threats were simple "office spats." DC MSJ, at 32-33. This is simply not so. First, General Schwartz was clear that there were no "office spats" with Ms. Clayton, and she was a stellar employee from the time of her hiring to the time of her termination. *See supra* § II.b. The only claimed issue was his statement to Neil Albert that Ms. Clayton had an issue with "cooperation" – although that was clearly not employment-related. *Id.* Of course, the only issue Ms. Clayton refused to "cooperate" with General Schwartz on was the stifling of Ms. Jones's sexual harassment complaint. Second, like Ms. Clayton, Ms. Jones also felt her employment was threatened. Clayton Depo., at 116:12-18 (**Ex. 14**); *supra* § II.d. *Bell v. Gonzales*, 2005 U.S. Dist. LEXIS 37879 *4, 2005 WL 3555490 (D.D.C. 2005) ("It is well-established that other acts of discrimination or retaliation by an employer similar to the discrimination or retaliation charged are admissible to show an employer's motive or intent in a separate case."). Third, the timeline itself displays the true nature of the threats:

- **January 2010**: Ms. Jones reports sexual harassment by General Schwartz to Ms. Clayton. Ms. Clayton reports it to DC OHR that same day and an Intake Questionnaire is filed by Ms. Jones. Ms. Clayton is listed as a witness.[14]

- **January 2010**: Sergeant Martin questions whether Ms. Clayton is "advising" Ms. Jones,[15] and Sergeant Martin and Colonel Dickens approach Ms. Clayton and state that they "have been huddling with the general, Forrest, Tall, Dickens, and I to see who

---

[14] Clayton Depo., at 118:3-20; Clayton Depo. Ex. 28; Sharpe Depo. Ex. 3, at 6.
[15] Sharpe Depo. Ex. 7, at 1.

would get to talk to you about an allegation of sexual harassment." Clayton Depo., at 119:25-120:3 **(Ex. 14)**.

- **January 2010**: General Schwartz threatens Ms. Clayton's employment in January 2010, stating "we'll see who's sitting in that seat in October." Clayton Depo., at 134:4-137:17**(Ex. 14)**.

- **April 2010**: Ms. Clayton inquires of DC as to the status of Ms. Jones' sexual harassment complaint; DC prepares and completes the Charge of Discrimination. Sharpe, DC Corp. Designee Depo., at 15:15-17:5 **(Ex. 43)**; Sharpe Depo. Ex. 4 **(Ex. 45)**.

- **April 2010**: General Schwartz again threatens Ms. Clayton, stating "we'll see who's sitting in that seat in October." Clayton Depo., at 134:4-137:17 **(Ex. 14)**. Ms. Clayton contemporaneously reports this to General Ricket.

- In or about **May 2010**: General Schwartz solicits advice from the DC Attorney General regarding his authority over DC employees.[16]

- **August 27, 2010**: DC Attorney General issues opinion concerning DCNG authority over DC employees.

- **September 2010**: General Schwartz again threatens Ms. Clayton, stating "we'll see who's sitting in that seat in October." Clayton Depo., at 134:4-137:17 **(Ex. 14)**.

- **September 27, 2010**: Ms. Clayton's position is converted from Career Service to Management Supervisory Service, thereby stripping her of all employment protections and converting her to an at-will employee. Gregory Depo. Ex. 6 **(Ex. 35)**.

---

[16] *See* DC MSJ at 32, not disputing when General Schwartz sought advice from the DC Attorney General and admitting he did solicit advice.

- **October 26, 2010/November 10, 2010**: Ms. Clayton is terminated on October 26, 2010, effective November 10, 2010. Albert Depo. Ex. 6 **(Ex. 57)**.

- **December 6, 2010**: DC dismisses Ms. Jones's sexual harassment complaint. Sharpe Depo. Ex. 10 **(Ex. 51)**; Sharpe, DC Corp. Designee Depo., at 39-4 **(Ex. 43)**.

Thus, the clear implication from the relevant events displays a clear cause and effect between Ms. Jones's sexual harassment complaint, Ms. Clayton's involvement in it, and General Schwartz's threats to Ms. Clayton's employment, which were ultimately carried out. Indeed, from the time Ms. Clayton reported General Schwartz's alleged sexual misconduct to the time of his verbal threats against her only a few days elapsed.

DC simply argues, as it did in prior motions,[17] that the protected activities were not in close enough temporal proximity to her adverse employment actions. This is simply not so. First, as this Court has previously recognized, *Clayton v. District of Columbia*, 117 F. Supp. 3d 68, 77 (D.D.C. 2015), Plaintiff need not rely on temporal proximity alone. Instead, there are direct threats by General Schwartz to Ms. Clayton's employment and a clear pattern of threats to her employment. *Id.* One need not view the temporal proximity in "isolation," but rather may look to the surrounding activities and circumstances. *E.g. Holcomb v. Powell*, 369 U.S. App. D.C. 122, 136, 433 F.3d 889, 903 (2006); *Clayton*, 117 F. Supp. 3d at 77. Indeed, here, it was no simple matter to take any action against Ms. Clayton. She was a Career Service employee with all its attendant protections. It would have been impossible for General Schwartz to terminate Ms. Clayton's employment immediately after assisting Ms. Jones in January 2010 or immediately after the Charge was formally filed in April 2010. For General Schwartz to carry out his threats more time, and action, was required.

---

[17] *Clayton v. District of Columbia*, 117 F. Supp. 3d 68, 77 (D.D.C. 2015).

Even if Plaintiff needed to rely solely on temporal proximity, three to five months is sufficiently close in time to create a jury question. *Castle v. Bentsen*, 867 F.Supp. 1, 3-4 (D.C. Cir. 1994) (holding that a lapse of three to five months between protected activities and adverse actions "establishes a causal connection . . . sufficient to go to the jury") (citing *Mitchell v. Baldridge*, 759 F.2d 80, 88 (D.D.C. 1985)).  In fact, an even longer "lag" in time could be sufficient.  This is because "there is no hard and fast rule that any specified amount of time is too removed for an inference of causation, and where a defendant retaliates at the first opportunity that is presented, a plaintiff will not be foreclosed from making out a prima facie case despite a substantial gap in time." *Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 69 n.24 (D.D.C. 2011) (EEOC complaint in April 2005 and termination in December 2005) (quoting *Cones v. Shalala*, 199 F.3d 512, 521, 339 U.S. App. D.C. 299 (D.C. Cir. 2000) (citing *Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 218 (D.D.C. 2008)).

Given the steps necessary to retaliate against Ms. Clayton, and that the opportunity to retaliate did not become actualized until after September 27, 2010, there is close temporal proximity here as well.  Further, her clear association with the Charge and the timeline set forth above makes clear Ms. Clayton was either engaging in protected activity or associated with protected activity sufficiently close to the adverse employment actions.  As such, Ms. Clayton has set forth a sufficient claim for retaliation and the motions for summary judgment should be denied.

2.      **Ms. Clayton set forth a claim for retaliation under the DC Whistleblower Protection Act.**

Under the DC-WPA, "[a] supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure."  D.C. Code § 1-615.53(a).  A "protected disclosure" is defined as follows:

(6) "Protected disclosure" means any disclosure of information, not specifically prohibited by statute, without restriction to time, place, form, motive, context, forum, or prior disclosure made to any person by an employee or applicant, including a disclosure made in the ordinary course of an employee's duties by an employee to a supervisor or a public body that the employee reasonably believes evidences:

> (A) Gross mismanagement;
> (B) Gross misuse or waste of public resources or funds;
> (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;
> (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
> (E) A substantial and specific danger to the public health and safety.

D.C. Code § 1-615.52(6). Sexual harassment matters and EEOC disclosures and participation plainly fall under subsection (6)(D), protecting disclosures related to violations of federal or state law. *See also Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 73-74 (D.D.C. 2011) (noting that EEOC participation or "alleging harassment and discrimination in violation of federal and state law clearly fall under subsection (6)(D)").

Defendants have set forth no argument that Ms. Clayton's disclosures related to Ms. Jones's sexual harassment complaint are not subject to DC-WPA protections. For this reason alone, summary judgment on this claim should be denied.

"The D.C. WPA also borrows its standards from the Title VII context." *Mentzer v. Lanier*, 677 F. Supp. 2d 242, 252 n. 6 (D.D.C. 2010) (citing *Johnson v. District of Columbia*, 935 A.2d 1113, 1117-18 (D.C. 2007). *See also Williams v. District of Columbia*, 825 F. Supp. 2d 88, 99 (D.D.C. 2011) (same and noting the similarity in legal standards of Title VII and DC-WPA). For the reasons set forth above § IV.a.1., the motion for summary on this claim should be denied for those additional reasons.

### 3. Ms. Clayton set forth a claim for sex discrimination under Title VII.

This Court previously explained the standard in a Title VII disparate treatment claim:

> The plaintiff merely bears the burden of alleging that she was treated less favorably than a "'similarly situated male employee'" and suffered a "materially adverse consequence[ ]" as a result. *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150, 361 U.S. App. D.C. 214 (D.C. Cir. 2004) (quoting *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344 (3d Cir. 1999); *Forkkio v. Powell*, 306 F.3d 1127, 1131, 353 U.S. App. D.C. 301 (D.C. Cir. 2002). The burden then shifts to the defendant to show a "legitimate, nondiscriminatory reason" for the differential treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

*Clayton v. District of Columbia*, 117 F. Supp. 3d 68, 78-80 (D.D.C. 2015).

As an initial matter, DC does not contend that Ms. Clayton was not treated less favorably and that she suffered a materially adverse consequence. This is beyond dispute because Ms. Clayton's predecessor as Government Operations Director, Anthony Devassey, was also a career service employee, not management supervisory. Brown, DC Corp. Designee Depo., at 106:16-22 (**Ex. 12 and 13**). On September 27, 2010, the District of Columbia converted Ms. Clayton's employment from Career Service to Management Supervisory Service. Gregory Depo. Ex. 6 (**Ex. 35**). DC issued a *second* notification the following day, this time citing the Attorney General's opinion to General Schwartz as its basis. Gregory Depo. Ex. 5 (**Ex. 34**). This Court observed that "removal of an important benefit like tenure appears to fall well within the range of sanctions that are cognizable under Title VII." *Clayton*, 117 F. Supp. 3d, at 79.[18]

To state a claim Plaintiff need not show that she was replaced by a person of lesser ability who is not a member of her protected class. *George v. Leavitt*, 366 U.S. App. D.C. 11, 18-19, 407 F.3d 405, 412-13 (2005). Nevertheless, from DC's perspective, this is exactly what

---

[18] In fact, as discussed above, accepting the conversion was really no choice at all. The notice specifically advised that Ms. Clayton would no longer have career service protections, she would be at-will, and that if she declined to accept the transfer, she would be transferred to a vacant career service position – although if no positions were available, her employment would be terminated. Gregory Depo. Ex. 6 (**Ex. 35**). As noted above, there were none.

happened.  As far as the District of Columbia knew, Mr. Preston, a male, had far less experience than Ms. Clayton, and it was not aware of *any* qualifications he had for the job.  Thompson, DC Corp. Designee Depo., at 100:20-111:15 (**Ex. 38**).[19]

Finally, DC half-heartedly claims that she and Mr. Devassey were not "similarly situated."  However, "'[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury.'"  *George v. Leavitt*, 366 U.S. App. D.C. 11, 20, 407 F.3d 405, 414 (2005).  It argues that simply because General Wherley supervised Mr. Devassey and General Schwartz supervised Ms. Clayton, they are automatically not "similarly situated."[20]  This is a distinction without a difference.  Put simply, General Schwartz did not make the decision to set Ms. Clayton as a Career Service employee.  Colonel Stamps forwarded Ms. Clayton's acceptance of the position to DC, Stamps Depo., at 45:22-46:1 (**Ex. 1**), and DC formally processed and appointed Ms. Clayton to the position, which included Career Service protections. Stamps Depo., at 30 (**Ex. 1**).  When Ms. Clayton accepted the position, she likewise understood it was a Career Service position.  Clayton Depo., at 152:6-9; 222:10-23 (**Ex. 14**).  However, there is no evidence that General Schwartz, or General Wherley, set the employment status as Career Service.  Thus, the fact that Mr. Devassey and Ms. Clayton had different commanding generals is irrelevant.  DC sets forth no other distinctions or differences between their role and positions. This single distinction is, at worst, a factual question for the jury.

> **4.     DC's purported reason for the converting Ms. Clayton's position is pretextual.**

---

[19] Likewise, even if he was qualified, Mr. Preston never conveyed his work performance or history to any decision-makers.  Preston, DC Corp. Designee Depo., at 103:18-104:3 (**Ex 54**).

[20] However, during Anthony Devassey's tenure, General Schwartz was the Adjutant General, the second highest ranking official at DCNG.  Schwartz Depo., at 24:13-1 (**Ex. 20**).  There is a clear inference that General Schwartz did have at least some supervisory role and responsibility of Mr. Devassey.

As it did in its motion to dismiss, DC contends that it converted Ms. Clayton from Career Service to Management Supervisory Service because of the August 27, 2010 Attorney General opinion. However, as this Court previously observed, "[e]ven where an employer acts pursuant to or consistently with its legitimate policies when it takes an adverse action against an employee, its selective enforcement of those policies may be evidence of discrimination in violation of Title VII." *Clayton*, 117 F. Supp. 3d, at 79. "A plaintiff may demonstrate pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fordyce v. Prince George's County Md.*, 2014 U.S. Dist. LEXIS 117967, *24 (D. Md. 2014) (internal quotation marks omitted). DC's proffered reason is pretextual – or at the very least a legitimate jury question.

As this Court previously observed,

> to the extent the District contends that its receipt of the 2010 Attorney General opinion was the necessary predicate for reclassifying Clayton's position, see Dkt. 47-1 at 13, evidence going beyond the pleadings and the opinion will be required to prove that fact: the opinion contains no mention of the Career Service, the Management Supervisory Service, or the criteria for assignment of employees between these classifications.

*Clayton*, 117 F. Supp. 3d, at 79. Therefore, as a starting point, the Attorney General's opinion, on its face, did not mandate or require Ms. Clayton to be transferred from Career Service to Management Supervisory Service. It was simply not addressed. Instead, the opinion dealt with reporting obligations and the ability to initiate and participate in the disciplinary process for DC employees at DCNG. **DC admits that there is nothing in the Attorney General's letter requiring Ms. Clayton to be converted from CS to MSS**. Thompson, DC Corp. Designee Depo., at 83:2-6 **(Ex. 38)**. Nobody stated that it was required. Thompson, DC Corp. Designee Depo., at 83:7-13 **(Ex. 38)**.

Although DC now claims the Attorney General's letter warranted the change, it cannot really make any contention in that regard. DC has no contention as to *who* made the decision to convert Ms. Clayton's employment from CS to MSS. Thompson, DC Corp. Designee Depo., at 84:11-13 (**Ex. 38**). Likewise, Ms. Gregory signed the written notification to Ms. Clayton informing her of the conversion, but does not recall who made the decision to convert her to MSS. Gregory Depo., at 27:12-28:9; 48:10-24 (**Ex. 33**). She does not know why the position was not converted prior to September 28, 2010 or whether Ms. Clayton's position was looked at specifically. Gregory Depo., at 49:7-13; 50:5-24 (**Ex. 33**).

Mr. Albert, Ms. Clayton's purported supervisor, denied involvement in the decision to transfer her position from CS to MSS, Albert Depo., at 15:25-16:3 (**Ex. 55**), and was not aware of any review of positions at the DCNG took place to consider whether to transfer positions from CS to MSS. Albert Depo., at 18:12 (**Ex. 55**). Nevertheless, Ms. Gregory confirmed that she would not convert the employment from CS to MSS without discussing it with Mr. Albert. Gregory Depo., at 141:11-15 (**Ex. 33**). That DC now claims that the Attorney General's opinion presaged the conversion at all simply buttresses the conclusion that it was requested and used offensively against Ms. Clayton.

Moreover, the Attorney General's opinion letter did not constitute some type of change in authority or shift in policy. The provision of law purporting to require Ms. Clayton's conversion from CS to MSS was in place at the time Mr. Devassey was hired. Brown, DC Corp. Designee Depo., at 107:15-18 (**Ex. 12 and 13**). *See also* D.C. Code § 1–609.58.

In fact, Ms. Clayton's predecessor as Government Operations Director, Anthony Devassey, was also treated as though he was under the mayor's supervision. Mr. Devassey was initially terminated by the then-commanding general of DCNG, General Wherley, on April 11,

2008 upon the expiration of his H1-B Visa. Gregory Depo. Ex. 11 (**Ex. 36**). However, the termination by DCNG was ineffective. Gregory Depo. Ex. 11 (**Ex. 36**).

On April 21, 2008, Brender Gregory, *the DC Human Resources Director*, "rescinded" General Wherley's termination letter and placed Mr. Devassey on administrative leave. Gregory Depo. Ex. 11 (**Ex. 36**); Gregory Depo. Ex. 12 (**Ex. 37**). After investigation, on May 2, 2008 Ms. Gregory observed that DCNG had no obligation to extend his visa. Gregory Depo. Ex. 12 (**Ex. 37**). At that point, *DC Human Resources* terminated Mr. Devassey's employment, effective May 14, 2008. Gregory Depo. Ex. 12 (**Ex. 37**). Thus, the suggestion that the Attorney General's opinion letter constituted any change in policy over who is the employer or termination authority over the Director of the Government Operations Division is simply false. That simply never changed from Mr. Devassey's employment as director to Ms. Clayton's employment as director. The only reason he was terminated at all was because his visa expired.

DC also claims that "other" staff also had to be converted, in addition to Ms. Clayton, but this is simply not true. There is no evidence of *any* other position conversions at that time.

### 5. DC's purported basis for terminating Ms. Clayton's employment is pretextual.

Defendants have asserted shifting reasons, or no reasons at all, for Ms. Clayton's termination from employment. In its motion for summary judgment, DC suggests two reasons: 1) that Ms. Clayton "refused" to cooperate with District agencies, DC Motion for Summary Judgment, at 24-25; and 2) Ms. Clayton "defied clear legal directives" on the supposed letterhead issue. DC Motion for Summary Judgment, at 25-27.[21] However the stated bases by DC's Corporate Designee were different. DC's Corporate Designee asserted two reasons for the

---

[21] These purported bases were set forth in response to Plaintiff's DC-WPA claim. Nevertheless, to the extent these bases apply to Plaintiff's Title VII claim, they are addressed here.

termination: that Ms. Clayton "used DoD's letterhead improperly" and seemed to have "an estranged relationship" with Neil Albert. Thompson, DC Corp. Designee Depo., at 45:1-17 (**Ex. 38**).

> ### i. Defendants' claim that Ms. Clayton "refused to cooperate" with District Agencies is incorrect and was not an asserted basis for termination.

As to the first asserted reason here on summary judgment, a supposed refusal to cooperate with "District Agencies," this is simply an invented reason for purposes of summary judgment. DC's Corporate Designee did not state that this was a basis for termination. Likewise, in its arguments that "refusal to cooperate" was a reason for the termination, the defense cites to nothing in the record showing that this *was* a reason. It is nothing other than a shifting and invented reason for purposes of summary judgment.

In fact, Josh Hermias, as DC admits, was simply an "OCA analyst" who would have no authority for termination. Moreover, there is nothing in the record displaying that Mr. Hermias had an issue with Ms. Clayton "discussing" the proposed MOU with Generals Schwartz and Ricket. As part of this invented reason for termination, DC also suggests that DCHR "had difficulty getting personnel folders" to convert other positions from CS to MSS. DC Motion for Summary Judgment, at 25. This purported "difficulty" was stated by either Phil Lattimore or Barry Kreiswirth. Gregory Depo., at 93:25-94:25 (**Ex. 33**). However, neither Mr. Lattimore nor Mr. Kreiswirth were decision-makers with respect to Ms. Clayton's termination. Thompson, DC Corp. Designee Depo., at 31:8-11 (**Ex. 38**). Moreover, Ms. Gregory apparently remembered an unknown e-mail from Mr. Lattimore or Mr. Kreiswirth to this effect but failed to identify it. Gregory Depo. , at 94:1-3 (**Ex. 33**). In fact, when asked whether this was why Ms. Clayton was terminated, Ms. Gregory specifically stated: "I cannot speculate because I didn't make that

decision. So I don't know…." Gregory Depo., at 95:1-7 **(Ex. 33)**. Likewise, Ms. Clayton never counseled about this. Gregory Depo., at 95:8-10 **(Ex. 33)**. Finally, the claimed "lack of cooperation" with Neil Albert is likewise an invented reason. Mr. Albert himself admitted that he has no reason to speculate about Ms. Clayton's job quality. Albert Depo., at 53:6-13 **(Ex. 55)**.

> ii. **Although not asserted on summary judgment, DC's prior claim that Ms. Clayton and Mr. Albert had an "estranged relationship" is incorrect.**

When asked why she was terminated, DC twice confirmed that it was because she was "at-will" and served "at the pleasure of the mayor." Thompson, DC Corp. Designee Depo., at 44:2-6; 44:15-18 **(Ex. 38)**. The termination notice itself likewise contains no reason for her termination, instead stating simply that Ms. Clayton is at-will. Albert Depo. Ex. 3 **(Ex. 56)**. DCNG has no contention as to why Ms. Clayton's position was converted or why her employment was terminated. Forrest, DCNG Corp. Designee Depo., at 142:17-143:7 **(Ex. 58)**.

DC's Corporate Designee asserted two reasons for the termination: that Ms. Clayton "used DoD's letterhead improperly" and seemed to have "an estranged relationship" with Neil Albert. Thompson, DC Corp. Designee Depo., at 45:1-17**(Ex. 38)**. Neither of these additional "bases" provide any support for the termination.

First, as the purported "estranged relationship between Ms. Clayton and Mr. Albert, DC claimed this simply because of the "tone" of two e-mails *from 2009*. Thompson, DC Corp. Designee Depo., at 45:17-47:11 **(Ex. 38)**. Indeed, DC's Corporate Designee was simply "interpreting" an unidentified e-mail from years earlier and admitted there was nothing from Mr. Albert displaying this supposed "estranged" relationship. Thompson, DC Corp. Designee Depo., at 47:15-48:8 **(Ex. 38)**. DC never produced this e-mail, the designee could not identify the e-mail, and most importantly, Mr. Albert himself rebuts this because he denied ever meeting Ms.

Clayton, Albert Depo., at 37:3-11 (**Ex. 55**), and had no reason to doubt her job quality.  Albert

Depo., at 53:6-13 (**Ex. 55**).  Further, DC admitted that Neil Albert never stated that Ms. Clayton

was disrespectful and nobody ever even told that to the designee.  Thompson, DC Corp.

Designee Depo., at 119:5-11(**Ex. 38**).

        **iii.**      **Defendants' claim that Ms. Clayton was terminated because she**
                   **"defied clear legal directives" in purportedly using DOD, DCNG**
                   **letterhead is pretextual.**

DC next claims that Ms. Clayton was terminated because she "defied a legal directive"

and used DCNG, Department of Defense letterhead.  DC Motion for Summary Judgment, at 25-

28; Thompson, DC Corp. Designee Depo., at 45:1-17(**Ex. 38**).

**As to this reason, the purported use of "DOD letterhead," DC contended in its**

**deposition that the purported offending action occurred in 2009, which is at least a year**

***before* her termination.**  Thompson, DC Corp. Designee Depo., at 48:11-13 (**Ex. 38**).  Thus, the

purported basis a year prior to the termination is plainly pretextual.

Nevertheless, to the extent DC tries to now claim that purportedly using DOD letterhead

in 2010 was the reason, it is likewise pretextual.  DC had no actual policy on which letterhead

Ms. Clayton should have used and was not aware if any letterhead was even in existence for the

Government Operations Division of the DCNG.  Thompson, DC Corp. Designee Depo., at

50:13-19 (**Ex. 38**).  **DC has no contention as to whether use of DOD letterhead was proper**

**or authorized given the DOD's involvement in the investigation and disciplinary process.**

Thompson, DC Corp. Designee Depo., at 54:8-16 (**Ex. 38**).  In fact, as discussed below, DCNG

was closely and carefully involved in the entire disciplinary process related to Ms. Clipper.

Further, the purported offending document that DC presents clearly and accurately

indicated that it was coming from "Betty J. Clayton, Director, DC Government Operations, DC

National Guard." DC MSJ Ex. 14, ECF No. 97-14. It did not state that it was issued from the Department of Defense. DC was not even aware whether the proposed disciplinary notice that was supposedly drafted on DOD letterhead was served on the employee. Thompson, DC Corp. Designee Depo., at 61:3-12 (**Ex. 38**). Notably, DC did not provide any counseling sessions related to supposed use of DOD letterhead. Thompson, DC Corp. Designee Depo., at 54:17-20 (**Ex. 38**). Moreover, the purported basis for claiming that the purported DOD letterhead issue was an issue at all was an e-mail that had absolutely nothing to do with letterhead at all. Thompson, DC Corp. Designee Depo., at 127:14-128:14 (**Ex. 38**); Thompson, DC Corp. Designee Depo, DC Depo. Ex. 1 (**Ex. 39**).

**Importantly, Mr. Albert was not aware of Ms. Clayton purportedly using Department of Defense, DCNG letterhead.** Albert Depo., at 15:15-24 (**Ex. 55**). **Likewise, Ms. Gregory has no idea whether using the wrong letterhead was a reason for the termination**. Gregory Depo., at 69:19-23 (**Ex. 33**). **Further, Mayor Fenty, the other purported decision-maker, had no knowledge of Ms. Clayton or any claimed issue with using DOD letterhead**. Fenty Affidavit, at ¶ 2 (**Ex. 59**). Mr. Albert even confirmed that there is no procedure in place to obtain DC government letterhead. Albert Depo., at 64:10-13 (**Ex. 55**).

Also, Ms. Clayton was clear that General Schwartz never informed Ms. Clayton there was an issue as to which letterhead she should use. Clayton Depo., at 216:1-6 (**Ex. 14**). The City Secretary of State advised Ms. Clayton that there was no issue with using the letterhead, particularly under these circumstances. Clayton Depo., at 89 (**Ex. 14**). Not only this but Government Operations Division budget proposals were on DOD letterhead and no one complained. Clayton Depo., at 215:19-5 (**Ex. 14**). General Schwartz previously approved, and literally signed off on, incentive awards for DC employees. Schwartz Depo. Ex. 24A (**Ex. 28**).

The Government Operations Division utilized DOD letterhead for this purpose. *Id.* Ms. Clayton was clear in Ms. Clipper's proposed termination notice that it was coming from "Director, D.C. Government Operations, D.C. National Guard." Clayton Depo., at 216:8-13 **(Ex. 14)**.

DC claims that *General Schwartz* e-mailed Ms. Clayton that she could not use DOD letterhead to discipline Ms. Clipper, Thompson, DC Corp. Designee Depo., at 51:12-52:8 **(Ex. 38)** , but there is no such e-mail in the thousands of pages of document production. Instead, in its motion for summary judgment, DC unearths an e-mail from Phillip Lattimore purportedly complaining about Ms. Clayton's use of DOD letterhead. However, Mr. Lattimore did not *order or instruct*, Ms. Clayton not to use that letterhead, instead simply suggesting that she "may" want to use alternative letterhead. Clayton Depo., at 216-218 **(Ex. 14)**. That Ms. Clayton "may" want to obtain alternative letterhead is most certainly not a "clear legal directive."[22]

Critically, even if Mr. Lattimore did have an issue with Ms. Clayton's supposed use of the letterhead, **he was not a decision-maker with respect to her termination**. Thompson, DC Corp. Designee Depo., at 31:4-11 **(Ex. 38)**.[23] **Further, although DC claims Mr. Albert was informed of this, there is no such writing to this effect. Neither Mr. Albert nor Mr. Fenty were aware of Ms. Clayton purportedly using Department of Defense letterhead so it could not possibly have factored into their termination decision.** Albert Depo., at 15:15-24 **(Ex. 55)**; Fenty Affidavit, at ¶ 2 **(Ex. 59)**. Indeed, Mr. Albert denied involvement, despite it allegedly being his decision. Under the circumstances, DC cannot even suggest, or set forth any admissible evidence, that Mr. Albert was informed of the purported letterhead issue. Mr.

---

[22] Further undermining this is that the attorney general's opinion and the proposed MOU predated this e-mail and Ms. Clayton was conspicuously not listed as the DG Government Operations Contact in the MOU and was not copied on the Attorney General's opinion.

[23] Also, at the June 12, 2017 Status Conference, DC confirmed, on the record, that Mr. Lattimore would *not* be called as a witness and any information he had was protected by attorney-client privilege.

Lattimore is not going to be a witness, any information he has is protected by attorney-client privilege, and Mr. Albert denies being aware of the letterhead issue. It simply could not factor into the decision here.

The suggestion that DCNG was not involved in disciplinary measures against Ms. Clipper is, in any event, simply incorrect. The DC Office of the Inspector General referred the investigations to General Schwartz and the DCNG, Schwartz Depo. Ex. 18A **(Ex. 22)**, the DCNG HRO, Colonel Stamps, performed *two* extensive investigations, Stamps Depo. Exs. 6-7 **(Ex. 7-8)**, Generals Schwartz and Ricket were briefed on the ongoing status of Ms. Clipper's employment, Schwartz Depo. Ex. 23A **(Ex. 26)**, the Director, Joint Staff, Kenny Ricket reviewed and "approved" the findings, Stamps Depo. Ex. 8 **(Ex. 9)**, on this basis General Schwartz approved the release to Ms. Clayton for action, *id*. Thus, any use of DOD letterhead simply continues the process that was initiated years earlier.

Finally, the suggestion by DC that DCNG was somehow behind the termination because of the letterhead issue was fully rebutted by its top two officials unequivocally confirming that Ms. Clayton's employment was superb and that she was a stellar employee from her hire to the time of her termination. *See supra*, § II.b. Indeed, when Ms. Clayton was terminated, the second-ranking official of the DCNG, General Ricket, was surprised because he thought Ms. Clayton was performing well and was an "excellent employee." Ricket Depo., at 130:20-131:6 **(Ex. 10)**. He did not see the termination coming. Ricket Depo., at 131:5-6; 132:2-4 **(Ex. 10)**. This is particularly notable because General Ricket was copied on the very e-mail DC now points to. ECF No. 97-12.

Likewise, DC had no complaints about Plaintiff's performance. Brown, DC Corp. Designee Depo., at 110:2-4 **(Ex. 12 and 13)**. It concedes that she had no negative employment

appraisals, the only employment appraisal was "overwhelmingly positive." Thompson, DC Corp. Designee Depo., at 35:6-36:3 (**Ex. 38**); Thompson, DC Corp. Designee Depo., at 90:2-97:9 (**Ex. 38**); Thompson, DC Corp. Designee Depo., at 97:10-13 (**Ex. 38**).

Ms. Clayton did not receive any negative reviews from any supervisors. Thompson, DC Corp. Designee Depo., at 98:1-3 (**Ex. 38**). Likewise, there are no memoranda or other writings showing that Ms. Clayton was no longer significantly exceeding expectations. Thompson, DC Corp. Designee Depo., at 98:4-13 (**Ex. 38**). If there had been, they would have been included in her employment file. Thompson, DC Corp. Designee Depo., at 98:15-21 (**Ex. 38**). DC also concedes that Ms. Clayton had no negative employment appraisals, the only employment appraisal was "overwhelmingly positive," "she was never placed on a performance improvement plan, [it] did not formally counsel her to improve performance, and [it] did not start any grievances or discipline." Thompson, DC Corp. Designee Depo., at 35:6-36:3 (**Ex. 38**).

"A plaintiff may demonstrate pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fordyce v. Prince George's County Md.*, 2014 U.S. Dist. LEXIS 117967, *24 (D. Md. 2014) (internal quotation marks omitted). Likewise, "a reasonable fact-finder could infer something 'fishy'" about DC's claims under the circumstances, suggesting pretext. *Dorriz v. District of Columbia*, 133 F. Supp. 3d 186, 199 (D.D.C. 2015).

DC's proffered reason is pretextual – or at the very least a legitimate jury question. Thus, to now claim in this litigation or on summary judgment that Ms. Clayton's employment performance was somehow deficient is simply incorrect and inconsistent with the facts here.

Under the circumstances, a reasonable jury could infer that DC's proffered reasons are pretextual.

### 6. Whether DC violated the DC False Claims Act is a question of fact for the jury.

To establish a D.C. False Claims Act retaliation claim, a plaintiff must show (1) that he or she engaged in protected activity, (2) that the defendant had knowledge that the plaintiff engaged in such protected activity, (3) that the defendant terminated the plaintiff's employment, and (4) that there was a causal connection between the protected activity and the defendant's termination of the plaintiff's employment. *Payne v. District of Columbia*, 773 F. Supp. 2d 89, 97 (D.D.C. 2011). *See also* D.C. Code § 2-308.16(b), currently codified at .D.C. Code § 2-381.01 *et seq.*

In December 2009, Ms. Clayton learned of and reported that annual leave for Ms. Clipper and Ms. Pelham, a budget specialist, were restored. Additionally, Ms. Clipper improperly restored that improperly taken leave. Ms. Clayton reported these instances of improper leave and improper restoration of the improperly taken leave to the D.C. CFO and D.C. IG in August 2010.

In or about September 2008, General Schwartz requested that Ms. Clayton approve incentive awards for certain District of Columbia employees for the fiscal year prior to Ms. Clayton's arrival at DCNG. These staff members, including Ms. Clipper, were permitted to write their own performance evaluations, which, incidentally, were the three largest awards proposed. Upon inspection, however, Ms. Clayton learned that Col. Essie Thomas, a United States Property and Fiscal Office officer, approved their awards even though she had not supervised them during their evaluation period. General Schwartz personally and repeatedly attempted to persuade Ms. Clayton to overlook this procedure and release the incentive awards

funds. Ms. Clayton, however, refused to release those funds to the employees and reported this to the District of Columbia Office of the Inspector General and District of Columbia CFO.

In another instance, Ms. Clayton reported that funds for a District of Columbia bus contract were inappropriately steered to a D.C. minority-based company without bid. Ms. Clayton reported the inappropriate co-mingling of DCNG youth leader camp 501(c)(3) funds and District of Columbia local funds prior to 2009.

Ms. Clayton reported employee federal and local tax withholdings of a federal security guard contract that were not disclosed to the treasury.

Prior to 2009, District of Columbia credit cards were not canceled when employees left the DCNG. Also, credit cards were being used within fifty miles of the worksite in violation of the DCNG procurement policy. In fact, one credit card was secured in the name of a secretary – although that secretary was ordered to immediately return it to the procurement officer. Ms. Clayton suspected that personnel in other District of Columbia agencies, including the DC Office of the Chief Financial Officer, the DC Office of Contracting and Procurement, the DC Department of Human Resources, and the DCNG were aware of or otherwise in involved in fraud, waste, abuse, and inappropriate use of funds related to DCNG credit cards. Ms. Clayton reported these incidents of District of Columbia credit card violations to the District of Columbia Office of the Inspector General.

Specifically, Ms. Clayton continuously reported these instances and pressured relevant D.C. agencies for action. By way of example, in May 2010, Ms. Clayton reported to Mr. Regan, the then-head of the D.C. Office of Contracting and Procurement about apparent improper use of D.C. credit cards and misappropriation of funds. Upon information and belief, Defendants were made aware of these reportings.

Ms. Clayton also uncovered and reported various furniture and equipment purchases in excess of $250,000 purchased in FY 2007. Those purchases were neither inventoried nor listed on the District of Columbia inventory control list until it came to Ms. Clayton's attention in 2010. This was contrary to established procedures.

Ms. Clayton reported numerous other instances of apparently unlawful and inappropriate action. By way of example, Ms. Clayton reported that in September 2009 DCNG created federal positions based on District of Columbia specific skills for the purpose of transferring two employees from the District of Columbia budget to the federal budget. Ms. Clayton reported potential United States security risks to General Schwartz. She explained that Mr. Devassey had ordered and saved certain military research – and showed him her concerns – but General Schwarz simply wiped his fingerprints from the publication and handed the information back to Ms. Clayton without comment. Clayton, Responses to District of Columbia's Interrogatories No. 5, at 8-11.

While Ms. Clayton has set forth a clear timeline displaying her participation in protected activity in relation to Ms. Jones's sexual harassment complaint against General Schwartz and Defendants' pattern of retaliation, she likewise engaged in these protected activities. Whether they constitute contributing factors or alternative factors for Ms. Clayton's termination should be a question of fact for the jury.

 **b.**   **District of Columbia National Guard**

 **1.**   **As this Court has already concluded, DCNG was Ms. Clayton's joint employer for Title VII purposes.**

As it did in the motion to dismiss stage, DCNG requests that Court dismiss Plaintiff's claim because it denies it was her employer. This contention was twice denied by this Court. For the reasons set forth in this Court's opinions on this issue, summary judgment should be

denied. *Clayton v. District of Columbia*, 117 F. Supp. 3d 68, 82-86 (D.D.C. 2015); *Clayton v. District of Columbia*, 999 F. Supp. 2d 178, 183-84 (D.D.C. 2013).

In November 2013, this Court observed:

If the plaintiff could be a joint employee, the court looks to "whether defendant 'retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.'" Harris, 657 F. Supp. 2d at 9 (quoting NLRB v. Browning-Ferris Indus. of Pa., Inc, 691 F.2d 1117, 1123 (3d Cir. 1982)). The plaintiff's employment status is not determined by who provided the employee's paycheck, or administered the employee's benefits. Id. at 12-13.

 *          *          *

Plaintiff's proposed amended complaint sufficiently pleads that the DCNG maintained some control over both the means and manner as well as the terms and conditions of Clayton's employment, thus making relief plausible. For example, Clayton alleges that Colonel Ronald Stamps of the DCNG was involved in hiring Clayton, Proposed 2d Am. Compl. ¶ 7, General Schwartz of the DCNG completed Clayton's performance evaluations, id. ¶ 10, and Clayton reported to both General Schwartz and D.C. agency officials during her employment, id. ¶ 13. In addition, Clayton alleges that "DC Government Operations is simultaneously a Directorate within Joint Force Head Quarters, DC National Guard and an agency of the Government of the District of Columbia." Id. ¶ 9. Clayton's proposed amended complaint also alleges that General Schwartz, as the head of the DCNG, has "supervisory authority" over D.C. employees of the DCNG, id. ¶ 84, and can [**14] "participate in the hiring process and confer on disciplinary actions," id. ¶ 83. Finally she alleges that General Schwartz has "independent authority to initiate remedial or disciplinary measures against Government Operations Division Personnel." Id. ¶ 84. Thus, because Clayton has amply pled that the DCNG maintained control over Clayton's employment, she has sufficiently pled facts that permit her to sue the DCNG under Title VII. Therefore, Clayton's motion to add two Title VII claims will be granted.

*Clayton v. District of Columbia*, 999 F. Supp. 2d 178, 184 (D.D.C. 2013).

Subsequent to this, in detailed opinion, this Court observed that "Title VII offers no meaningful definition of 'employee' or 'employer.' *See, e.g., Juino v. Livingston Parish Fire Dist.*, 717 F.3d 431, 434 (5th Cir. 2013); *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 371 (2d Cir. 2006). The Supreme Court, accordingly, has instructed that courts should look to 'traditional

agency law principles.'" *Clayton v. District of Columbia*, 117 F. Supp. 3d 68, 82 (D.D.C. 2015). Examining relevant case law and persuasive dictum, this Court concluded that "the *Browning-Ferris* test is better suited than the *Spirides* test to resolve claims of joint employment." *Clayton*, 117 F. Supp. 3d, at 83 (D.D.C. 2015).[24] The Court also rejected a strict "remuneration test." *Id.*, at 84-85.

The Court observed that "Clayton alleges that DCNG officials had substantial authority over—and in fact played significant roles in—her hiring and supervision. Even more to the point, Clayton alleges that General Schwartz repeatedly threatened her 'with termination of her employment.' *Id.* ¶ 68. It is plausible to infer from these allegations that Clayton was subject to the control of the DCNG." *Clayton*, 117 F. Supp. 3d, at 84. Finally, the Court appreciated the complex relationship between DC and DCNG:

> The pleadings and incorporated documents only underscore that the relationship between the District and the DCNG is unique, complex, and, at times, imperfectly understood by personnel affiliated with both entities. *See, e.g.*, Dkt. 56-3 at 2 (proposing draft memorandum of understanding to "clarify the reporting relationship between the DCNG and the [DC Government Operations] Division"); *see also* Dkt. 45 ¶ 9 (allegation that document provided to Clayton when she was hired characterized "DC Government Operations" as "simultaneously a Directorate" within DCNG and an "agency" of the District); *id.* ¶ 70 (alleging that General Schwartz's staff sought guidance regarding administrative authority over employees of Government Operations Division).

*Clayton*, 117 F. Supp. 3d, at 86.

In its papers, DCNG suggests to the Court that it had little or no involvement with Ms. Clayton's employment. This is simply not so. Instead, DCNG was closely involved in Ms.

---

[24] The Court also observed that "even if the *Spirides* test were applicable, the result at this stage of the proceedings would be the same, since the *Browning-Ferris* test 'is not terribly distinct from the primary consideration in the *Spirides* test.' *Dean v. Am. Fed'n of Government Emps.*, 549 F. Supp. 2d 115, 122 (D.D.C. 2008); *Harris*, 657 F. Supp. 2d at 10. Both involve a core inquiry regarding the degree to which the purported 'employer' or 'joint employer' exercised control over the worker's performance and the terms and conditions of his or her engagement." *Clayton*, 117 F. Supp. 3d, at 83-84.

Clayton's hiring, personnel actions, performance reviews, reporting and supervisory matters, and conferred directly on Ms. Clayton's performance. In fact, this was true both before and after the Attorney General's opinion.

> **i.    DCNG interviewed and recommended Ms. Clayton for the position of Government Operations Director of DCNG.**

After the former Director of Government Operations, Anthony Devassey, was removed, a board of DCNG personnel was convened to make a recommendation on the hiring of a replacement. Stamps Depo., at 28-29; 32-33 (**Ex. 1**). Either General Schwartz or General Ricket advised Colonel Stamps to draft the hiring notice. Stamps Depo., at 39 (**Ex. 1**). Ms. Clayton applied for the position and was qualified. Stamps Depo. Ex. 1 (**Ex. 2**). Ms. Clayton's first interview was with a panel of DCNG employees. Clayton Depo., at 10-11 (**Ex. 14**). After her initial interview, she had a follow-up interview with General Schwartz. Clayton Depo., at 13-15 (**Ex. 14**) .

On or about March 13, 2008 Colonel Stamps advised Ms. Clayton that she was selected to the position, contingent upon DC approval. Stamps Depo. Ex. 2 (**Ex. 3**). Ms. Clayton formally accepted the position by written correspondence on March 26, 2008. Stamps Depo. Ex. 3 (**Ex. 4**); Clayton Depo. Exs. 1-3 (**Ex. 15-17**). Colonel Stamps forwarded Ms. Clayton's acceptance of the position to DC, Stamps Depo, at 45:22-46:1 (**Ex. 1**)., which formally processed and appointed Ms. Clayton to the position. Stamps Depo., at 30 (**Ex. 1**). There is no evidence that DC requested its own interviews of Ms. Clayton.

> **ii.    DCNG and DC witnesses both confirm that Ms. Clayton reported to both DCNG and DC.**

The relationship between DC employees and the DCNG is complex. For example, Colonel Stamps, the DCNG Human Resources Officer, confirmed his understanding from the

2008-2010 timeframe was that the DC Government Operations is simultaneously a Directorate within Joint Force Head Quarters, DC National Guard and an agency of the Government of the District of Columbia.  Stamps Depo., at 62:21-63:9 (**Ex. 1**).

Ms. Clayton reported to the Commanding General – General Schwartz.  Ricket Depo., at 30:14-31:1 (**Ex. 10**).  General Schwartz confirmed that, at the time Ms. Clayton was employed at the DCNG, she reported directly to him.   Schwartz Depo., at 73:11-13 (**Ex. 20**).  Moreover, while she was employed to work at the DCNG, he continued to be her supervisor at the time of her termination.  Schwartz Depo., at 75:5-11 (**Ex. 20**).  Brender Gregory, the DC Director of Human Resources, also confirmed that Ms. Clayton's reporting authority was to General Schwartz, the Commanding General, ***and*** Neil Albert, the City Administrator.  Gregory Depo., at 95:19-25 (**Ex. 33**).  **DC's Corporate Designee confirmed that both before and after the Attorney General's opinion letter Ms. Clayton reported to both the commanding general and the mayor and city administrator.** Thompson, DC Corp. Designee Depo., at 61:13-16; 62:21-63:17 (**Ex. 38**).  Likewise, DC confirmed that both before and after the opinion, the commanding general was free to confer with DC on personnel decisions, could participate in disciplinary actions, and even initiate it.  Thompson, DC Corp. Designee Depo., at 63:18-65:5 (**Ex. 38**).

It was commonplace for federal employees to supervise employees of the District of Columbia government.  Schwartz Depo., at 29:6-13 (**Ex. 20**).  General Schwartz himself appraised and reviewed Ms. Clayton's employment performance, Schwartz Depo., at 69:12-70:20 (**Ex. 20**), and completed her performance review.  Schwartz Depo. Ex. 9.[25] (**Ex. 21**).

      iii.    **The Attorney General's opinion highlights the complex nature of the reporting relationship DC and DCNG employees.**

---

[25] He did not stop appraising and reviewing the Government Operations Director until *after* Ms. Clayton was no longer employed there.  Schwartz Depo., at 72:11-17.

General Schwartz requested an opinion letter from the DC Attorney General, Peter J. Nickles related to his authority over DC employees. Thompson, DC Corp. Designee Depo., at 17:20-18:1; 23:11-15 (**Ex. 38**). See also AG Opinion letter (**Ex. 60**). Despite acknowledging that DC personnel issues were in DC's, and Ms. Clayton's, purview, General Schwartz had no explanation for why he was questioning to the DC Attorney General Ms. Clayton's disciplinary authority or his own authority over DC government personnel. Schwartz Depo., at 222:7-224:7 (**Ex. 20**).

On August 27, 2010, Attorney General Nickles, observed that "there is no statute that establishes [the Government Operations Division for the DCNG] as an independent or subordinate agency of the Mayor or the District of Columbia." **Ex. 60**, Attorney General Opinion, at 1. The Attorney General pointed out a number of aspects of the Government Operations Division for the DCNG that are linked to District of Columbia government, such as a right of appeal to the D.C. Office of Employee Appeals and budgeting. Attorney General Nickles also recognized, however, that, pursuant to "DCNG's organizational chart, it appears that the Director of the Government Operations Division, a District employee, is in your chain of command." Attorney General Opinion, at 1 (**Ex. 60**). Later, however, the opinion noted that "the Division Director is in the chain of command of the Mayor and the City Administrator" of the District of Columbia. Attorney General Opinion, at 2 (**Ex. 60**).

Further highlighting this unique situation is that the Attorney General opined that it is the Mayor who may exercise supervisory authority over D.C. employees of the DCNG. Attorney General Opinion, at 2 (**Ex. 60**). While recognizing this, the Attorney General also noted that the Commanding General of the DCNG may participate in the hiring process and confer on disciplinary actions. *Id.* This is especially noteworthy because Ms. Clayton, as the Director of the

Government Operations Division for the DCNG, had no direct supervisors within the D.C. government and there was no statute or regulation so governing. The "Commanding General of the DCNG is free to confer with the Mayor through the Office of the City Administrator" regarding personnel matters, may "participate in the hiring process (i.e., be a member of a hiring panel) of Division employees, and may discuss with District officials whether administrative action should be filed against an employee." Attorney General Opinion, at 2 **(Ex. 60)**. "As for matters that pertain exclusively to the National Guard, while the Division Director is in the chain of command of the Mayor and the City Administrator, she also has an informal, dotted-line reporting relationship with the Commanding General." Attorney General Opinion, at 2 **(Ex. 60)**.

As such, the D.C. Attorney General's opinion supports the conclusion that Ms. Clayton, the Director, was a unique employee in terms of her relationship and employment with the D.C. government and the DCNG.

In fact, both before and after the AG opinion letter Ms. Clayton reported to both the commanding general and the mayor and city administrator. Thompson, DC Corp. Designee Depo., at 61:13-16; 62:21-63:17 **(Ex. 38)**. Likewise, DC confirmed that both before and after the opinion, the commanding general was free to confer with DC on personnel decisions, could participate in disciplinary actions, and even initiate it. Thompson, DC Corp. Designee Depo., at 63:18-65:5 **(Ex. 38)**.

The DC Director of Human Resources, Brender Gregory, also observed that Attorney General Nickles advised that General Schwartz should have to opportunity to confer with the District on personnel matters. Gregory Depo., at 54:6-13 **(Ex. 33)**. General Schwartz could confer with any District official, including Neil Albert. Gregory Depo., at 55:11-14 **(Ex. 33)**. Ms. Clayton's direct supervisor was Mr. Albert and she had a "quasi" relationship with General

Schwartz as head of the National Guard where she was stationed. Gregory Depo., at 94:11-25; 114:23-115:8 (**Ex. 33**).

This is precisely what happened here. As DC Human Resources Director Brender Gregory confirmed, General Schwartz "conferred" with Neil Albert and claimed that Ms. Clayton was not "cooperating" with him. Gregory Depo., at 60:12-61:14 (**Ex. 33**); Gregory Depo., at 93:19-22(**Ex. 33**); Gregory Depo., at 136:24-137:21 (**Ex. 33**). As discussed above, given that General Schwartz confirmed Ms. Clayton's employment performance was flawless, and further that Neil Albert had no knowledge of the now-claimed "letterhead issue," the only matter that Ms. Clayton was not "cooperating" on with DCNG was silencing Ms. Jones's complaints that General Schwartz sexually harassed her.

### iv. DCNG routinely engaged in Army investigations over DC employees.

As discussed above, § II.c., DCNG engaged in Army AR 15-6 investigations multiple times over DC employees, including Ms. Clipper. Further, DCNG was not conducting some rogue investigation. DC actually referred the investigations to DCNG. The DC Office of the Inspector General referred the investigations to General Schwartz and the DCNG, Schwartz Depo. Ex. 18A. The DCNG HRO, Colonel Stamps, performed *two* extensive investigations, Stamps Depo. Exs. 6-7 (**Ex. 7-8**), Generals Schwartz and Ricket were briefed on the ongoing status of Ms. Clipper's employment, Schwartz Depo. Ex. 23A (**Ex. 26**), General Ricket advised Ms. Clayton on who would be an appropriate hearing officer for the Clipper case, Schwartz Depo. Ex. 22 (**Ex. 25**), General Ricket reviewed and "approved" the findings, Stamps Depo. Ex. 8, and on this basis General Schwartz approved the release to Ms. Clayton for action. *Id.*

In fact, in 2009 DCNG engaged in an "informal inquiry" of Ms. Clayton (based on a strike complaint by Ms. Clipper). Ricket Depo., at 79-80 (**Ex. 10**). DCNG had the ability to

order a formal inquiry but ultimately did not.  Ricket Depo., at 80 (**Ex. 10**).  No discipline or

reprimand was issued against Ms. Clayton and the report was not even provided to her.  Ricket

Depo., at 82 (**Ex. 10**).  As discussed above, this was not any basis whatsoever for Ms. Clayton's

termination and she had flawless employment performance (as confirmed by DC, General

Schwartz, and General Ricket, who approved this inquiry).  However, the import of this is that

DCNG could, and apparently actually did, open an inquiry into Ms. Clayton, and further believed

it had the authority to order a formal investigation as well.

> iv.  **Additional unique factors relating to the complex nature of the DC and DCNG relationship.**

There are numerous additional unique factors concerning the relationship between DC

and DCNG.  The Court previously observed:

> DCNG, which exists to serve both national and local interests. Thus, although the President serves as the Commander-in-Chief of the National Guard of the District of Columbia, D.C. Code § 49-409, and the Commanding General is "considered to be an employee of the Department of Defense," *id.* § 49-301, the Mayor of the District of Columbia may "call on" National Guard to aid in the suppression of riots in the District, *id.* § 49-103. Moreover, the financial relationship between the District and the National Guard is not as clear cut as the DCNG suggests. The Commanding General, for example, is required to "transmit to the Mayor of the District of Columbia an estimate of the amount of money required for the next ensuing fiscal year to pay the expenses authorized by" the provisions of the D.C. Code governing the DCNG, and the Mayor, in turn, is required to include those figures in "his annual estimates of appropriations for the District." *Id.* § 49-905.

*Clayton v. District of Columbia*, 117 F. Supp. 3d 68, 85-86 (D.D.C. 2015)

General Schwartz also previously approved, and literally signed off on, incentive awards

for DC employees.  Schwartz Depo. Ex. 24A (**Ex. 28**).  The Government Operations Division

utilized DOD letterhead for this purpose.  *Id.*  DCNG obtains its funding from the DC Council,

and submits its requests for information directly to the Commanding General.  Schwartz Depo.

Ex. 25A (**Ex. 29**).  DC further holds performance and oversight hearings on DCNG.  *Id.*  It

requests information, including: organizational charts; names of senior personnel; a Schedule A for the agency identifying employees by title/position, current salaries, fringe benefits, and program office; listings of employees with salaries above $110,000; "cost of needs" for the agency on a "Form B" to submitted to the Mayor or CFO; programming and budget information; grants and sub-grants; capital projects and their costs and expenditures; pending lawsuits against the agency; credit card pruchases and authorizations; use of government vehicles; employee travel; contract or term personnel; an annual performance plan; and agency priorities. Schwartz Depo. Ex. 25A **(Ex. 29)**. Therefore, the relationship between DC and DCNG is clearly complex and multi-dimensional.

> **iv.    DCNG cannot claim that the conversion of Ms. Clayton's position from CS to MSS was not pretextual.**

In almost passing fashion, DCNG claims that the decision to convert Ms. Clayton's position was not pretextual. However, DCNG's corporate designee, Lieutenant Colonel Forrest, made clear that it has no position on that one way or the other:

> Q You can open up the notice if you want right
> there as well. My question simply is this: Does
> the District of Columbia National Guard have a
> position one way or the other as to the reason for
> Betty Clayton's position being reclassified from
> career services management to supervisor?
> **A No, sir.**
> Q Moving on to Topic No. 7, does the District
> of Columbia National Guard have any position one way
> or the other as to the reason why Betty Clayton was
> terminated?
> **A No, sir.**

Forrest, DCNG Corp. Designee Depo., at 142:17-143:6 **(Ex. 58)**. Therefore, DCNG is bound by its sworn corporate admission and cannot now, on summary judgment, create new reasons for the termination. *E.g. United States v. M & T Mortg. Corp.*, 235 F.R.D. 11, 24 (D.D.C. 2006) ("Rule

30(b)(6) testimony is a sworn corporate admission that is binding on the corporation."); *Rainey v. Am. Forest & Paper Ass'n*, 26 F. Supp. 2d 82, 95 (D.D.C. 1998) ("Rule 30(b)(6)…binds the corporate party to the positions taken by its 30(b)(6) witnesses so that opponents are, by and large, insulated from trial by ambush).

### 2. Plaintiff properly exhausted her administrative remedies.

In another attempt at reconsideration of this Court's previous opinion and order, DCNG again argues that Ms. Clayton did not exhaust her administrative remedies before filing suit against DCNG.  This Court previously stated:

> The DCNG next argues that Clayton failed to comply with the requirement that a Title VII plaintiff seeking to sue the federal government must consult with an Equal Employment Opportunity counselor within 45 days of the alleged discriminatory event giving rise to the claim. *See* 29 C.F.R. § 1614.105(a)(1). This and other "administrative time limits created by the EEOC . . . function[] like statutes of limitations." *Bowden v. United States*, 106 F.3d 433, 437, 323 U.S. App. D.C. 164 (D.C. Cir. 1997). Thus, failure to comply with the time limits in section 1614.105 is an affirmative defense to a Title VII action against the federal government, although those limits "are subject to equitable tolling, estoppel, and waiver." *Id.*; *see also Brown v. Marsh*, 777 F.2d 8, 13, 250 U.S. App. D.C. 8 (D.C. Cir. 1985) (in Title VII actions, failure to exhaust administrative remedies is an affirmative defense).
>
> \*  \*  \*
>
> Pursuant to section 1614.105(a)(2), "[t]he agency . . . shall extend the 45-day time limit" in paragraph (a)(1) "when the [complainant] shows that he or she was not notified of the time limits and was not otherwise aware of them." *Id.* A plaintiff who shows that she was not notified pursuant to that paragraph, moreover, is permitted to sue notwithstanding a failure to comply with the time limits set out in section 1614.105(a). *See Harris v. Gonzales*, 488 F.3d 442, 444-45, 376 U.S. App. D.C. 289 (D.C. Cir. 2007) (reversing grant of summary judgment to defendant where plaintiff raised an issue of fact as to notification under section 1615.105(a)(2)). In *Harris*, the Court of Appeals adopted an objective test for assessing the adequacy of notice under paragraph (a)(2). That test asks "(1) whether notification of the time requirements was provided, and (2) whether the notification was reasonably geared to inform the complainant of the time limits." *Harris*, 488 F.3d at 445 (citation and internal quotation marks omitted).

In a declaration attached to her brief, Clayton states that she was never notified about the 45-day time limit to contact an EEO counselor and that she "cannot recall ever seeing" posters advising of that limit "anywhere in the DCNG." Dkt. 69-1 ¶¶ 3-5. Her testimony—which the DCNG has not yet had an opportunity to rebut—does not conclusively establish that Clayton is entitled to bring suit without having complied with the 45-day requirement. It is possible that the DCNG will be able to present evidence showing that its notification procedures satisfied the *Harris* requirements. It has not done so yet, however, and Plaintiff's declaration— like the declaration in *Harris*—is sufficient to raise a factual issue as to the adequacy of the DCNG's notification regarding the EEOC time limits. *See id.* at 445. For this reason, the Court cannot grant summary judgment on the ground of Plaintiff's alleged failure to exhaust administrative remedies.

*Clayton v. District of Columbia*, 117 F. Supp. 3d 68, 81-82 (D.D.C. 2015) (alterations in original).

Nothing in the record improves DCNG's arguments on this point.

### i. DCNG admitted it has no policies in place related to DC employees making EEO complaints.

It was commonplace for federal employees to supervise employees of the District of Columbia government. Schwartz Depo., at 29:6-13 (**Ex. 20**). Despite this being so common, and the numerous state and federal employees working at DCNG, it has no policies or procedures related to state employees making EEO complaints. Johnson, DCNG Corp. Designee Depo., at 40:11-22 (**Ex. 52**). In fact, DCNG has claimed that its policy is that for EEO matters, if it's a DC government employee, that matter would be handled by the DC government. Johnson, DCNG Corp. Designee Depo., at 31:20-32:2 (**Ex. 52**). Thus, its Corporate Designee admitted there are no policies in place. DCNG cannot now claim that there were policies or that Ms. Clayton was notified of such policies that did not even exist at the time.

### ii. Administrative exhaustion requirements are subject to equitable considerations, including waiver, estoppel and equitable tolling.

Title VII's administrative deadlines are not jurisdictional. *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985). They are subject to equity considerations, including waiver, estoppel and equitable tolling. *Id.* Importantly, exhaustion requirements do not generally constitute jurisdictional barriers to filing a lawsuit and the court should presume that exhaustion is non-jurisdictional. *Holmes v. PHI Service Co.*, 437 F.Supp.2d 110, 121 (2006) (quoting *Avocados Plus*, *Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004)).

> ### iii. DCNG waived it exhaustion argument by failing to raise it during the administrative process.

DCNG failed to raise any alleged lack of exhaustion during the administrative process. Its failure to do so should lead to a waiver here. In *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997), the D.C. Circuit noted that "failure to raise the issue in the administrative process may lead to waiver of the defense when the complainant files suit." Ms. Clayton's case was pending in the EEOC from August 2011 until May 2013 – a span of over twenty-one months. Despite this great passage of time, DCNG failed to ever make any exhaustion argument. In fact, attached to its supplement brief for its first motion for summary judgment on this issue was its apparent response to the EEOC. ECF No. 67-2. When it finally responded to the EEOC, DCNG failed to reference or make any argument related to a purported failure to exhaust. Indeed, in a thirty-one page filing to the EEOC, there is no reference or suggestion that there was a failure to administratively exhaust any remedies. ECF No. 67-2.

Later, although DCNG opposed Plaintiff's motion to amend the complaint, it did not argue failure to exhaust or similar futility grounds. ECF No. 43. Instead, it relied on its argument, later rejected, that Ms. Clayton was not a DCNG employee. ECF No. 43 at 1, 4. This Court granted leave to amend over DCNG's objection. ECF No. 44. Thus, even in this Court, when it had at least two opportunities to argue its exhaustion defense, it failed to do so.

In sum, given DCNG's failure to raise exhaustion during the administrative process or during its first opportunities in this Court, its motion for summary judgment on this basis should denied. Its additional failure to raise it when it specifically opposed adding the Title VII claims even further bolsters DCNG's waiver of the argument here.

### iv. The 45-day notice requirement would serve no practical purpose and would be inequitable in these unique circumstances.

"Title VII exhaustion requirements…are practical and pragmatic... and should not be invoked when [they] serve[ ] no practical purpose." *Bowden*, 106 F.3d at 439.[26] "The purpose of these time limits is to ensure that complaints are investigated when the facts giving rise to them are still fresh in the minds of the participants. Time limits also ensure that longstanding expectations about the consequences of events are not unsettled." *Johnson v. Billington*, 404 F. Supp. 2d 157, 162 (D.D.C. 2005) (citing *Bowden*, 106 F.3d at 438) (internal citation omitted). Therefore, "when an agency is able to investigate a case in a timely fashion, before evidence is stale or lost and before expectations about the consequences of the actions at issue are settled, '[the agency] has no legitimate reason to complain about a judicial decision on the merits.'" *Johnson*, 404 F. Supp. 2d at 163 (alteration in original) (emphasis added). Similarly, principles of equitable estoppel are relevant here as well. *Brown*, 777 F.2d at 14. The 45-day notice requirement would serve no practical purpose and would be inequitable here.

DCNG has consistently denied that Ms. Clayton was its employee. In this case alone, DCNG has denied it in at least four filings. E.g. ECF No. 27-1 at 2 (arguing that "the District of Columbia, not DCNG, was her employer"); ECF No. 27-1 at 9 (arguing that "Plaintiff was an employee of the District…not the DCNG"); ECF No. 43 at 1 (arguing that "she is not an

---

[26]  (first alteration added, other alterations in original) (internal quotation marks omitted).

employee of the DCNG"); ECF No. 43 at 4 (arguing that Plaintiff was an employee of the District…not the DCNG"); ECF No 56-1 at 10-16 (despite being "mindful of the fact" that the court recognized that for Title VII purposes Plaintiff could be considered a DCNG employee, arguing that "DCNG Was Not Plaintiff's Employer"); ECF No. 96, at 7. It would be both impractical, inequitable, and contradictory for DCNG to have it both ways – consistently denying that Plaintiff could be construed to be its joint employee, yet demanding that she contact a DCNG EEO officer to initiate proceedings against it.

Indeed, DCNG does not even suggest initiating such contact would serve any purpose or would have caused any difference in any aspect of this case. According to DCNG's corporate representative, it had no policies in place to deal with this and would simply have referred her to DC in any event.

DCNG likewise offers not even a suggestion of any prejudice. In fact, the DCNG was expressly aware of the factual underpinnings of Ms. Clayton's claims years ago, and certainly by November or December 2010. At that time, Ms. Clayton submitted her claims to the D.C. Office of Employee Appeals reporting the factual basis leading to her filings in both the EEOC and this Court. *See*, *e.g.*, ECF Nos. 60-1 and 60-2.[27]

Additionally, after the April threat by General Schwartz, Ms. Clayton informed the second-highest ranking official at DCNG, General Kenny Ricket, of those threats. Those communications with General Ricket were within 45 days of the threats. *See* Affidavit of Betty Clayton, at ¶ 6 (**Ex. 61**). That constitutes, at the very least, substantial compliance – if not actual compliance.

---

[27] In a somewhat analogous scenario, "the defect of a prematurely filed lawsuit may be excused when it is cured by the issuance of a right to sue letter while the action is pending." *Cruz-Packer v. District of Columbia*, 539 F.Supp. 2d 181, 190 (D.D.C. 2008).

Moreover, "equitable tolling is proper where the plaintiff has received 'inaccurate or ineffective notice from a government agency required to provide notice of the limitations period.' *Bowden,* 106 F.3d at 438." *Dyson v. D.C.*, 710 F.3d 415, 422 (D.C. Cir. 2013). Here, in addition to DCNG's denial that Ms. Clayton was its employee, General Schwartz requested and received an opinion of the D.C. Attorney General suggesting that Ms. Clayton was a District of Columbia employee, not a DCNG employee. ECF No. 56-3 at 2, Letter Opinion from Attorney General Nickles to Major General Schwartz ("I conclude that the Division, a unit that supports the DCNG, is a subordinate agency of the Mayor of the District of Columbia."). Despite the government's protestations, it was not until years later, in November 2013, that this Court first recognized in a Memorandum Opinion and Order that Plaintiff *could* be a joint employee of D.C. and DCNG. ECF No. 44 at 9-12, *Clayton v. D.C.*, 999 F. Supp. 2d 178, 183-85 (D.D.C. 2013). Thus, in addition to the 45-day requirement serving no practical purpose, DCNG's consistent denials that she could be its employee for Title VII purposes, and it being expressly aware of her claims for years, the Plaintiff here also should be excused from the requirement because she received incorrect and inadequate notice and advice from a government agency – specifically the attorney general opinion issued at the behest of a central actor in this case, General Schwartz.

If not substantially complied with, under these extremely unique and highly specific circumstances, this court should excuse compliance with the 45-day notice requirement.

> **v.     The 45-day deadline should be equitably tolled or extended due to Ms. Clayton's lack of awareness of it and DCNG's failure to inform of it.**

As noted above, the 45-day notice requirement is subject to equity considerations, including waiver, estoppel and equitable tolling. *Brown*, 777 F.2d at 14. The 45-day notice requirement may, therefore, be tolled through equitable tolling or an extension of the deadline

under 29 C.F.R. § 1614.105(a)(2). "A federal claimant is entitled to equitable tolling of the 45-day deadline to contact an EEO counselor if she can make a showing that she was unaware of the time limit." *Norden v. Samper*, 544 F. Supp. 2d 43, 46 (D.D.C. 2008). Likewise, "an employer's failure to inform employees of EEO procedures and time limits can also serve as the basis for equitable tolling. *Kelly v. U.S. Dep't of Homeland Sec.*, 2014 WL 1046876, No. CA 12-929L (D.R.I. Mar. 19, 2014) (citing *Earnhardt v. Commonwealth of Puerto Rico*, 691 F.2d 69, 73 (1st Cir.1982)). This Court has explained:

> A federal claimant is entitled to equitable tolling of the 45-day deadline to contact an EEO counselor if she can make a showing that she was unaware of the time limit. *Harris v. Gonzales,* 488 F.3d 442 (D.C.Cir.2007). Lack of actual notice of the 45-day time limit is not itself sufficient to warrant equitable tolling. Rather, the D.C. Circuit adopted the Seventh Circuit's two-step constructive notice inquiry, which considers "(1) whether 'notification of the time requirements was provided,' and (2) whether the notification was 'reasonably geared to inform the complainant of the time limits.' " *Id.* at 445 (quoting *Johnson v. Runyon,* 47 F.3d 911, 918 (7th Cir.1995)).

*Norden v. Samper*, 544 F. Supp. 2d 43, 46-47 (D.D.C. 2008) (*Norden II*). *See also* 29 C.F.R. § 1614.105(a)(2).

Here, at the time of the events giving rise to these proceedings, Ms. Clayton was unaware of any 45-day deadline to contact an EEO counselor. Affidavit of Betty Clayton, at ¶ 2 (**Ex. 61**). In fact, she was never notified by the District of Columbia or the DCNG of any 45-day deadline to contact an EEO counselor. Affidavit of Betty Clayton, at ¶ 3 (**Ex. 61**). Neither the District of Columbia nor the DCNG provided her with any written or oral explanations of any 45-day deadline to contact an EEO counselor. Affidavit of Betty Clayton, at ¶ 4 (**Ex. 61**). Not only that, but there were no posters displayed in any of the lunchrooms, conference rooms, or common areas in the DCNG headquarters advising of any 45-day deadline to contact an EEO counselor. Affidavit of Betty Clayton (**Ex. 61**). Ms. Clayton further could not recall ever seeing any such posters anywhere in the DCNG. Affidavit of Betty Clayton, at ¶ 5 (**Ex. 61**). DCNG has

produced no such posters, pictures, or materials in existence or provided to Ms. Clayton at that time.

In *Norden v. Samper*, 503 F. Supp. 2d 130, 148 (2007) (*Norden I*), the plaintiff submitted an affidavit indicating "that that she was unaware that she was required to contact an EEO Counselor within 45 days of an adverse employment action." In that case, the defendant presented at least some evidence that the plaintiff had at least constructive knowledge of the requirements but did not submit sufficient facts into evidence to refute the affidavit. *Id.* at 148-49. The *Norden I* court concluded that "[b]ecause there is a material issue of disputed fact as to Dr. Norden's knowledge of the 45-day requirement, the Court must deny without prejudice both parties' motions." *Id.* at 149.[28]

This case far exceeds the dispute of material fact precluding summary judgment in *Norden I*. In *Norden I* there were disputes of material fact whether actual, constructive, or any notice was provided to the plaintiff. Here, not only was Ms. Clayton unaware of any such deadline, there being no posters displayed, and no such advice being given to Ms. Clayton, but the DCNG Corporate Designee conceded that there were no procedures or policies in place with respect to DC government employees. This is despite the common nature of federal supervision over DC employees. The uncontradicted record demonstrates that Plaintiff was unaware of the 45-day deadline and DCNG totally failed to provide any notice of it – constructive or actual. Affidavit of Betty Clayton (**Ex. 61**). Therefore, given Ms. Clayton's lack of awareness of the 45-day deadline, coupled with DCNG's total failure to inform Ms. Clayton of it, she meets the

---

[28] Eight months later, upon a more complete factual record, the *Norden II* court ultimately granted summary judgment on the 45-day notice issue because "[u]sing an objective test, the Court finds that the Smithsonian has demonstrated that it provided notice of the EEO time limitations to its employees at the Museum of Natural History." *Norden II*, 544 F. Supp. 2d at 48.

requirements set forth in *Norden* and *Harris*. Equitable tolling or extension of the deadline is, therefore, appropriate under these circumstances.

### 3. Plaintiff set forth a *prima facie* case of retaliation and disparate treatment.

DCNG claims that the decision to convert Ms. Clayton's position was not pretextual. However, DCNG's corporate designee, Lieutenant Colonel Forrest, made clear that it has no position on the reason for Ms. Clayton's conversion and termination one way or the other:

> Q You can open up the notice if you want right
> there as well. My question simply is this: Does
> the District of Columbia National Guard have a
> position one way or the other as to the reason for
> Betty Clayton's position being reclassified from
> career services management to supervisor?
> **A No, sir.**
> Q Moving on to Topic No. 7, does the District
> of Columbia National Guard have any position one way
> or the other as to the reason why Betty Clayton was
> terminated?
> **A No, sir.**

Forrest, DCNG Corp. Designee Depo., at 142:17-143:6 (**Ex. 58**). Therefore, DCNG is bound by its sworn corporate admission and cannot now, on summary judgment, create new reasons for the termination. *E.g. United States v. M & T Mortg. Corp.*, 235 F.R.D. 11, 24 (D.D.C. 2006) ("Rule 30(b)(6) testimony is a sworn corporate admission that is binding on the corporation."); *Rainey v. Am. Forest & Paper Ass'n*, 26 F. Supp. 2d 82, 95 (D.D.C. 1998) ("Rule 30(b)(6)…binds the corporate party to the positions taken by its 30(b)(6) witnesses so that opponents are, by and large, insulated from trial by ambush).

Nevertheless, for the reasons set forth above, § IV.a.4.-5., Ms. Clayton has set forth a prima facie case and established the pretextual nature of DC's purported reason for termination.[29]

---

[29] DCNG also erroneously claims that Ms. Clayton must meet a "burt for" causation standard. However, that is only the standard for *private employers*. The EEOC has made clear that the standard set forth in *Texas Southwestern*

## V. Conclusion.

Plaintiff respectfully requests that the Court deny Defendants' motions for summary judgment.

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

   /s/  Levi S. Zaslow
Timothy F. Maloney (Bar No. 416522)
tmaloney@jgllaw.com
Levi S. Zaslow (Bar No. MD29101)
lzaslow@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
301.220.2200 (T)
301.220.1214 (F)
*Counsel for Plaintiff Betty Clayton*

## **REQUEST FOR HEARING**

Plaintiff respectfully requests a hearing in this matter.

   /s/  Levi S. Zaslow
Levi S. Zaslow (Bar No. MD29101)

---

*Medical Center v. Nassar*, 133 S.Ct. 2517 (2013), is not relevant to federal employers.  The EEOC stated: "that the 'but for' standard discussed in Nassar does not apply to retaliation claims by federal sector applicants or employees under Title VII…because the relevant federal sector statutory language does not contain the 'because of' language on which the Supreme Court based its holdings in Nassar… ."  *Complainant v. Johnson, Secretary, Department of Homeland Security*, EEOC Appeal No. 0720140037 (May 29, 2015), available at https://www.eeoc.gov/decisions/0720140037.txt; *Complainant v. Johnson, Secretary, Department of Homeland Security*, EEOC Appeal No. 0720130035 (Oct. 20, 2015), available at https://www.eeoc.gov/decisions/0720130035.txt.  Instead, the standard is lower: "The causal nexus requires a showing that retaliation for her prior protected activity more likely than not caused the challenged actions... ."  *Id.*

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**BETTY CLAYTON**

    *Plaintiff*,

      v.

**DISTRICT OF COLUMBIA,** *et al.*

    *Defendants*.

**Civil Action No. 1:11-cv-01889-RDM**

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

In accordance with LCvR 7(h)(1), Plaintiff submits this Statement of Material Facts in

Support of Response to Defendants' Motions for Summary Judgment.[1]

**I.**    **Statement of Material Facts.**

    **a.**    **Ms. Clayton is hired as the Government Operations Director of DCNG.**

1. In the 2007-2010 timeframe Colonel Ronald Stamps was the Human Resources Officer

(HRO) for DCNG. Stamps Depo., at 12:8-17 **(Ex. 1)**. He was directing human resources and

oversaw personnel, budget, and financing. Stamps Depo., at 12:19-13:6 **(Ex. 1)**. He oversaw

both federal and DC employees. Stamps Depo., at 13-14 **(Ex. 1)**.

2. After the former Director of Government Operations, Anthony Devassey, was removed, a

board of DCNG personnel was convened to make a recommendation on the hiring of a

replacement. Stamps Depo., at 28-29; 32-33 **(Ex. 1)**. Ms. Clayton's first interview was with a

panel of DCNG employees. Clayton Depo., at 10-11 **(Ex. 14)**. After her initial interview, she

had a follow-up interview with General Schwartz. Clayton Depo., at 13-15 **(Ex. 14)**.

---

[1] Additional facts are set forth in Plaintiff's Response to Defendants' Motions for Summary Judgment, at § II and
elsewhere within her Response.

3. On or about March 13, 2008 Colonel Stamps advised Ms. Clayton that she was selected to the position, contingent upon DC approval. Stamps Depo. Ex. 2 (**Ex. 3**). Ms. Clayton formally accepted the position by written correspondence on March 26, 2008. Stamps Depo. Ex. 3 (**Ex. 4**); Clayton Depo. Exs. 1-3 (**Ex. 15-17**).

4. Colonel Stamps forwarded Ms. Clayton's acceptance of the position to DC, Stamps Depo., at 45:22-46:1 (**Ex. 1**), and DC formally processed and appointed Ms. Clayton to the position. Stamps Depo., at 30 (**Ex. 1**).

5. Ms. Clayton was hired as a career service employee. Brown, DC Corp. Designee Depo., at 19:7-12 (**Ex. 12**); Ricket Depo., at 27:22-28:9 (**Ex. 10**). When Ms. Clayton accepted the position, she likewise understood it was a Career Service position. Clayton Depo., at 152:6-9; 222:10-23 (**Ex. 14**).

1. **The unique supervisory structure of DC and DCNG supervision.**

6. In 2008, right around the time of Ms. Clayton's hire, Errol Schwartz became the commanding general of DCNG, the highest ranking official in the agency. Schwartz Depo., at 25:4-10 (**Ex. 20**). Prior to this, since 2003, General Schwartz became the Adjutant General, the second highest ranking official at DCNG. Schwartz Depo., at 24:13-15 (**Ex. 20**). He retired on February 21, 2017 when the President accepted his resignation. Schwartz Depo., at 9:13; 10:1-11:11 (**Ex. 20**).

7. The DCNG essentially consists of three components: the Air Force, the Army, and DC government employees. Schwartz Depo., at 25:11-27:6 (**Ex. 20**).

8. Colonel Stamps confirmed his understanding from the 2008-2010 timeframe was that the DC Government Operations is simultaneously a Directorate within Joint Force Head Quarters,

DC National Guard and an agency of the Government of the District of Columbia. Stamps Depo., at 62:21-63:9 (**Ex. 1**).

9. Ms. Clayton reported to the Commanding General – General Schwartz. Ricket Depo., at 30:14-31:1 (**Ex. 10**); Schwartz Depo., at 73:11-13 (**Ex. 20**); Gregory Depo., at 95:19-25 (**Ex. 33**).

10. Moreover, while she was employed to work at the DCNG, he continued to be her supervisor at the time of her termination. Schwartz Depo., at 75:5-11 (**Ex. 20**). DC's Corporate Designee confirmed that both before and after the Attorney General's opinion letter Ms. Clayton reported to both the commanding general and the mayor and city administrator. Thompson, DC Corp. Designee Depo., at 61:13-16; 62:21-63:17(**Ex. 38**).

11. Both before and after the opinion, the commanding general was free to confer with DC on personnel decisions, could participate in disciplinary actions, and even initiate it. Thompson, DC Corp. Designee Depo., at 63:18-65:5 (**Ex. 38**).

12. It was commonplace for federal employees to supervise employees of the District of Columbia government. Schwartz Depo., at 29:6-13. (**Ex.20**) General Schwartz previously approved, and signed off on, incentive awards for DC employees. Schwartz Depo. Ex. 24A (**Ex. 28**). The Government Operations Division utilized DOD letterhead for this purpose. *Id.* DCNG obtains its funding from the DC Council. *E.g.* Schwartz Depo. Ex. 25A (**Ex. 29**).

    **b.**     **Ms. Clayton's employment performance was flawless throughout her tenure.**

13. General Schwartz appraised and reviewed Ms. Clayton's employment performance, Schwartz Depo., at 69:12-70:20 (**Ex. 20**), and completed her performance review. Schwartz Depo. Ex. 9.[2] (**Ex.21).**

---

[2] He did not stop appraising and reviewing the Government Operations Director until *after* Ms. Clayton was no longer employed there. Schwartz Depo., at 72:11-17.

14. General Schwartz confirmed that "Mrs. Clayton did a great job as the Director of D.C. Government Operations." Schwartz Depo., at 77:16-18 (**Ex. 20**). He awarded her the highest possible rating, a flawless 5 out 5 in every performance review category. Schwartz Depo., at 77:19-78:5 (**Ex. 20**); Schwartz Depo. Ex. 9 (**Ex. 21**). These included perfect, "Significantly Exceeds Expectations," marks in each of the categories: Communication, Customer Service, Dependability, Flexibility/Adaptability, Initiative, Integrity and Trust, Job Knowledge, Professionalism, Resource Usage, Teamwork, Conflict Management, Leadership, Managing People, Operations Planning and Evaluating, and Strategic Planning. Schwartz Depo. Ex. 9 (**Ex. 21**); Schwartz Depo., at 75:17-78:5; 79:21-93:21 (**Ex. 20**).

15. General Schwartz testified that Ms. Clayton's performance was the top possible, significantly exceeded expectations, Schwartz Depo., at 78:6-12 (**Ex. 20**), and that remained so for the remainder of Ms. Clayton's employment at DCNG. Schwartz Depo., at 78:13-79:20 (**Ex. 20**).

16. General Schwartz's Chief of Staff, and the second highest official at the DCNG during this time frame, General Kenny Ricket, also expected Ms. Clayton to get a good appraisal because she was "an excellent employee." Ricket Depo., at 33:4-11 (**Ex. 10**). General Ricket agreed with the ratings and comments submitted by General Schwartz. Ricket Depo., at 33-38 (**Ex. 10**). Colonel Stamps also had no complaints and never received any complaints about Ms. Clayton's job performance. Stamps Depo., at 126:16-127:7 (**Ex. 1**).

17. DC had no complaints about Ms. Clayton's job performance. Brown, DC Corp. Designee Depo., at 110:2-4 (**Ex. 12**). Ms. Clayton had no negative employment appraisals, the only employment appraisal was "overwhelmingly positive," "she was never placed on a performance

improvement plan, [it] did not formally counsel her to improve performance, and [it] did not start any grievances or discipline." Thompson, DC Corp. Designee Depo., at 35:6-36:3 (**Ex. 38**).

18. Ms. Clayton did not receive any negative reviews from any supervisors. Thompson, DC Corp. Designee Depo., at 98:1-3 (**Ex. 38**). Likewise, there are no memoranda or other writings showing that Ms. Clayton was no longer significantly exceeding expectations. Thompson, DC Corp. Designee Depo., at 98:4-13 (**Ex. 38**). If there had been, they would have been included in her employment file. Thompson, DC Corp. Designee Depo., at 98:15-21 (**Ex. 38**).

19. Ms. Clayton also had a positive reputation for truthfulness and honesty. Ricket Depo., at 74:1-2 (**Ex. 10**); Schwartz Depo., at 221:4-222:6 (**Ex. 20**).

    **c.**       **Ms. Clayton's attempts to discipline Charlotte Clipper.**

20. Pursuant to charges set forth by Ms. Clayton, Stamps Depo., at 100-101(**Ex. 1**), Colonel Stamps was appointed to conduct an AR15-6 investigation of Ms. Clipper. Stamps Depo., at 94-96 (**Ex. 1**); Stamps Depo. Exs. 6-7 (**Ex. 7-8**). The investigation was approved by General Ricket, *id.*, and concerned misconduct by Ms. Clipper. Stamps Depo., at 94-101 (**Ex. 1**).

21. At the conclusion of the investigation, in February 2010, General Ricket reviewed and approved of Colonel Stamps' findings and reports, as did General Schwartz. Stamps Depo. Ex. 8 (**Ex. 9**); Stamps Depo., at 101-102 (**Ex. 1**).

22. During the intervening period, Ms. Clayton repeatedly attempted disciplinary action against Ms. Clipper, including progressive discipline, Clayton Depo., at 65:4-13 (**Ex. 14**), and attempted to fire her at least nine different times. Clayton Depo., at 14-18 (**Ex. 14**). However, each time she received interference. Clayton Depo., at 65-69 (**Ex. 14**). Ms. Clayton did, however, suspend Ms. Clipper on multiple occasions. Clayton Depo., at 74:17-75:6 (**Ex. 14**).

23. However, Derrick Savoy, who DC designated as a corporate representative, advised Ms. Clayton that she cannot take administrative action against Ms. Clipper until he completed his investigation. Clayton Depo., at 214:11-22 (**Ex. 14**); Clayton Depo. Ex. 39 (**Ex. 19**). Ms. Clayton's understanding was that the investigation was still ongoing in the 2009/2010 timeframe. Clayton Depo., at 215:3-6 (**Ex. 14**). In fact, it did not close until 2013. Clayton Depo., at 215:1-2 (**Ex. 14**).

24. DC does not take a position on the DCNG's investigation against Ms. Clipper and whether his report was accurate or inaccurate. Brown, DC Corp. Designee Depo., at 70:15-72:16 (**Ex. 12**). *See also* Brown, DC Corp. Designee Depo., at 72:20-74:4 (**Ex. 12**). DC stated that the "investigation was conducted by someone outside of the District of Columbia Government, and we cannot confirm or deny any of his legal conclusions." Brown, DC Corp. Designee Depo., at 71:11-14 (**Ex. 12**). *See also* Brown, DC Corp. Designee Depo., at 72:20-74:4 (**Ex. 12**).

25. DCNG was closely involved in the Clipper matter. In August 2008, the DC Office of the Inspector General informed General Schwartz about the allegations and *referred* them to him for investigation. Schwartz Depo. Ex. 18A (**Ex. 22**). In June and July 2009, Colonel Thomas Forrest, a JAG attorney, conferred with DC and was closely interested in and discussing the status of Ms. Clipper's employment and status. Schwartz Depo. Ex. 23A (**Ex. 26**). Ms. Clayton "briefed General Schwartz and General Ricket on this issue." *Id.*

26. At the conclusion of the investigation, in February 2010, Brigadier General Kenny Ricket, a direct report to General Schwartz, delivered to him Colonel Stamps' investigative report. Schwartz Depo. Ex. 19 (**Ex. 23**). General Schwartz signed General Ricket's Memorandum to him. *Id.*

27. In July 2010, Ms. Clayton copied General Schwartz on her proposal to the DC CFO's office to reassign Ms. Clipper away from DCNG. Schwartz Depo. Ex. 23B **(Ex. 27)**.

28. In February 2011, after the termination of Ms. Clayton, General Schwartz created a memorandum *directing* Herman Preston, Ms. Clayton's successor, to investigate various related matters. Schwartz Depo. Ex. 29 **(Ex. 30)**; 188:7-189:9 **(Ex. 20)**.

      **d.**     **Ms. Clayton assists Tamara Jones in her sexual harassment complaint against General Schwartz and both she and Ms. Jones are met with hostility and repeated threats to their employment.**

29. Tamara Jones made a sexual harassment complaint against General Schwartz. Sharpe, DC Corp. Designee Depo., at 10:4-16 **(Ex. 43)**.

30. Ms. Jones reported this to Ms. Clayton, who immediately reported it. Ms. Clayton also referred the matter to a DC HR specialist. Clayton Depo., at 117:16-118:2 **(Ex. 14)**. Ms. Clayton immediately went downtown and met with and reported this to DC OHR. Clayton Depo., at 118:3-20 **(Ex. 14)**; Clayton Depo. Ex. 28 **(Ex. 18)**. Ms. Clayton spoke with and reported to DC OHR in January 2010. Clayton Depo. Ex. 28 **(Ex. 18)**.

31. After being assisted by Ms. Clayton, DC OHR accepted Ms. Jones' allegation on January 14, 2010. Sharpe Depo. Ex. 3, at 6 **(Ex. 44)**. Sharpe, DC Corp. Designee Depo., at 11-12 **(Ex. 43)**.

32. On January 14, 2010, after Ms. Clayton's reporting and meeting with DC HR, Ms. Jones alleged that:

> Sexual Assault against Major General Errol R. Schwartz. I do not recall that date of the incident except that it took place sometime in mid-early 2008[3] In his office In which he inappropriately touch my buttocks and tried to kiss me. I was fearful of reporting the incident for feet my husband (a disabled vet with the DCNG) would retaliate and that I may face reprisal[.] I also had not gotten my citizenship

---

[3] In the Questionnaire, Ms. Jones stated that all incidents occurred within 365 days of the filing. Sharpe Depo. Ex. 3, at 4. Likewise, in her Charge of Discrimination, Ms. Jones state the incidents occurred between June 1 and December 30, 2009. Sharpe Depo. Ex. 4, at 1.

as yet. The incident that pushed me to tell Mrs[.] Clayton and file this complaint is the Commanding General called me to his office and asked me whether I has told anyone of the incident and whether I was going to try to get him fired. He the[n] intimated that over the past 6 years he has been fighting similar cases and that not were successful. This took place on 15 December 2009.

Sharpe Depo. Ex. 3, at 6 (**Ex. 44**). Sharpe, DC Corp. Designee Depo., at 11-12 (**Ex. 43**).

33. Ms. Jones was specifically afraid of reprisals by reporting the sexual harassment matter to DCNG. Sharpe Depo. Ex. 3, at 2 (**Ex. 44**).

34. General Schwartz, the highest ranking officer at the DCNG was not aware of the protocols to deal with Ms. Jones' sexual harassment complaints. Schwartz Depo., at 200:16-201:4 (**Ex. 20**).

35. Ms. Clayton provided aid and assistance to Ms. Jones in the sexual harassment matter. Sharpe, DC Corp. Designee Depo., at 41-43 (**Ex. 43**); Sharpe Depo. Exs. 3, at 5; 6, at 2 (**Ex. 44**). Brown, DC Corp. Designee Depo., at 36:8-11 (**Ex. 12**).

36. Other than the assistance provided by Ms. Clayton, DC provided no further assistance to Tamra Jones in any way. Brown, DC Corp. Designee Depo. II, at 21:2-23:16 (**Ex. 12**); Sharpe, DC Corp. Designee Depo. at 43:22-44:8 (**Ex. 43**); Brown, DC Corp. Designee Depo., at 51 (**Ex. 12**).

37. Upon these complaints, DCNG attempted to persuade Ms. Jones away from pursuing her complaints: On January 18, 2010, Captain Gladys Lanier of the DCNG attempted to bury the allegations in exchange for obtaining an apology from General Schwartz and confirming Ms. Jones's employment was safe: "Lt Jones, I was wondering if you wanted to try a different approach to this. I suggest that if possible that the General would agree to meet with me and your wife on this matter and get an appology [sic] from him as well as her job being secured, will this be sufficient?" Sharpe Depo. Ex. 7, at 2 (**Ex. 48**).

38. Sergeant Martin likely discussed the Jones allegations with General Schwartz. Ricket Depo., at 59:9-15 **(Ex. 10)**.

39. DCNG was repeatedly attempting to intervene in this sexual harassment matter, Ms. Jones did not want him involved, but he persisted nonetheless. Sharpe Depo. Ex. 9, at 2 **(Ex. 50)**; Sharpe Depo. Ex. 7 **(Ex. 48)**, at 1.

40. In January, **Sergeant Martin even called Ms. Clayton out by name, questioning whether Ms. Clayton was "advising" Ms. Jones**. *Id.*

41. Ms. Jones felt "pressured and uncomfortable, bordering on harassment." *Id.*

42. Ms. Clayton discussed and provided aid and assistance to Ms. Jones in both January 2010 and April 2010. Clayton Depo. Ex. 28 **(Ex. 18)**; Clayton Depo., at 114:8 **(Ex. 14)**. Ms. Clayton calmed the crying Ms. Jones down, advised of her rights as she understood them and offered assistance. Clayton Depo., at 115:24-116:8 **(Ex. 14)**.

43. Ms. Jones permitted Ms. Clayton to refer the matter to a DC HR specialist or EEO officer, which Ms. Clayton did right then. Clayton Depo., at 117:16-118:2 **(Ex. 14)**. Ms. Clayton immediately went downtown and met with and reported this to DC OHR. Clayton Depo., at 118:3-20 **(Ex. 14)**; Clayton Depo. Ex. 28 **(Ex. 18)**.

44. Sergeant Martin and Colonel Dickens approached Ms. Clayton and stated that they "have been huddling with the general, Forrest, Tall, Dickens, and I to see who would get to talk to you about an allegation of sexual harassment." Clayton Depo., at 119:25-120:3 **(Ex. 14)**.

45. Sergeant Martin pressed Ms. Clayton for details, specifically asking of Ms. Jones reported the harassment to her. Clayton Depo., at 120:8-22 **(Ex. 14)**.

46. Similar to the threats to Ms. Jones, on his way out, Sergeant Martin said to Ms. Clayton "I never lose a case." Clayton Depo., at 120:24-25 **(Ex. 14)**.

On April 8, 2010, the Charge was formally filed on Ms. Jones' behalf, specifically

alleging sexual harassment and threatened retaliation by General Schwartz:

> I believe I have been discriminated against in the terms, conditions and privileges of my employment on the bases of my sex (female/sexual harassment/hostile work environment) and retaliation for the following reasons:
>
> **SEXUAL HARASSMENT**
>
> From June 2009 thru August 2009, the Commanding General subjected me to unwelcome comments and inappropriate touching, which I perceived as sexual harassment, I asked the Commanding General to discontinue this behavior, which he did.
>
> **RETALIATION**
>
> In or around October 2009, I filed an internal EEO Complaint against a co-worker. In November or December 2009, the Commanding General asked me if I was going to report him too and try to get him fired. In December 2009, I was denied training for which I was already registered, that would have afforded me the required credentials for an upcoming promotion. I believe the denial of my training was in retaliation for filing my EEO Complaint.

Sharpe Depo. Ex. 4 (**Ex. 45**); Sharpe, DC Corp. Designee Depo., at 15:15-17:5 (**Ex. 43**); Sharpe,

DC Corp. Designee Depo., at 16:15-22 (**Ex. 43**); Sharpe Depo. Ex. 4 (**Ex. 45**).

47. At the latest, on April 26, 2010, DC delivered to Sergeant Chris Martin and DCNG

correspondence related to the Jones sexual harassment Charge and the Charge itself. Sharpe

Depo. Ex. .5 (**Ex. 46**); Brown, DC Corp. Designee Depo., at 47-48 (**Ex. 12**).

48. On May 10, 2010, Ms. Jones e-mailed OHR, confirming that she had disclosed the

harassment to Ms. Clayton, and also that she had been intimidated and harassed to not pursue it.

Sharpe Depo. Ex. 6 (**Ex. 47**).

49. Chris Martin of the DCNG contacted DC OHR at least four times, Sharpe Depo. Ex. 8

(**Ex. 49**) (noting two messages and one phone call); Sharpe, DC Corp. Designee Depo., at 31:3-6

(**Ex. 43**) (phone call); Sharpe Depo. Ex. 9, at 2 (**Ex. 50**), and also alleged that DC OHR did not

have jurisdiction to investigate the Jones sexual harassment complaint against General Schwartz. Sharpe, DC Corp. Designee Depo., at 17:22-18:3; 19:12-20:16 **(Ex. 43)**.

50. Nevertheless, DCNG, said it requires a "written request for [Sergeant Martin] to act in the capacity of an EEO Counselor" in the Jones matter. Sharpe Depo. Ex. 9 **(Ex. 50)**; Sharpe, DC Corp. Designee Depo., at 31:14-32:4 **(Ex. 43)**. DC confirmed that it has never seen a situation where another agency was requesting to act in the capacity of an EEO counselor. Sharpe, DC Corp. Designee Depo., at 32:10-13 **(Ex. 43)**. This was an "unusual request" and DC had never received a request like that before or after this incident. Sharpe, DC Corp. Designee Depo., at 32:14-18 **(Ex. 43)**.

51. DC invited DCNG to submit a motion to dismiss. Sharpe Depo. Ex. 9 **(Ex. 50)**.

52. Nothing was done on Ms. Jones's sexual harassment complaint between June 2010 and December 2010. Sharpe, DC Corp. Designee Depo., at 39:15-18 **(Ex. 43)**.

53. Instead, on December 6, 2010, DC simply dismissed the complaint. Sharpe Depo. Ex. 10 **(Ex. 51)**; Sharpe, DC Corp. Designee Depo., at 39-40 **(Ex. 43)**.

54. DCNG has no policies or procedures related to state employees making EEO complaints. Johnson, DCNG Corp. Designee Depo., at 40:11-22 **(Ex. 52)**. Instead, it would refer them to the DC government for action. Johnson, DCNG Corp. Designee Depo., at 33:9-21; 36:21-37:3 **(Ex. 52)**.

55. DCNG maintains hard and electronic files of complaints from 2010-2017, and the files are not routinely destroyed. Johnson, DCNG Corp. Designee Depo., at 45-48 **(Ex. 52)**. The files include not only formal complaints made with the DCNG but also complaints to other agencies or even phone calls with complaints. Johnson, DCNG Corp. Designee Depo., at 49:17-50:11 **(Ex. 52)**.

56. Ms. Johnson specifically searched the files for the name Jones. Johnson, DCNG Corp. Designee Depo., at 47:1-6 (**Ex. 52**). Although DCNG exchanged phone calls, received documents, and had meetings, *e.g.*, Sharpe, DC Corp. Designee Depo. Exs. 5, 9, 10 (**Ex. 46, 50-51**)), DCNG now has *no* files or records related to the Jones complaint. Johnson, DCNG Corp. Designee Depo., at 15:21-16:12; 17:10-17; 18:13-19:5 (**Ex. 52**).

     e.     **General Schwartz repeatedly threatens Ms. Clayton's employment following her aid and assistance to Ms. Jones in her sexual harassment complaint against him.**

57. After Ms. Clayton provided aid and assistance to Ms. Jones in her sexual harassment matter against General Schwartz, he distinctly threatened her employment three times – each time with a notable event attached to it. General Schwartz threatened Ms. Clayton's employment in January 2010, April 2010, and September 2010. Clayton Depo., at 134:4-137:17 (**Ex. 14**); *See also* Plaintiff's Responses to DC Interrogatories, No. 5.

58. The threat in or about January 2010 was shortly after Ms. Jones initiated her sexual harassment complaint; the threat in or about April 2010 was shortly after DC OHR prepared and delivered the Charge to DCNG and Ms. Clayton provided further assistance to Ms. Jones; and the September 2010 threat was after the DC OAG opinion and just prior to or after the change of Ms. Clayton's employment from Career Service to Management Supervisory.

59. In January 2010, General Schwartz threatened Plaintiff's employment, stating "we'll see who's sitting in that chair come October 1." Clayton Depo., at 134:16-18 (**Ex. 14**).

60. In April 2010, General Schwartz again told Ms. Clayton, "We'll see who's sitting in that chair on October 1." Clayton Depo., at 135:22-23 (**Ex. 14**).

61. In the spring of 2010 Ms. Clayton reported to General Ricket General Schwartz's threat that "we'll see who's sitting in that seat in October." Ricket Depo., at 72:21-73:9 (**Ex. 10**). Ms.

Clayton reported this particular threat to General Ricket the same day it happened. Ricket Depo., at 77:18-78:6 (**Ex. 10**).

62. In September 2010, General Schwartz again threatened Plaintiff, stating, "we'll see who's sitting in that chair when you – come October 1." Clayton Depo., at 137:15-17 (**Ex. 14**).

       **f.**      **Upon a request from General Schwartz, DC initiates a legal opinion explaining its power of Government Operations Division Personnel, and further highlighting the complex relationship between DC and DCNG.**

63. General Schwartz requested an opinion letter from the DC Attorney General, Peter J. Nickles related to his authority over DC employees. Thompson, DC Corp. Designee Depo., at 17:20-18:1; 23:11-15 (**Ex. 38**). See also AG Opinion letter (**Ex. 60**).

64. General Schwartz had no explanation for why he was questioning the DC Attorney General about Ms. Clayton's disciplinary authority or his own authority over DC government personnel. Schwartz Depo., at 222:7-224:7 (**Ex. 20**).

65. The Attorney General issued his opinion on August 27, 2010, explaining the complex nature of the relationship between DC and DCNG. Attorney General Opinion (**Ex. 60**)**.**

66. Both before and after the AG opinion letter Ms. Clayton reported to both the commanding general and the mayor and city administrator. Thompson, DC Corp. Designee Depo., at 61:13-16; 62:21-63:17 (**Ex. 38**).

67. Both before and after the opinion, the commanding general was free to confer with DC on personnel decisions, could participate in disciplinary actions, and even initiate it. Thompson, DC Corp. Designee Depo., at 63:18-65:5 (**Ex. 38**).

68. Ms. Clayton's direct supervisor was Mr. Albert and she had a "quasi" relationship with General Schwartz as head of the National Guard where she was stationed. Gregory Depo., at

94:11-25; 114:23-115:8 **(Ex. 33)**. However, as her direct supervisor, Albert retained the authority to terminate Ms. Clayton. Gregory Depo., at 98:11-14; 122:21-23; 134:3-12 **(Ex. 33)**.

69. Despite Ms. Clayton being the director of the very agency at issue, she was not sent a copy of the Attorney General's opinion. *See* Attorney General Opinion, at 3 **(Ex. 60)** (Clayton not cc'd on opinion); Thompson, DC Corp. Designee Depo., at 25:11-20 **(Ex. 38)**. DC has no explanation for this. Thompson, DC Corp. Designee Depo., at 27:7-22 **(Ex. 38)**.

70. In the proposed Memorandum of Understanding ("MOU") attached to the AG Opinion letter, it was clear that Ms. Clayton was anticipated to *not* be the representative of the Government Operations Division for DCNG. The MOU, prepared by DC, contained a notification space for the authorized representatives of DCNG and DC. Although DC indicated that General Schwartz was the authorized representative for DCNG, it specifically left blank the space for the authorized representative on behalf of the Government Operations Division. Ex. 40, Attorney General Opinion, MOU; Thompson, DC Corp. Designee Depo. Ex. 12 **(Ex. 40)**; Thompson, DC Corp. Designee Depo., at 28:1-29:10.[4] **(Ex. 38)**.

71. DC has no contention as to why it did not list Ms. Clayton as the authorized representative of the Government Operations Division. *Id.*

72. A prior Memorandum of Understanding in August 2009 specifically listed Betty Clayton as the point of contact for the Government Operations of DCNG. Schwartz Depo. Ex. 30, at 6 **(Ex. 31)**.

        **1.**       **The Attorney General's opinion did not change any policy or standing procedure concerning termination of the Government Operations Director's employment.**

---

[4] Neither is Ms. Clayton listed as a signatory to the Memorandum of Understanding. 29:11-30:5.

73. The prior Government Operations Director, Anthony Devassey, was initially terminated by the then-commanding general of DCNG, General Wherley, on April 11, 2008 upon the expiration of his H1-B Visa.  Gregory Depo. Ex. 11 **(Ex. 36)**.  However, the termination by DCNG was ineffective.  Gregory Depo. Ex. 11 **(Ex. 36)**.

74. On April 21, 2008, Brender Gregory, DC Human Resources Director, "rescinded" General Wherley's termination letter and placed Mr. Devassey on administrative leave.  Gregory Depo. Ex. 11 **(Ex. 36)**; Gregory Depo. Ex. 12 **(Ex. 37)**.

75. After investigation, on May 2, 2008 Ms. Gregory observed that DCNG had no obligation to extend his visa.  Gregory Depo. Ex. 12 **(Ex. 37)**.  At that point, *DC Human Resources* terminated Mr. Devassey's employment, effective May 14, 2008.  Gregory Depo. Ex. 12 **(Ex. 37)**.  Thus, in 2008 DC likewise was exercising final supervisory authority over the Government Operations Director of DCNG.

> **g.** **Ms. Clayton's position is converted from Career Service to Management Supervisory Service, unlike her male predecessor, Anthony Devassey.**

76. Ms. Clayton's predecessor as Government Operations Director, Anthony Devassey, was also "hired" by DCNG.  Brown, DC Corp. Designee Depo., at 105:3-12 **(Ex. 12)**.

77. He too was a career service employee, not management supervisory.  Brown, DC Corp. Designee Depo., at 106:16-22 **(Ex. 12)**.

78. The provision of law purporting to require Ms. Clayton's conversion from CS to MSS was in place at the time Mr. Devassey was hired.  Brown, DC Corp. Designee Depo., at 107:15-18 **(Ex. 12)**.  *See also* D.C. Code § 1–609.58.

79. On September 27, 2010, the District of Columbia converted Ms. Clayton's employment from Career Service to Management Supervisory Service.  Gregory Depo. Ex. 6 **(Ex. 35)**.

80. The notice specifically advised that Ms. Clayton would no longer have career service protections, she would be at-will, and that if she declined to accept the transfer, she would be transferred to a vacant career service position – although if no positions were available, her employment would be terminated. Gregory Depo. Ex. 6 (**Ex. 33**).

81. DC issued a second notification the following day, this time citing the Attorney General's opinion to General Schwartz as its basis. Gregory Depo. Ex. 5 (**Ex. 34**).

82. There is nothing in the Attorney General's letter requiring Ms. Clayton to be converted from CS to MSS. Thompson, DC Corp. Designee Depo., at 83:2-6 (**Ex. 38**). Nobody stated that it was required. Thompson, DC Corp. Designee Depo., at 83:7-13 (**Ex. 38**).

83. DC has no contention as to *who* made the decision to convert Ms. Clayton's employment from CS to MSS. Thompson, DC Corp. Designee Depo., at 84:11-13 (**Ex. 38**).

84. Ms. Gregory signed the written notification to Ms. Clayton informing her of the conversion, but does not recall who made the decision to convert her to MSS. Gregory Depo. , at 27:12-28:9; 48:10-24 (**Ex. 33**). She does not know why the position was not converted prior to September 28, 2010 or whether Ms. Clayton's position was looked at specifically. Gregory Depo., at 49:7-13; 50:5-24 (**Ex. 33**).

85. Mr. Albert, Ms. Clayton's purported supervisor, denied involvement in the decision to transfer her position from CS to MSS, Albert Depo., at 15:25-16:3 (**Ex. 55**), and was not aware of any review of positions at the DCNG took place to consider whether to transfer positions from CS to MSS. Albert Depo., at 18:12 (**Ex. 55**). Nevertheless, Ms. Gregory confirmed that she would not convert the employment from CS to MSS without discussing it with Mr. Albert. Gregory Depo., at 141:11-15 (**Ex. 33**).

86. DC *assumed* that the decision to terminate Ms. Clayton's employment was made after the conversion but does not know that to be a fact. Thompson, DC Corp. Designee Depo., at 117:8-16 (**Ex. 38**).

87. There were no vacant CS positions in the Government Operations Division and if there are no such vacant positions then the employee will be terminated. Thompson, DC Corp. Designee Depo., at 85:1-15 (**Ex. 38**); Gregory Depo. Ex. 6, at 1, 3 (**Ex. 33**).

88. Thus, the District conceded that Ms. Clayton's "choice" was really no choice at all: either accept the conversion to MSS or be terminated. Thompson, DC Corp. Designee Depo., at 86:16-87:3 (**Ex. 38**).

**h.** **After conferring with General Schwartz, DC terminates Ms. Clayton's employment, but each purported decision-maker denies responsibility.**

89. On October 26, 2010, without any progressive discipline or formal warning, DC, via City Administrator Neil Albert, terminated Ms. Clayton's employment, effective November 10, 2010. Albert Depo. Ex. 3 (**Ex. 56**).

90. Mr. Albert had no reason to believe that Ms. Clayton's job performance was anything less than satisfactory and did not even make any inquiry into her job performance. Albert Depo., at 53:6-13 (**Ex. 55**).

91. Ms. Clayton was in the protected CS status for two years prior to being converted to MSS, and was terminated just one month after the conversion. Thompson, DC Corp. Designee Depo., at 43:15-44:1 (**Ex. 38**).

92. Ms. Clayton was not a security risk to the federal government, DC, or the DCNG. Thompson, DC Corp. Designee Depo., at 56:10-22 (**Ex. 38**).

93. Ms. Gregory, Director of Human Resources, stated that Mr. Albert retained the authority to terminate Ms. Clayton. Gregory Depo., at 98:11-14; 122:21-23; 134:3-12 (**Ex. 33**).

94. Ms. Gregory did not make the decision about whether to terminate directors. Gregory Depo., at 39:4-7 (**Ex. 33**). Instead, it was the decision of the mayor and/or the city administrator whether to terminate a director. Gregory Depo., at 36:18-20; 98:11-14 (**Ex. 33**).

95. Neil Albert was the City Administrator of DC Government from June 2009 through December 2010. Albert Depo., at 7:8-12 (**Ex. 55**).

96. Other than at his deposition, he doesn't believe he ever met with Ms. Clayton. Albert Depo., at 10:19-23 (**Ex. 55**).

97. Mr. Albert admits signing the letter terminating Ms. Clayton's employment. Albert Depo., at 19:20 (**Ex. 55**). However, he paradoxically denied making the decision to terminate her employment. Albert Depo., at 19:21-24 (**Ex. 55**). He further claimed that he was not even aware of who did make the termination decision. Albert Depo., at 20:3-5 (**Ex. 55**). While acknowledging signing the termination letter, he claimed that he has "no recollection" of Ms. Clayton's termination. Albert Depo., at 30:23-32:21 (**Ex. 55**).

98. Mr. Albert recognized that there must be a "justifiable reason" to terminate Ms. Clayton's employment. Albert Depo., at 21: 4:9. He does not recall any "investigation" bearing on the decision to terminate Ms. Clayton's employment. Albert Depo., at 21:25-22:12 (**Ex. 55**).

99. Mr. Albert was involved in "high-level" decisions, Albert Depo., at 66: 10-12 (**Ex. 55**), and terminating one of the approximately 72 government directors was a "high-level decision." Albert Depo., at 67:21-24 (**Ex. 55**). Nevertheless, he claimed not know why she was being terminated or who was involved in the decision. Albert Depo., at 21:10-15 (**Ex. 55**).

100.      The day after Ms. Clayton received the termination notice, she asked Barry Kreiswirth of the City Administrator's Office why she was terminated. He advised that she

needed to speak with Mr. Albert. Clayton Depo., at 191:13-21 **(Ex. 14)**. Ms. Clayton called Mr. Albert on several occasions but he never took her call. Clayton Depo., at 191:22-24 **(Ex. 14)**.

101. Mr. Albert denied recalling any involvement by DCNG in the termination of Ms. Clayton. Albert Depo., at 22:16-18 **(Ex. 55)**. However, although he could not recall any involvement by DCNG, he admitted that does not mean it didn't happen. Albert Depo., at 25:5-9 **(Ex. 55)**.[5]

102. He is familiar with General Schwartz. Albert Depo., at 10:24-11:2 **(Ex. 55)**. He doesn't remember any specific dates of meetings, but he had "interacted with General Schwartz" in his role as agency head of the DCNG in 2010. Albert Depo., at 37:21-38:7 **(Ex. 55)** .

103. Brender Gregory recalled Mr. Albert stating General Schwartz claimed that he was not able to gain "cooperation" from Ms. Clayton. Gregory Depo., at 60:12-17 **(Ex. 33)**. Ms. Gregory specifically recalls Mr. Albert telling her this. Gregory Depo., at 61:2-8; 93:19-22; 99:24-100:1 **(Ex. 33)**.

104. DC claims that the mayor at the time, Mayor Adrian Fenty, was the decision-maker to terminate Ms. Clayton's employment with the District. Thompson, DC Corp. Designee Depo., at 32:1-3 **(Ex. 38)**. DC also contended that Mayor Fenty and Neil Albert communicated regarding the termination of Ms. Clayton. Thompson, DC Corp. Designee Depo., at 33:15-19 **(Ex. 38)**.

105. Mayor Fenty denied any involvement or knowledge of the decision to terminate Ms. Clayton's employment. Fenty Affidavit, at ¶ 2 **(Ex. 59)**. Mayor Fenty stated that he has "no personal knowledge or recollection of Betty Clayton," and he "had no involvement in the

---

[5] Likewise, DC assumes that there were no oral communications between DC and DCNG decision-makers regarding the termination of Ms. Clayton but concedes that if there were, it would not know about them. Thompson, DC Corp. Designee Depo., at 117:17-118:6 **(Ex. 38)**.

conversion of Ms. Clayton's position to the Management Supervisory Service or the decision to terminate her employment." Fenty Affidavit, at ¶ 2 (**Ex. 59**).

106.    Brender Gregory believes that General Schwartz would have conferred with DC officials related to the termination of Ms. Clayton's employment. Gregory Depo., at 57:25-58:6 (**Ex. 33**).

107.    General Schwartz claimed to "have no idea" why or how Ms. Clayton was terminated. Schwartz Depo., at 162:15-21 (**Ex. 20**). According to General Schwartz's testimony, one day Ms. Clayton was present and the next she was simply gone. Schwartz Depo., at 162:22-163:2 (**Ex. 20**).

108.    Although DC denied communications between it and DCNG related to the termination of Ms. Clayton's employment, its only basis for stating that is that it was advised as such by its attorneys. Thompson, DC Corp. Designee Depo., at 36:16-37:9 (**Ex. 38**).

109.    However, Brender Gregory recalls Mr. Albert telling her that he had communications with General Schwartz related to "cooperation" with Ms. Clayton. Gregory Depo., at 60:12-61:14 (**Ex. 33**); Gregory Depo., at 93:19-22 (**Ex. 33**); Gregory Depo., at 99:12-100:1 (**Ex. 33**); Gregory Depo., at 136:24-137:21 (**Ex. 33**). The purported "cooperation" issue was not related to Ms. Clipper. Gregory Depo., at 137:22-24 (**Ex. 33**).

110.    Ms. Clayton had no performance issues according to both General Schwartz and DC. *Supra*, at § II.b. *See also* Schwartz Depo. Ex. 9; Schwartz Depo., at 75:17-78:5; 79:21-93:21 (**Ex. 20**). Her employment performance was top possible and exceeded expectations from the start through the time of her termination. Schwartz Depo., at 78:6-12 (**Ex. 20**); Schwartz Depo., at 78:13-79:20 (**Ex. 20**).

111.     The only area that Ms. Clayton was not "cooperating" with General Schwartz and his staff were their attempts to pressure her and Ms. Jones to not report and press the sexual harassment matter. *See supra*, at § II.d.

112.     DCNG has no contention one way or the other as to the reason for Ms. Clayton' s position being reclassified from CS to MSS.  Forrest, DCNG Corp. Designee Depo., at 142:17-143:1.  DCNG also has no position as to the reason for Ms. Clayton's termination.  Forrest, DCNG Corp. Designee Depo., at 143:2-6 (**Ex. 58**).

   **i.     Summary of involvement by "Decision-Makers."**

113.     Each putative "decision-maker" denied any involvement in the decision to terminate Ms. Clayton's employment.  The following chart displays the finger-pointing and circular denials of the decision-makers:

| Purported Decision-Maker | Involvement? |
|---|---|
| **Brender Gregory, Director of DC Office of Human Resources** | Did not make the decision to terminate Ms. Clayton's employment, Gregory Depo., at 39:4-7 (**Ex. 33**), but it was likely made by the City Administrator (Neil Albert) or the Mayor (Adrian Fenty).  Gregory Depo., at 30:6-9; 36:18-20 (**Ex. 33**). |
| **Neil Albert, City Administrator** | Did not make the decision to terminate Ms. Clayton's employment and is not aware of who made the decision.  Albert Depo., at 19:21-24; 20:3-5 (**Ex. 55**). |
| **LaTonya Thompson, DC Corporate Designee** | Claims that Mayor Adrian Fenty was the decision-maker to terminate Ms. Clayton's employment with the District.  Thompson, DC Corp. Designee Depo., at 32:1-3 (**Ex. 38**). |

| | |
|---|---|
| **Adrian Fenty, Mayor** | Denies any involvement in, or knowledge of, Ms. Clayton's termination. Fenty Affidavit, at ¶ 2 (**Ex. 59**). |
| **General Errol Schwartz, Commanding General of DCNG** | Claims to "have no idea" why or how Ms. Clayton was terminated, Schwartz Depo., at 162:15-21 (**Ex. 20**), and she was simply present one day and gone the next. Schwartz Depo., at 162:22-163:2 (**Ex. 20**). |
| **Lieutenant Colonel Thomas W. Forrest, DCNG Corporate Designee** | DCNG has no position as to the basis for Ms. Clayton's termination. Forrest, DCNG Corp. Designee Depo., at 143:2-7 (**Ex. 58**). |

In sum, neither DC nor DCNG can maintain *any* contention as to how or why Ms. Clayton was terminated.

> **j.    Ms. Clayton is replaced by a male subordinate employee who, to DC's knowledge had less experience.**

114.    After Ms. Clayton was terminated, DC elevated one of her direct reports, Herman Preston.  Albert Depo. Ex. 6 (**Ex. 57**).  A contemporaneous e-mail states that "Neil," Mr. Albert, wanted Herman Preston to be appointed interim director.  *Id.*  However, Mr. Albert also claimed to "have no knowledge" as to who replaced Ms. Clayton, 22:19-22 (**Ex. 14**).

115.    General Schwartz was familiar with Mr. Preston.  Schwartz Depo., at 37-39:1 (**Ex. 20**).

116.    As far as the District of Columbia knew, Mr. Preston, a male, had far less experience than Ms. Clayton and was not aware of *any* qualifications he had for the job. Thompson, DC Corp. Designee Depo., at 100:20-111:15 (**Ex. 38**).[6]

---

[6] Likewise, even if he was qualified, Mr. Preston never conveyed his work performance or history to any decision-makers.  Preston Corp. Designee Depo., at 103:18-104:3 (**Ex. 54**).

117.     DC's purported basis for promoting Mr. Preston, that he was the "deputy director," is simply not true.  Mr. Preston, also a DC Corporate Designee, confirmed that he was not the deputy director, there was not such position as deputy director, and he never suggested that to anyone.  Preston Corp. Designee Depo., at 15:19-16:13 (**Ex. 54**).

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

   /s/  Levi S. Zaslow                  
Timothy F. Maloney (Bar No. 416522)
tmaloney@jgllaw.com
Levi S. Zaslow (Bar No. MD29101)
lzaslow@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
301.220.2200 (T)
301.220.1214 (F)
*Counsel for Plaintiff Betty Clayton*