# EXHIBIT 1

# In the Matter Of:

## *BETTY CLAYTON*

### *vs.*

## *DISTRICT OF COLUMBIA, et al.*

---

## *RONALD STAMPS*

## *January 23, 2017*

---

RONALD STAMPS - 01/23/2017          Pages 10..13

Page 10

1    A   No.

2    Q   And the house is currently rented?

3    A   No.

4    Q   Do you ever return to that house?

5    A   Yes.

6    Q   But you don't consider that to be your

7  residence any longer?

8    A   No.  My son is living in it.

9    Q   Can you walk me through your work

10  experience?

11    A   Okay.  I joined the Air Force in 1974.

12  Went to basic in Texas.  I became an air crew life

13  support technician.  I went to training at Chanute

14  Air Force Base, Illinois and I was stationed in

15  Kansas, O'Connell Air Force Base.

16    I applied for the Presidential Honor Guard

17  in Washington, D.C. and I was selected, so I came to

18  Washington, D.C.  I was in the Presidential Honor Guard

19  until 1978, when I got out of the service.  I went back

20  to college.

21    Q   In '78?

22    A   Yes.  And then in '83, I joined the D.C.

Page 11

1  National Guard.  And I was an air crew life support

2  technician in the D.C. National Guard.

3    And then from that job, I went to be an

4  in-flight passenger specialist with the 201st Air Lift

5  Squadron; that would have been 1985.  So, I flew — we

6  flew VIPs, the Vice-President on down, dignitaries.  I

7  did that until 1990.

8    I applied for commission.  I got

9  commissioned as a second-lieutenant.  I was a personnel

10  officer.  My first job was labor relations officer for

11  the D.C. National Guard.  And then from there, I went

12  to the 113th wing as a director of personnel; that

13  would have been in 1992, I think.

14    And then from that job, I went to

15  communications flight commander, 113th communications

16  flight commander, and I did that from about 1995 to

17  2000.

18    In 2000, I went to the D.C. armory as the

19  executive staff support officer for General Freeman.

20  Still personnel, but it was supporting the senior

21  staff.

22    Then in 2003, I deployed to Iraq.  I was in

Page 12

1  Iraq until February 2004.  I came back, then I was

2  assigned to the 113th maintenance squadron as a

3  maintenance officer.

4    Then at the end of 2004, I went back to

5  Iraq.  And I came back, then I deployed, I went to

6  Katrina in 2005, the hurricane.  I was there for about

7  three months.

8    And then I came back to the D.C. National

9  Guard, to the armory, as the deputy HRO; human

10  resources officer.  That would have been 2006.

11    Q   That was in 2006?

12    A   Yes.

13    Q   Were you employed as the deputy HRO from

14  2006 until your retirement in 2016?

15    A   No.  I became the — it was probably two

16  thousand — I'm not sure — 2007 or '08 I became the

17  HRO.  And then in 2011, I became the director of the

18  joint staff.  Then on March 1st of 2016, I retired.

19    Q   What were your duties from 2007-2008 as

20  HRO until you became the director of the joint staff

21  in 2011?

22    A   Personnel for the D.C. National Guard,

Page 13

1  Army and air technicians and AGRs.

2    Q   What's that?

3    A   Active Guard Reserve.

4    Q   What were your job duties?

5    A   I was the director of human resources.

6  Oversee personnel, the budget, funding.

7    Q   Anything else?

8    A   No.

9    Q   Did you have a list of staff whom you

10  oversaw?

11    A   Yes.

12    Q   What type of list was kept?

13    A   I had staffing.  I had classification.  I

14  had labor relations.  Training and budget.

15    Q   And you had lists of employees for each of

16  these?

17    A   Yes.

18    Q   Were there any federal employees on these

19  lists?

20    A   They were federal employees — I had a

21  combination of.

22    Q   So, the answer would be yes?

RONALD STAMPS - 01/23/2017                    Pages 14..17

Page 14

1    A   Yes.

2    Q   Were there also what you would call D.C.
3  government employees on these lists?

4    A   That work for me?

5    Q   Well, you mentioned there were staff
6  lists, classification lists, labor relations lists,
7  training lists and budget lists.  You mentioned
8  federal employees were on these lists.  Were D.C.
9  government employees on these lists?

10   A   I would say yes.

11   Q   Do you still have any of these lists?

12   A   No.

13   Q   Do you know where they are now?

14   A   No.

15   Q   When you were the human resources officer,
16  did you maintain those lists in any particular place?

17   A   We had a manning document they were
18  maintained on.

19   Q   What is that?

20   A   It has the name of the employee, their
21  duties, their pay grade.

22   Q   Would that be what one would think of as

Page 15

1  like an employment file, or something different?

2    A   It could be, yeah.

3    Q   Were these manning documents for all
4  federal and D.C. government employees?

5    A   I had the federal employees and the AGRs.

6    Q   Where was the D.C. government employees
7  list kept?

8    A   With the D.C. government.  I would know
9  who was on board and where they were assigned on my
10  document, but not -- I mean, I just knew where they
11  were assigned.

12   Q   Where were these manning documents
13  maintained when you were there?

14   A   They were maintained in the HRO and also
15  at -- the wing had a manning document and the Army G1
16  had a manning document.

17   Q   What is a G1?

18   A   That's personnel.  Army personnel.  A1 is
19  Air Force personnel.

20   Q   And G1 is?

21   A   Army personnel.

22   Q   Is there a particular room or file cabinet

Page 16

1  or server in which this was stored?

2    A   I don't know which server it would have
3  been stored on.  But most of it was stored on
4  servers.

5    Q   You had this document as an electronic
6  document, all these lists?

7    A   No.

8    Q   It was only hard copies?

9    A   Yes.  They had them then.  But I don't
10  have any now.

11   Q   I understand.  My question is where they
12  were stored when you were the director of human
13  resources.

14   A   On the server.

15   Q   Were they also stored in hard copy?

16   A   Yes.

17   Q   Where were they stored in the hard copy,
18  in the HRO office?

19   A   Yes.

20   Q   Anywhere else?

21   A   They also had documents at the wing and at
22  the Army G1.

Page 17

1    Q   That's what you told me a moment ago?

2    A   Yes.

3    Q   Were these lists kept in the HRO, the
4  server and the G1 after you became the director of
5  the joint staff in 2011?

6    A   Yes.  They remained where they were.

7    Q   Was that true until your retirement in
8  2016?

9    A   Yes.

10   Q   When you retired in 2016, you retired as
11  director of the joint staff?

12   A   Yes.

13   Q   Can you walk me through the structure of
14  the D.C. National Guard?  I'm asking sort of like an
15  organizational chart.

16   A   We have a commanding general.  Then under
17  the commanding general, we have the adjutant general.
18  That's on the Army side.

19       On the Air side, we have the 113th wing,
20  which has -- it's a brigadier general position, so it's
21  the wing commander.  The wing commander and the TAG
22  report to the CG; commanding general.

Page 18

1    Q   What is the TAG?

2    A   The adjutant general.

3    Q   The adjutant general is known as the TAG?

4    A   Yes.

5    Q   So, you were walking me through the

6    organizational chart.

7        A   Then there's a land component commander

8    who is a brigadier general that reports to the

9    adjutant general. And then I can't go too far down

10   on the Army side, because they really break out.

11           But under that land component commander,

12   they have the Army band, they have an MP company, they

13   have an aviation unit. They have a medical unit. They

14   have a transportation unit, a maintenance unit and a

15   U.S.P.F.O., which is the financial office.

16   Q   What is that?

17       A   U.S.P.F.O.; I don't know what it stands

18   for.

19           Then on the air side, you have the wing

20   commander. Under the wing, you have the 201st air lift

21   squadron. You have the 113th fighter wing. You have

22   the 121st fighter squadron. You have the 113th

Page 19

1    communications flight. Then the 113th medical

2    squadron.

3    Q   Okay. Anything else?

4    A   No.

5    Q   So, as the human resources -- and you were

6    a colonel at the time, in 2008?

7        A   I think I got promoted to colonel in 2008,

8    yeah.

9    Q   Where did you fit on the organizational

10   chart you just described to me?

11       A   At that time, we didn't have a TAG, so I

12   report to the commanding general. Actually, we had

13   the director of the joint staff; I reported to him.

14   Actually, both. I would report to General Schwartz,

15   the commanding general, as the HRO and I would also

16   report to the director of the joint staff.

17   Q   Then where does the director of the joint

18   staff fit in with this organizational chart?

19       A   They report to the commanding general.

20   Q   Is the director of the joint staff the

21   adjutant general?

22       A   No.

Page 20

1    Q   They're two, different people?

2    A   Two, different people.

3    Q   So, where does the director of the joint

4    staff fit in next to or above or below the adjutant

5    general?

6        A   He's under.

7    Q   So, you would have the director of the

8    joint staff reporting to the adjutant general?

9    A   Yes.

10   Q   But the director of the joint staff it

11   sounds like could perhaps go directly to the

12   commanding general and that would be appropriate?

13       A   If the TAG wasn't there.

14   Q   So, when you were the director of HRO, you

15   would report to the director of joint chiefs?

16       A   Director of joint staff.

17   Q   And the commanding general?

18   A   Yes.

19   Q   Anybody else you had to report to?

20   A   No.

21   Q   When you were the director of the joint

22   chiefs, you would report either to the adjutant

Page 21

1    general or the commanding general?

2    A   Yes.

3    Q   From the 2008 through 2016 time frame, was

4    General Schwartz the commanding general of the D.C.

5    National Guard?

6        A   Yes. Wait a minute. General Whirley, I'm

7    not sure when he left.

8    Q   Fair enough.

9        A   General Whirley was -- I think 2008 is

10   when he retired.

11   Q   Sometime in 2008, you reported to General

12   Schwartz, through 2016?

13       A   Right.

14   Q   Were Generals Whirley and Schwartz at the

15   D.C. National Guard at the same time, did they

16   overlap at all?

17       A   Yes.

18   Q   How long did they overlap?

19       A   I'm not sure.

20   Q   Prior to 2008, what was General Schwartz's

21   role at D.C. National Guard?

22       A   He was the TAG; the adjutant general.

Page 26

1  no.
2       I do know -- from what I understand, the
3  D.C. National Guard, the commanding general is
4  appointed by the President.
5       And before the commanding general can leave,
6  someone needs to be named to replace him, which could
7  affect a retirement.
8    Q   So, do you have any other knowledge as to
9  General Schwartz's retirement plans or lack thereof
10 one way or the other?
11   A   No.
12   Q   When is the first time you heard about
13 Betty Clayton?
14   A   It would have been when we were hiring the
15 D.C. government operations position.
16   Q   Do you know when that was?
17   A   I can give you a ballpark.
18   Q   Okay.
19   A   2008.
20   Q   You know who she is, correct?
21   A   Yes.
22   Q   And you recognize her sitting here to my

Page 27

1  left?
2    A   Yes, I do.
3    Q   And you worked with Betty Clayton for a
4  number of years?
5    A   Yes.
6    Q   How many years?
7    A   I'm not sure.  I'm not sure when she left.
8  But from the time she came there until she left, I
9  was there as the human resource officer.
10   Q   And you worked with her, you know she was
11 a director of the government operations division of
12 the D.C. National Guard?
13   A   Right.
14   Q   And you worked with her in that capacity?
15   A   Yes.
16   Q   Did you have to work with her, given you
17 were the D.C.N.G. human resources officer and she was
18 the top civilian official in the D.C. National Guard?
19   A   Yes.
20   Q   Did you support the hiring of Betty
21 Clayton?
22   A   I don't know.  Can you rephrase the

Page 28

1  question?  Because I was HR, I get -- somebody
2  applies for a position, you know.
3    Q   What was your role in the 2008 time frame
4  in the hiring of the government operations director
5  of the D.C. National Guard?
6    A   I got involved -- Mr. Devassy had been
7  removed from the position, so there wasn't a director
8  of operations.
9       They were looking -- they were hiring
10 somebody, but I didn't become aware of it until,
11 believe it or not, the preacher from my church asked me
12 about if there was a job opening in the D.C. Guard --
13 D.C. government.  That's when I became aware of it.
14   Q   That's when you became aware of what?
15   A   That there was a position -- that the
16 position had been advertised in "The Washington
17 Post." I talked to General Ricket about it.
18       And when I became involved was during the
19 notification.  And there was a board that met to select
20 or to review the applicants.
21   Q   What board was that?
22   A   It would have been a recommendation board

Page 29

1  during the notification.
2    Q   So, this is essentially a hiring committee
3  to hire the government operations director of the
4  D.C. National Guard?
5    A   No.  They would make a recommendation.
6    Q   Who was on this recommendation committee?
7    A   I don't know.  I don't remember.
8    Q   You were on this?
9    A   No.
10   Q   Do you know anybody who was on it?
11   A   The only name I can remember is Wendy
12 Messick.
13   Q   Wendy Messick is who?
14   A   She was a colonel.
15   Q   In the D.C. National Guard?
16   A   Yes.
17   Q   Federal employee?
18   A   Active Guard Reserve.
19   Q   So, at what point did you become involved
20 in the decision as to who to hire?
21   A   I didn't really -- I didn't make the
22 decision of who to hire.  General Ricket, he was the

Page 30

1  director of the joint staff, and I got involved.

2        I actually notified Ms. Clayton about the

3  position and she would be -- she would have to go --

4  she was recommended for the position or selected for

5  the position; I don't remember which.

6        But she had to process through D.C.

7  government to process in and to become a D.C. employee

8  because I didn't have the authority to appoint her to

9  that position.

10       Q    Why did you not have authority, to your

11  knowledge?

12       A    Because I only had authority over federal

13  technicians and AGRs in the D.C. National Guard.

14       Q    Who told you that?

15       A    It's in my position -- we had a position

16  description.  It talks about your jobs and duties and

17  who you're responsible for.

18       I knew that from reading my position

19  description when I was put in the position and from

20  being a personnel officer quite a bit of my career.

21       Q    Did anybody tell you you did not have any

22  hiring authority for the position of government

Page 31

1  operations director of the D.C. National Guard?

2       A    I don't remember.

3       Q    Was there any legal counsel you had at the

4  D.C. National Guard who you consulted during this

5  time frame?

6       A    Yes.

7       Q    Who was that?

8       A    It would have been Colonel Tall and

9  Colonel Forrest.

10       Q    Are they both attorneys?

11       A    They're JAGs.

12       Q    You're not a JAG or an attorney, are you?

13       A    No.

14       MR. ZASLOW:  We're going to have this

15  marked as Exhibit Number 1.

16       (Whereupon, Exhibit 1 was marked for

17  identification.)

18  BY MR. ZASLOW:

19       Q    Do you recognize the document you've got

20  in front of you there, Exhibit Number 1?

21       A    Yes.

22       Q    You see a signature in the middle of the

Page 32

1  page there?

2       A    Yes.

3       Q    Is that your signature?

4       A    Yes.

5       Q    You signed this?

6       A    Yes.

7       Q    What was the purpose of this memorandum?

8       A    Notifying Colonel Ricket of the results of

9  the board.

10       Q    And you mentioned the board earlier.  And

11  the board is, essentially, the hiring committee?

12       A    No.  Recommendation.

13       Q    Should we call it the recommendation

14  committee?

15       A    That sounds good.

16       Q    Who were the board members?  Does this

17  refresh your recollection it was Colonel Wendy

18  Messick, Lawrence Montgomery and Lieutenant Colonel

19  Essie Thomas?

20       A    Yes.

21       Q    Those were the board members you were

22  referring to earlier?

Page 33

1       A    Yes.

2       Q    Wendy Messick was an active duty federal

3  employee?

4       A    Yes.

5       Q    Lawrence Montgomery was an active duty

6  federal employee?

7       A    No.  He was a federal technician.

8       Q    Not active duty, but a federal employee?

9       A    Yes.

10       Q    And Essie Thomas?

11       A    Active duty.

12       Q    Federal employee also?

13       A    No.  She was Active Guard Reserve.

14       Q    Do you recall the applicants Michael

15  Thornton and Susan Role?

16       A    Michael Thornton was the preacher at my

17  church; temporary preacher.  He had come in

18  part-time.  No, Susan, no; I have no recollection of

19  her at all.

20       Q    And Betty Clayton you, obviously, have a

21  recollection of?

22       A    Yes.

Page 30

1  director of the joint staff, and I got involved.
2       I actually notified Ms. Clayton about the
3  position and she would be -- she would have to go --
4  she was recommended for the position or selected for
5  the position; I don't remember which.
6       But she had to process through D.C.
7  government to process in and to become a D.C. employee
8  because I didn't have the authority to appoint her to
9  that position.
10      Q   Why did you not have authority, to your
11 knowledge?
12      A   Because I only had authority over federal
13 technicians and AGRs in the D.C. National Guard.
14      Q   Who told you that?
15      A   It's in my position -- we had a position
16 description. It talks about your jobs and duties and
17 who you're responsible for.
18      I knew that from reading my position
19 description when I was put in the position and from
20 being a personnel officer quite a bit of my career.
21      Q   Did anybody tell you you did not have any
22 hiring authority for the position of government

Page 31

1  operations director of the D.C. National Guard?
2      A   I don't remember.
3      Q   Was there any legal counsel you had at the
4  D.C. National Guard who consulted during this
5  time frame?
6      A   Yes.
7      Q   Who was that?
8      A   It would have been Colonel Tall and
9  Colonel Forrest.
10     Q   Are they both attorneys?
11     A   They're JAGs.
12     Q   You're not a JAG or an attorney, are you?
13     A   No.
14     MR. ZASLOW:  We're going to have this
15 marked as Exhibit Number 1.
16     (Whereupon, Exhibit 1 was marked for
17 identification.)
18 BY MR. ZASLOW:
19     Q   Do you recognize the document you've got
20 in front of you there, Exhibit Number 1?
21     A   Yes.
22     Q   You see a signature in the middle of the

Page 32

1  page there?
2      A   Yes.
3      Q   Is that your signature?
4      A   Yes.
5      Q   You signed this?
6      A   Yes.
7      Q   What was the purpose of this memorandum?
8      A   Notifying Colonel Ricket of the results of
9  the board.
10     Q   And you mentioned the board earlier.  And
11 the board is, essentially, the hiring committee?
12     A   No.  Recommendation.
13     Q   Should we call it the recommendation
14 committee?
15     A   That sounds good.
16     Q   Who were the board members?  Does this
17 refresh your recollection it was Colonel Wendy
18 Messick, Lawrence Montgomery and Lieutenant Colonel
19 Essie Thomas?
20     A   Yes.
21     Q   Those were the board members you were
22 referring to earlier?

Page 33

1      A   Yes.
2      Q   Wendy Messick was an active duty federal
3  employee?
4      A   Yes.
5      Q   Lawrence Montgomery was an active duty
6  federal employee?
7      A   No.  He was a federal technician.
8      Q   Not active duty, but a federal employee?
9      A   Yes.
10     Q   And Essie Thomas?
11     A   Active duty.
12     Q   Federal employee also?
13     A   No.  She was Active Guard Reserve.
14     Q   Do you recall the applicants Michael
15 Thornton and Susan Role?
16     A   Michael Thornton was the preacher at my
17 church; temporary preacher.  He had come in
18 part-time.  No, Susan, no; I have no recollection of
19 her at all.
20     Q   And Betty Clayton you, obviously, have a
21 recollection of?
22     A   Yes.

RONALD STAMPS - 01/23/2017                    Pages 38..41

Page 38

1     Q   Did Charlotte Clipper make the decision
2  whether to hire Betty Clayton?
3     A   No.
4     Q   In fact, Betty Clayton would be Charlotte
5  Clipper's boss, essentially, isn't that right?
6     A   Correct.
7     Q   So, who made the final decision to hire
8  Betty Clayton?
9     A   I don't know.
10    Q   Was it you?
11    A   No.
12        (Whereupon, Exhibit 2 was marked for
13  identification.)
14  BY MR. ZASLOW:
15    Q   I hand you Exhibit Number 2.  You've seen
16  Exhibit Number 2 before, right?
17    A   Yes.
18    Q   That's your signature on the bottom of
19  Exhibit Number 2?
20    A   Yes.
21    Q   And this is a memorandum you drafted
22  essentially advising Betty Clayton she was selected

Page 39

1  for the position of director of D.C. National Guard?
2     A   Yes.
3     Q   Did anybody tell you to draft this
4  memorandum?
5     A   Probably, yes.
6     Q   Who told you that?
7     A   I'm not sure if it was General Ricket or
8  General Schwartz.
9     Q   It would have been one of those two,
10  though?
11    A   Yes.
12    Q   Nobody else would have the authority to
13  tell you to issue such a memorandum, is that fair to
14  say?
15    A   Yes.
16    Q   Then it says in paragraph one, the last
17  sentence, "You have been selected as the Director,
18  District Government Operations."  Then, there's a
19  series of numbers; it looks like a code:
20  2603-DS-0301-14, do you see that?
21    A   Yes.
22    Q   What is that?

Page 40

1     A   That's on the document.  That's the job
2  description and duties and where it falls on the
3  document, the D.C. government document, I guess.
4     Q   That is a D.C. government job description
5  code there?
6     A   Yes.  As far as I know, yes.
7     Q   And in paragraph two, the proposal was to
8  bring her in at $87,832 as a Step 2?
9     A   Yes.
10    Q   Then is it accurate the position was
11  contingent on her meeting the requirements for D.C.
12  and human resources?
13    A   Yes.
14    Q   Obviously, she met all those requirements,
15  correct?
16    A   Yes.
17    Q   Actually, in the third paragraph, there's
18  two blanks, question marks.  Were those ultimately
19  filled in, the copy that ultimately went to Ms.
20  Clayton?
21    A   I don't remember.  The reason there's
22  blanks in here was I had a hard time getting Ms.

Page 41

1  Clipper to do the notification, to contact Ms. Clayton
2  and start processing her as a D.C. government employee.
3     Q   That's the second time Ms. Clipper's come
4  up.  Do you know why you had a hard time getting Ms.
5  Clipper to process this?
6     A   In hindsight, I think I know why.
7     Q   Tell me why, in hindsight.
8     A   Mr. Devassy had been terminated, he was
9  gone, and Charlotte Clipper reported to him.  They
10  had a close relationship.
11        Advertising the job in "The Washington Post"
12  where maybe very few people would see it, Mr. Devassy
13  could get the position back as a -- whatever his status
14  was, his citizenship status, because there were no
15  other qualified applicants for the position.
16        That's just my opinion.  So, she was not
17  cooperative in bringing Ms. Clayton on board.
18    Q   Did you sense hostility from Ms. Clipper?
19    A   Yes.
20    Q   Did you sense hostility from Ms. Clipper
21  throughout Ms. Clayton's tenure with the D.C.
22  National Guard?

Page 42

1     A   Yes.

2     Q   We're going to come back to this.  But,
3  you actually investigated Ms. Clipper on more than
4  one occasion, is that right?

5     A   I investigated her, yes.  Started an
6  investigation, but then I think it got reopened, yes.

7     Q   So two, but it actually might have been
8  one investigation, reopened later?

9     A   Yeah.  I can't remember.

10    Q   Did you also learn Ms. Clipper was working
11 behind the scenes to help Mr. Devassy obtain a work
12 visa?

13    A   Yes.

14    Q   Did you also learn Mr. Devassy was billing
15 the D.C. National Guard to pay for his personal
16 attorneys to obtain a visa for him?

17    A   Yes.

18    Q   That, in fact, happened, is that right?

19    A   I think so, yeah.

20    Q   And you actually performed an
21 investigation as part of your investigation into Ms.
22 Clipper, right?

Page 43

1     A   Yes.

2     Q   Did the D.C. National Guard actually pay
3  Mr. Devassy's attorneys for his visa situation?

4     A   I don't know.  I did see an invoice that
5  was unpaid, but it was a balance due.

6     Q   Ms. Clipper, actually she had control over
7  the D.C. National Guard checkbook?

8     A   Yes -- well, I don't know.  I know she had
9  youth leadership.

10    Q   She did have access to D.C. National Guard
11 funds, is that fair to say?

12    A   Yes.

13    Q   In your years as a human resources
14 director and as the director, chief of staff, have
15 you ever seen anything like what Ms. Clipper was
16 doing for Mr. Devassy?

17    A   No.

18    Q   That was an extremely unusual
19 circumstance, is that fair to say?

20    A   Yes.

21    Q   Did Ms. Clipper also work with federal
22 employees?

Page 44

1     A   Yes.

2     Q   Did you ever hear Ms. Clipper threaten she
3  had embarrassing information on some federal
4  employees?

5     A   No.

6     Q   Did you ever hear that allegation
7  generally being made?

8     A   No.

9     Q   Have you ever heard that had once become
10 an issue?

11    A   No.

12    Q   Nobody ever discussed that with you?

13    A   No.

14    Q   Did anybody ever tell you that did not
15 happen, that she didn't have embarrassing
16 information?

17    A   No.

18    Q   Conversation never happened one way or the
19 other?

20    A   No.

21    Q   Is that right?

22    A   Yes.

Page 45

1     Q   Did Ms. Clayton ultimately accept the
2  position?

3     A   Yes.

4         (Whereupon, Exhibit 3 was marked for
5  identification.)

6  BY MR. ZASLOW:

7     Q   I'm going to hand you Exhibit Number 3.
8  You recognize this memo to you?

9     A   Yes.

10    Q   This is a letter where Ms. Clayton
11 accepted the offer of employment with the D.C.
12 National Guard, is that right?

13    A   Yes.

14    Q   Actually, here, she's listed as a grade
15 14. Does that sound accurate?

16    A   Yes.

17    Q   Did Ms. Clayton need to convey her
18 acceptance to anyone other than you, to your
19 knowledge?

20    A   I don't know.  I know it had to go to D.C.
21 government, her acceptance.

22    Q   Did you forward it to the D.C. government?

RONALD STAMPS - 01/23/2017                    Pages 42..45

Page 42

1    A   Yes.

2    Q   We're going to come back to this.  But,
3  you actually investigated Ms. Clipper on more than
4  one occasion, is that right?

5    A   I investigated her, yes.  Started an
6  investigation, but then I think it got reopened, yes.

7    Q   So two, but it actually might have been
8  one investigation, reopened later?

9    A   Yeah.  I can't remember.

10    Q   Did you also learn Ms. Clipper was working
11  behind the scenes to help Mr. Devassy obtain a work
12  visa?

13    A   Yes.

14    Q   Did you also learn Mr. Devassy was billing
15  the D.C. National Guard to pay for his personal
16  attorneys to obtain a visa for him?

17    A   Yes.

18    Q   That, in fact, happened, is that right?

19    A   I think so, yeah.

20    Q   And you actually performed an
21  investigation as part of your investigation into Ms.
22  Clipper, right?

Page 43

1    A   Yes.

2    Q   Did the D.C. National Guard actually pay
3  Mr. Devassy's attorneys for his visa situation?

4    A   I don't know.  I did see an invoice that
5  was unpaid, but it was a balance due.

6    Q   Ms. Clipper, actually she had control over
7  the D.C. National Guard checkbook?

8    A   Yes -- well, I don't know.  I know she had
9  youth leadership.

10    Q   She did have access to D.C. National Guard
11  funds, is that fair to say?

12    A   Yes.

13    Q   In your years as a human resources
14  director and as the director, chief of staff, have
15  you ever seen anything like what Ms. Clipper was
16  doing for Mr. Devassy?

17    A   No.

18    Q   That was an extremely unusual
19  circumstance, is that fair to say?

20    A   Yes.

21    Q   Did Ms. Clipper also work with federal
22  employees?

Page 44

1    A   Yes.

2    Q   Did you ever hear Ms. Clipper threaten she
3  had embarrassing information on some federal
4  employees?

5    A   No.

6    Q   Did you ever hear that allegation
7  generally being made?

8    A   No.

9    Q   Have you ever heard that had once become
10  an issue?

11    A   No.

12    Q   Nobody ever discussed that with you?

13    A   No.

14    Q   Did anybody ever tell you that did not
15  happen, that she didn't have embarrassing
16  information?

17    A   No.

18    Q   Conversation never happened one way or the
19  other?

20    A   No.

21    Q   Is that right?

22    A   Yes.

Page 45

1    Q   Did Ms. Clayton ultimately accept the
2  position?

3    A   Yes.

4        (Whereupon, Exhibit 3 was marked for
5  identification.)

6  BY MR. ZASLOW:

7    Q   I'm going to hand you Exhibit Number 3.
8  You recognize this memo to you?

9    Q   This is a letter where Ms. Clayton
10  accepted the offer of employment with the D.C.
11  National Guard, is that right?

12    A   Yes.

13    Q   Actually, here, she's listed as a grade
14  14.  Does that sound accurate?

15    A   Yes.

16    Q   Did Ms. Clayton need to convey her
17  acceptance to anyone other than you, to your
18  knowledge?

19    A   I don't know.  I know it had to go to D.C.
20  government, her acceptance.

21    Q   Did you forward it to the D.C. government?

1    A   Yes.

2    Q   Did you fax it to them?

3    A   I don't remember.  I think I gave it to
4  Ms. Clipper, but I don't remember for sure.

5    Q   But you provided it to the D.C.
6  government?

7    A   Yes.

8    Q   Do you recall if Ms. Clipper ultimately
9  did process a confirmation of Ms. Clayton's
10  employment?

11    A   Yes.

12        (Whereupon, Exhibit 4 was marked for
13  identification.)

14  BY MR. ZASLOW:

15    Q   I'm going to hand you Exhibit 4 and ask
16  you if you recognize this document.  You recognize
17  this as the confirmation letter Ms. Clipper
18  ultimately sent?

19    A   Yes.

20    Q   Do you know if Ms. Clipper was a
21  supervisor at that time?

22    A   I'm not sure.  My investigation talks

1  about that, but I don't remember on this exact date
2  if she was a supervisor or not, I don't.

3    Q   Because you see in the signature block, it
4  says, "Charlotte Clipper Supervisory;" do you see
5  that?

6    A   Yes.

7    Q   Then under it, it says, "Human Resources
8  Specialist;" do you see that?

9    A   Yes.

10    Q   Do you know if there were any other human
11  resources specialists?

12    A   I don't know if there were other ones.

13    Q   Can you think of any others?

14    A   There were two employees there, but I'm
15  not sure.  Again, that's in my report on what their
16  duties were.

17    Q   What is a District Government Application
18  Form 2000?

19    A   I think it's to apply for a D.C.
20  government job.

21    Q   You are aware Ms. Clayton was hired as a
22  career service employee?  You're familiar with that

1  term, right?

2    A   I know what a career service employee is,
3  yes.

4    Q   Do you know she was hired as a career
5  service employee?

6    A   I would say yes.  I mean now, I do.

7    Q   Were you involved in that decision?

8    A   No.

9    Q   Do you know how that came about?

10    A   From Mrs. Clipper.

11    Q   You're saying Ms. Clipper processed it
12  that way, or do you know one way or the other?

13    A   I don't know one way or the other.

14    Q   Did you have any reservations upon or
15  before hiring Ms. Clayton?

16    A   No.

17    Q   Were you involved in the decision to
18  terminate Ms. Clayton?

19    A   No.

20    Q   When was the first time you heard Ms.
21  Clayton was going to be terminated?

22    A   I never heard she was going to be

1  terminated.  I was either on leave or TDY.  I came
2  back and she had been terminated.

3    Q   What was the temporary duty?

4    A   I don't remember.

5    Q   So, you heard she was terminated after she
6  actually was terminated?

7    A   Right.

8    Q   You had no advance warning she was going
9  to be terminated?

10    A   No.

11    Q   You are aware Mrs. Clayton at one point
12  was switched over from career service to management
13  supervisory; you've heard of that before, correct?

14    A   Yes.

15    Q   And you know what management supervisory
16  is, obviously?

17    A   Right.

18    Q   Did you have any advance warning Mrs.
19  Clayton was going to be switched over to management
20  supervisory?

21    A   No.

22    Q   When is the first you heard Ms. Clayton

RONALD STAMPS - 01/23/2017                    Pages 62..65

Page 62

1   entitled, "Background Information" for the D.C.
2   National Guard?
3       A   Background?
4       Q   Yeah.  Have you ever seen a document?
5       A   I don't know.  I may have.  You mean
6   background about the D.C. guard?
7       Q   Well, I'll give you the first page and see
8   if you're familiar with it.
9           (Whereupon, Exhibit 5 was marked for
10  identification.)
11  BY MR. ZASLOW:
12      Q   This is the first page of what appears to
13  be a 13-page document.  Have you ever seen this first
14  page before?
15      A   I probably did, but I don't remember.
16  It's been a long time.
17      Q   Do you see right in the middle of the page
18  there under the heading, "District status of the DC
19  National Guard?"
20      A   Yes.
21      Q   Do you see there it says, "DC Government
22  Operations is simultaneously a Directorate within

Page 63

1   Joint Force Head Quarters, DC National Guard and an
2   agency of the Government of the District of
3   Columbia?"
4       A   Yes.
5       Q   Was that your understanding of the two in
6   the 2008 time frame?
7       A   Yes.
8       Q   That would be for 2009 and 2010 as well?
9       A   Right.
10      Q   Have you ever seen Betty Clayton's
11  employment appraisals?
12      A   No.
13      Q   What about a performance evaluation; does
14  that make a difference, if I refer to it like that?
15      A   No, I don't remember ever seeing an
16  evaluation of her performance report.
17      Q   So, you've never seen her performance
18  evaluation?
19      A   I don't remember seeing it.
20      Q   Do you know who filled out her performance
21  evaluation?
22      A   No.

Page 64

1       Q   Did anyone ever discuss Ms. Clayton's
2   employment with you?
3       A   Not after she was initially hired, no.
4       Q   Did anybody ever discuss with you how she
5   was doing as an employee?
6       A   Not that I remember.
7       Q   Do you know who was reviewing her
8   employment?
9       A   No.
10      Q   Do you know who reviewed Mr. Devassy's
11  employment?
12      A   No.  I'm not sure.
13      Q   Was the director of the D.C. government
14  operations of the D.C. National Guard -- was that
15  individual under an obligation and duty to
16  investigate and discipline potential wrongdoing at
17  D.C. National Guard?
18      A   That's my understanding.
19      Q   And would you also agree the director of
20  the D.C. government operations division had the
21  obligation to investigate fraud, waste and abuse, if
22  any, occurring at D.C. National Guard?

Page 65

1       A   Yes.
2       Q   You do recall Ms. Clayton reporting some
3   wrongdoing to you, generally?
4       A   Yes.
5       Q   Did she report fraud, waste and abuse to
6   you?
7       A   What are you talking about?
8       Q   A waste of government funds, for example;
9   did she report such things to you?
10      A   She reported the Clipper information to
11  me.
12      Q   You're aware, generally, Ms. Clayton
13  reported wrongdoing to General Schwartz, for example?
14      A   No.
15      Q   You don't know one way or the other?
16      A   I don't know one way or the other.  I know
17  I was appointed to investigate, that's what I know.
18  And I talked to Ms. Clayton to get more information.
19      Q   Did you ever learn Ms. Clayton reported
20  wrongdoing to Colonels Tall or Forrest?
21      A   I'm not sure.  I don't remember.
22      Q   Is Colonel Tall a JAG attorney?

RONALD STAMPS - 01/23/2017                    Pages 66..69

Page 66

1    A   Yes.
2    Q   Who is Tamara Jones?
3    A   She was the secretary or administrative
4  assistant to General Schwartz.
5    Q   At some point, you learned Ms. Jones made
6  a sexual harassment complaint regarding General
7  Schwartz?
8    A   Yes.
9    Q   When did you first learn of that?
10   A   I'm not sure exactly when it was, but I
11  think she was gone when I learned about it.
12   Q   When did she leave D.C. National Guard?
13   A   I don't know.  I don't remember.
14   Q   Did she make any complaint directly to
15  you?
16   A   No.
17   Q   When is the first time you learned about
18  it?
19   A   It was at -- Chief Martin was the EEO
20  officer.
21   Q   First name?
22   A   Dwight.  In a meeting, he told me he was

Page 67

1  either providing guidance or provided guidance, and
2  didn't know if it was going to D.C. or federal.
3        And that's it.  That's all I remember about
4  it.  It was just in a meeting where he was closing
5  things out, I think.  I mean, it was such a short,
6  quick conversation.  That's all I know.
7    Q   Do you recall the approximate year in
8  which you were informed of this allegation?
9    A   If I knew when Mrs. Jones left, I could
10  probably tell you, but I don't know.
11   Q   What were the general details that were
12  conveyed to you regarding the allegation?
13   A   All I knew was -- I don't even know if she
14  filed a complaint or not -- he was giving her
15  guidance on what to do.  That's all I know.
16   Q   Who was giving who guidance?
17   A   Chief Martin was giving Ms. Jones
18  guidance.
19   Q   With what to do on what?
20   A   On a complaint.
21   Q   Do you know when that guidance was
22  provided?

Page 68

1    A   I don't know.
2    Q   What is Dwight Martin's title?
3    A   He was the state equal employment
4  management officer.  Same as an EEO.
5    Q   Was Tamara Jones a state or federal
6  employee?
7    A   She was a state employee.
8    Q   She was General Schwartz's secretary?
9    A   Or administrative assistant.
10   Q   Did there come a time where you learned
11  what the general allegations were?
12   A   No.
13   Q   So, till this day, you don't know what the
14  general allegations are?
15   A   No.  I never saw anything at all in
16  writing about any allegations.
17   Q   As the human resources officer, is it your
18  role to be involved in any allegations of sexual
19  harassment?
20   A   Yes and no.  I mean, when a complaint came
21  in, it came into the SARC; they would handle the
22  case.  Then if action was taken later, I would find

Page 69

1  out about it.
2        But the details of the case, unless there
3  was a reason for me to know, I wouldn't know about it
4  to keep that -- I mean, the confidentiality is -- if
5  the SEEM, State Equal Employment Management Officer, is
6  investigating it or the Sexual Assault Awareness
7  Officer, NCO, if they're investigating it, I don't need
8  to review that investigation; I mean, that wasn't under
9  my authority.  That would go to either the commanding
10  general or whoever the commander was that individual
11  fell under.
12   Q   Why is that not part of your duties?
13   A   Because if somebody files a sexual
14  harassment complaint, they go to the SARC or that
15  individual Sexual Assault Response Coordinator and
16  they coordinate that.
17        They interview the victim and they handle
18  the case with the commander, whoever that person's boss
19  is, or their supervisor.  So, I wouldn't get involved
20  in the investigation at all.
21        I mean, I would get the results of it, maybe
22  if we terminated an individual based on either sexual

Page 94

1  A  Yes.
2  Q  -- it says there Ms. Clipper was
3  uncooperative again.
4  A  Yes.
5  Q  Do you recall she was uncooperative yet
6  again?
7  A  Yes.
8  Q  Did you again attempt to contact Mr.
9  Devassy?
10  A  Yes.
11  Q  Were you able to contact him?
12  A  No.
13  Q  Do you recall what she told you about
14  documents related to Mr. Devassy's actions regarding
15  his immigration and employment issues?
16  MR. GRACE:  Objection as to form.  Who are
17  we talking about?  You said, "she."
18  MR. ZASLOW:  Ms. Clipper.
19  THE WITNESS:  I mean, I would have to read
20  through this again.  But, basically, any documents I
21  wanted from Ms. Clipper she either couldn't find
22  them, didn't know where they were or -- I mean, it

Page 95

1  was just she wasn't providing anything.
2  BY MR. ZASLOW:
3  Q  Did you attempt to get them from the
4  District of Columbia?
5  A  I don't remember.
6  Q  Did you attempt to get them from District
7  of Columbia National Guard?
8  A  I don't remember.  I probably did, but I
9  don't remember.  I didn't know where to go look for
10  them because she's the one that created them, as far
11  as I know.
12  Q  Did Ms. Clipper have one or two computers?
13  A  I don't know.
14  Q  Do you know if Ms. Clayton had one or two
15  computers?
16  A  No.
17  Q  Did you ever hear some D.C. National Guard
18  employees had two computers, one for District of
19  Columbia and one for District of Columbia National
20  Guard?
21  A  I know they had separate e-mails.  I know
22  we had a problem with the e-mail.  I didn't know

Page 96

1  there were two, separate computers.
2  Q  Did Ms. Clipper have a federal and state
3  e-mail?
4  A  I don't remember.
5  Q  What about Ms. Clayton; do you know if she
6  had two?
7  A  I think Ms. Clayton had a D.C.
8  government -- I don't know.  I think she had a
9  regular e-mail.  I know we had problems getting
10  messages out from meetings because we didn't send it
11  to the .gov.
12  Q  And I asked you earlier if Ms. Clipper --
13  if you ever learned she made false statements to the
14  government related to Mr. Devassy's applications.
15  If you turn to paragraph three on page
16  three, in fact, you substantiated allegations Ms.
17  Clipper made "false official statements,
18  representations, or committed --
19  A  Yes.
20  Q  -- any other misconduct when communicating
21  with other Agencies concerning Mr. Anthony Devassy,"
22  correct?

Page 97

1  A  Yes.
2  Q  I'd like you to turn, if you can, to page
3  five.
4  A  Okay.
5  Q  You see paragraph six?
6  A  Yes.
7  Q  Well, it's five and six, actually.  In
8  paragraph five you wrote, "Another concern is in my
9  last report I recommend the immediate demotion of Ms.
10  Clipper;" do you see that there?
11  A  Yes.
12  Q  Do you know if she was demoted?
13  A  No, I don't.
14  Q  Did you express to Ms. Clayton Ms. Clipper
15  should be demoted?
16  A  Yes, I think I did.
17  Q  Do you know if Ms. Clayton attempted to
18  demote Ms. Clipper?
19  A  I don't know.
20  Q  Paragraph number six, you recommended she,
21  once again, be demoted?
22  A  Right.

RONALD STAMPS - 01/23/2017                    Pages 98..101

Page 98

1    Q    But you don't know if she was or not --
2    A    No.
3    Q    -- is that right?
4    A    Yes.
5    Q    In paragraph 6.b., you wrote, "After her
6    demotion, Ms. Clipper should be terminated as a DC
7    employee;" do you see that there?
8    A    Yes.
9    Q    In fact, you also noted she has falsely
10   represented the agency, withheld information to you,
11   as the investigator, and also she has been derelict
12   in her duties?
13   A    Yes.
14   Q    That was your conclusion, correct?
15   A    Yes.
16   Q    And you also recommended she be terminated
17   for all these reasons?
18   A    Yes.
19   Q    Do you know if she ever was terminated?
20   A    No.
21   Q    Do you know if there were efforts made to
22   terminate her?

Page 99

1    A    Yes.
2    Q    Do you know what the outcome of those
3    attempts were?
4    A    No.
5    Q    Did anybody ever attempt to engage in any
6    discussion with you related to the attempts to
7    discipline, demote or terminate Ms. Clipper?
8    A    No.  The only things I had, when I talked
9    to the investigator, Mr. Savoy; that's all I
10   remember.  I know I tried to do some follow-ups to
11   see if something was happening to her.
12   Q    Did you have concerns related to Ms.
13   Clipper's continued employment with the D.C. National
14   Guard after October 2009?
15   A    What do you mean by "concerns?"  I didn't
16   think she should be there.  But, I mean, that was
17   based on my investigation.
18   Q    And your findings and recommendations in
19   those investigations?
20   A    Yes.
21   Q    Did you find it surprising she was still
22   employed there after October 2009?

Page 100

1    A    No.
2    Q    Why not?
3    A    It's slow-moving removing employees or
4    even disciplining, at least with D.C., my experience
5    with the D.C. government.  It just moves slow.
6         My feeling, once I turn this over to Mr.
7    Savoy and the D.C. government, I felt it was their
8    responsibility to take it and do the termination and/or
9    whatever they were going to do to Ms. Clipper.  I can
10   only make the recommendations.  I couldn't do anything.
11   Q    Why not?
12   A    I didn't have the authority to terminate
13   her.
14   Q    Did you have any discussions with General
15   Ricket related to the Clipper investigation?
16   A    Yes.
17   Q    What were those discussions?
18   A    I don't remember, because -- I gave him
19   the report, so I'm sure we had some type of
20   discussion.
21   Q    You do recall it was Ms. Clayton who made
22   a number of reports concerning the conduct of Ms.

Page 101

1    Clipper?
2    A    Yes.
3    Q    Did you understand Ms. Clipper was
4    essentially doing her job in making those reports?
5    A    I don't know what you mean by "doing her
6    job."
7    Q    Well, it was appropriate for Ms. Clayton
8    to --
9    A    You said Ms. Clipper.
10   Q    It was appropriate for Ms. Clayton to make
11   these reports to you, is that right?
12   A    Yes.
13   Q    Consistent with her job duties to do so?
14   A    Yes.
15       (Whereupon, Exhibit 8 was marked for
16   identification.)
17   BY MR. ZASLOW:
18   Q    I hand you Exhibit Number 8.  You've seen
19   Exhibit 8 before?
20   A    Yes.
21   Q    This is from General Ricket, who is a
22   general by this point, correct?

RONALD STAMPS - 01/23/2017          Pages 102..105

Page 102

1    A   Right.

2    Q   And this is concerning your AR 15-6

3  investigation?

4    A   Yes.

5    Q   Do you know whose handwriting is in the

6  top, right corner?

7    A   No, I don't.

8    Q   Is it your understanding through this

9  memorandum General Ricket was approving your findings

10 and recommendations?

11   A   Yes.

12   Q   So, he's essentially affirming what you

13 determined to be the issues with Ms. Clayton, is that

14 what this is?

15   A   Ms. Clipper.  Yes.

16   Q   So, General Ricket is confirming your

17 findings and recommendations related to the Clipper

18 investigation, right?

19   A   Yes.

20   Q   Did you pass on the investigative report

21 to Ms. Clayton?

22   A   I don't remember.  That would have

Page 103

1  probably come from the JAGS or excuse -- actually,

2  General Ricket could have passed it on because he's

3  the one that appointed me.

4    Q   In paragraph number four, General Ricket

5  authorizes the release of the investigation to Ms.

6  Joan Murphy; do you know who that is?

7    A   Well, I do by reading this.

8    Q   It appears she's with the employee

9  relations unit?

10   A   Right.

11   Q   Is that a typical place where that would

12 be released to?

13   A   I would assume so.

14   Q   Do you know what, if any, assistance the

15 employee relations unit provided Ms. Clayton in

16 relation to disciplining or terminating, demoting or

17 doing anything relating to Clipper issues?

18   A   No.

19   Q   Did Colonel Tall or Colonel Forrest ever

20 discuss the Clipper issues with you?

21   A   Yes.

22   Q   Tell me about that.

Page 104

1       MR. GRACE:  I object to any conversations

2  he might have had with the lawyers regarding

3  investigations.

4  BY MR. ZASLOW:

5    Q   Are Colonel Tall and Colonel Forrest both

6  attorneys?

7    A   Yes.

8    Q   When you discussed the Clipper issues with

9  them, was there anybody else present?

10   A   I don't remember.

11   Q   When you were discussing it with them, in

12 what capacity were you discussing it with them?

13   A   As the investigating officer.

14   Q   Why were you discussing it with them?

15   A   Basically, talking to them about my

16 findings and if that's, I guess, sufficient.

17      I mean, when you have a 15-6, you have a JAG

18 that is there to assist you with questions you have.

19 So, I would ask him questions.

20   Q   Did Colonel Forrest do his own

21 recommendations based on your investigation?

22   A   He would do -- he did -- I think a lawyer,

Page 105

1  a JAG, reviewed my recommendations before it went to

2  General Ricket.  It had a legal review.

3    Q   Did you discuss it with him in order for

4  him to do his legal review?

5    A   Yes.

6    Q   And since we're discussing it, tell me if

7  this is the legal review you're talking about.

8       (Whereupon, Exhibit 9 was marked for

9  identification.)

10      THE WITNESS:  Yes.

11 BY MR. ZASLOW:

12   Q   And what was Colonel Forrest's

13 recommendation, if you recall?

14      MR. GRACE:  What's on this document?

15 BY MR. ZASLOW:

16   Q   You've seen what's on the document,

17 correct?

18   A   This would go forward, saying my findings

19 were legitimate or supported.  That was it.

20   Q   Do you know any specifics of actions

21 attempted to be taken against Ms. Clipper?

22   A   I know they tried to remove her, but

**Page 106**

1  that's all I know.
2     Q   To your understanding, was it,
3  essentially, out of your hands at that point?
4     A   Yes.
5     Q   Setting aside legal sufficiency, do you
6  know if Forrest wanted Clipper to be removed?
7     A   No.
8     Q   You don't know one way or the other?
9     A   You mean his personal opinion?
10    Q   Correct.
11    A   I don't want to answer for him.
12    Q   Do you know if Colonel Tall provided any
13 assistance in attempting to discipline Ms. Clipper?
14    A   I don't know.
15       A VOICE IDENTIFIED AS MELAINE WILLIAMS,
16 ESQUIRE:  Can we take a quick break?
17       MR. ZASLOW:  Okay.
18       MR. GRACE:  Yeah.
19          (Brief recess.)
20       MR. ZASLOW:  Back on the record.
21 BY MR. ZASLOW:
22    Q   In your investigation related to Ms.

**Page 107**

1  Clipper, did Ms. Clayton provide any documents to
2  you?
3     A   Yes.
4     Q   Did you provide questions to her you would
5  like answered?
6     A   Yes.
7     Q   Did she respond to those questions to you?
8     A   Yes.
9     Q   I'm going to hand you a couple of those.
10       (Whereupon, Exhibits 10, 11 and 12 were
11 marked for identification.)
12 BY MR. ZASLOW:
13    Q   Colonel Stamps, you have Exhibits 10, 11
14 and 12 in front of you there.  Do you see those?
15    A   Yes.
16    Q   And you provided a few questions to Ms.
17 Clayton in your investigation of Ms. Clipper, is that
18 right?
19    A   That's right.
20    Q   Was it actually about five questions you
21 proposed to her?
22    A   Yes.

**Page 108**

1     Q   Exhibit 10 is question number one.  And
2  you asked, "What do you see as the duties and
3  responsibilities of Ms. Clipper?"  Do you see that
4  there?
5     A   Yes.
6     Q   And Ms. Clayton provided a response?
7     A   Yes.
8     Q   Did you ever find anything inaccurate or
9  improper related to Ms. Clayton's response in Exhibit
10 Number 10?
11    A   No.
12    Q   As far as you know, it was complete,
13 accurate and appropriate?
14    A   Yes.
15    Q   Exhibit Number 11, this is a response to
16 your question number two?
17    A   Yes.
18    Q   And the question there was, what duties,
19 if any, has Ms. Clipper failed to perform?
20    A   Yes.
21    Q   And Ms. Clipper responded there in Exhibit
22 Number 11?

**Page 109**

1     A   Ms. Clayton.
2     Q   Ms. Clayton responded?
3     A   Yes.
4     Q   Did you ever find anything incorrect or
5  improper related to Ms. Clayton's response?
6     A   No.
7     Q   As far as you know, it was an appropriate,
8  accurate and correct response?
9     A   Yes.
10    Q   And then Exhibit Number 12, questions four
11 and five?
12    A   Yeah.
13    Q   In there, you were asking about additional
14 action against Ms. Clipper; do you recall that?
15    A   Yes.
16    Q   And Ms. Clayton provided a response?
17    A   Yes.
18    Q   Did you find anything inaccurate,
19 incorrect, improper related to her responses?
20    A   No.
21    Q   As far as you know, her responses were
22 correct, accurate and appropriate?

RONALD STAMPS - 01/23/2017                    Pages 110..113

Page 110

1    A   Yes.
2        (Whereupon, Exhibit 13 was marked for
3    identification.)
4    BY MR. ZASLOW:
5    **Q   I'm going to hand you Exhibit Number 13.**
6    **Do you recognize Exhibit Number 13 as an e-mail from**
7    **Ms. Clayton to you?**
8    A   Yes.
9    **Q   And Ms. Clayton -- is this a summary**
10   **statement of Betty Clayton on events preceding a**
11   **personnel investigation at the District of Columbia**
12   **National Guard?**
13   A   Yes.
14   **Q   And this has -- is related to, it says,**
15   **Green, Clipper?**
16   A   Yes.
17   **Q   Do you know what this is about?**
18   A   Yes.
19   **Q   What is this about?**
20   A   The investigation.
21   **Q   Who is Green?**
22   A   That was an employee that was, I believe,

Page 111

1    on maternity leave or on leave.
2    **Q   Was her name Ms. Takia Green, if you know?**
3    A   Yes.
4    **Q   And did you review this at the time,**
5    **obviously?**
6    A   Yes.
7    **Q   Did you find anything incorrect or**
8    **improper in any way related to Ms. Clayton's**
9    **statements in this summary statement?**
10   A   No.
11   **Q   As far as you know, it was accurate,**
12   **truthful and appropriate?**
13   A   Yes.
14   **Q   Who is Kianna Brittingham?**
15   A   She worked for me; administrative
16   assistant.
17   **Q   Was she a D.C. or federal employee?**
18   A   D.C.
19   **Q   What was her role working for you?**
20   A   Administrative assistant.
21   **Q   Was there any type of investigation**
22   **related to Kianna Brittingham?**

Page 112

1    A   Not by me.
2    **Q   By who?**
3    A   I don't know.  I know I wanted her -- I
4    had some issues with her on a HIPAA violation and I
5    wanted action taken.
6    **Q   Who did you want to take action?**
7    A   I know it had to be the D.C. government.
8    **Q   Did you make any requests for anybody to**
9    **do anything about it?**
10   A   Yes.
11   **Q   Who did you make a request to?**
12   A   I don't remember.  But I know I went to
13   Colonel Forrest to assist me.  It may have made it to
14   Ms. Clayton, but I don't remember.
15   **Q   Did Forrest give you assistance?**
16       MR. GRACE:  Objection as far as any
17   privileged communications between the JAG and advice
18   given to the investigating officer.
19   BY MR. ZASLOW:
20   **Q   Was Colonel Forrest acting as counsel when**
21   **you went to him, was that why you went to him?**
22   A   I don't know.  It's been so long ago.  I

Page 113

1    wanted the person -- I wanted action taken against
2    them.  So, I probably went to Ms. Clayton and whoever
3    I could go to to get the ball rolling.
4    **Q   Without getting into anything you**
5    **discussed with Colonel Forrest, do you know if he did**
6    **anything?**
7        MR. GRACE:  Objection.  This is
8    communications between Colonel Stamps in his D.C.
9    National Guard position to his attorney.
10       MR. ZASLOW:  I don't want any
11   communications.  I want to know if he did anything.
12       MR. GRACE:  Anything Colonel Tall would
13   have done was in his capacity as the D.C. National
14   Guard attorney.  It's privileged, regarding what he
15   did.
16       MR. ZASLOW:  No, Colonel Forrest's conduct
17   would not be privileged.
18       For example, if he investigated, if he had a
19   discussion with Ms. Brittingham, if he had a discussion
20   with Ms. Clayton, if he had a discussion with any D.C.
21   government employees; none of those would be
22   privileged, I understand.

RONALD STAMPS - 01/23/2017                    Pages 126..129

Page 126

1      Q   What about printing out military research,
2   would that be appropriate, if Mr. Devassy did that?
3      A   I don't know.  Was he researching the D.C.
4   Guard?  It depends on what he was researching.
5      Q   Okay.  Depending on what he researched,
6   that would dictate whether it would be appropriate or
7   inappropriate?
8      A   There's a lot of lawyers here; I'm not one
9   of them.  I don't know.
10      Q   I'm asking in your capacity as human
11   resources officer.
12      A   I would say no -- if somebody has
13   something that's inappropriate on the computer, then
14   it should be reported.  I mean, if it was classified,
15   of course it would need to be reported.
16      Q   Did you ever receive any complaints
17   regarding Ms. Clayton's job performance?
18      A   No.
19      Q   Did anybody ever tell you she was
20   performing her duties inappropriately?
21      A   No.
22      Q   Did anybody ever tell you she was

Page 127

1   performing her duties in an unsafe manner?
2      A   No.
3      Q   Did you hear of any complaints whatsoever
4   related to Ms. Clayton's job performance as the
5   director of the government operations division of the
6   D.C. National Guard?
7      A   Not that I remember.
8      Q   Did you ever have the opportunity to
9   review an opinion by the attorney general, District
10   of Columbia, related to the relationship between the
11   District of Columbia and District of Columbia
12   National Guard?
13      A   No.
14      Q   Have you ever heard such an opinion was
15   issued?
16      A   Yes.  I didn't know it was an opinion.
17   I've heard of it.
18      Q   When you say -- what is it you heard of?
19      A   That it's there.  I've never read it all
20   the way through.  So, I haven't read it.
21      Q   Did anybody ever tell you to read it?
22      A   No.

Page 128

1      Q   Did anybody ever tell you not to read it?
2      A   No.
3      Q   Why did you never read the opinion?
4      A   At the time -- I'm not even sure when the
5   opinion was done.
6      Q   Would August 2010 sound correct?
7      A   I don't know.  If it would come down and
8   it would have been given to me at the time, I would
9   have read it.  But I don't remember it coming down.
10      Q   Do you remember when it came down, at the
11   time?
12      A   No.
13      Q   When did you first hear of it?
14      A   Since we've had this deposition.
15      Q   Prior to preparing for your deposition,
16   have you ever heard or have you ever reviewed the
17   attorney general's opinion?
18      A   No, not that I remember.
19      Q   But you've seen it now?
20      A   I've glanced at it, that's it.
21         (Whereupon, Exhibit 14 was marked for
22   identification.)

Page 129

1   BY MR. ZASLOW:
2      Q   Is this the attorney general's opinion
3   you've glanced at, you mentioned?
4      A   I think so.
5      Q   But you've never read it through?
6      A   No.
7      Q   When is the first time you learned the
8   opinion was issued?
9      A   I don't remember.
10      Q   Did General Schwartz ever talk to you
11   about it?
12      A   No.
13      Q   Did General Ricket ever talk to you about
14   it?
15      A   No.
16      Q   Other than counsel, has anybody talked
17   with you about it?
18      A   No, not that I remember.
19      Q   Do you understand now this opinion relates
20   to the relationship between the District of Columbia
21   and the District of Columbia National Guard?
22      A   Now that I'm looking at it, yes.

Page 146

1  was terminated?

2     A  No.

3        MR. ZASLOW:  Nothing further.

4        MR. JOHNSON:  Take a short break.

5        (Brief recess.)

6              EXAMINATION

7  BY MR. JOHNSON:

8     Q  Mr. Stamps, my name is Eric Johnson.  I'm

9  an assistant attorney general with the D.C. Office of

10  the Attorney General, representing the District in

11  this matter.

12       Mr. Zaslow already went over some of the --

13  sort of the basic procedures.  Please, answer verbally.

14  Wait till I'm done speaking before you respond.  If you

15  need a break, please, answer any pending questions.

16       Any questions at this time?

17    A  No.

18    Q  Are you familiar with the government

19  operations division of the District of Columbia

20  National Guard?

21    A  Yes, a little bit.

22    Q  That's what Ms. Betty Clayton was the

Page 147

1  director of?

2     A  Yes.

3     Q  What is your understanding of the chain of

4  command at the government operations division with

5  respect to the D.C. National Guard?

6     A  Her position?

7     Q  Her position.

8     A  Her position she was in reported to

9  either.  That position reports to general -- the

10  commanding general or the -- at that time, General

11  Ricket.

12    Q  Then there were some employees who

13  reported directly to you; is that correct?

14    A  Yes.

15    Q  Then there were other D.C. government

16  employees who reported to employees of the D.C.

17  National Guard, correct?

18    A  Yes.

19    Q  How about with respect to human resources

20  matters in terms of the chain of command across the

21  government operations division in the D.C. National

22  Guard?

Page 148

1     A  That was -- Ms. Clipper handled the human

2  resources for the D.C. government employees.

3     Q  Did you ever work on human resources

4  matters related to district government employees?

5     A  No.

6     Q  Would the government operations division

7  ever have worked on HR matters for anyone in the D.C.

8  National Guard?

9     A  No.

10    Q  Do you know why Ms. Clayton was converted

11  to management supervisory service?

12    A  No.

13    Q  Exhibit 6 was the October 2008 report; do

14  you recall seeing that as an exhibit earlier?

15    A  Yes.

16    Q  Who did you share that report with?

17    A  I would have given it to the vice-chief of

18  staff, General Ricket; Colonel Ricket at the time of

19  this, I think.

20    Q  Would you have given it to anyone else?

21    A  He would have had the authority to release

22  it.  I don't remember if I gave it to somebody else,

Page 149

1  but I would have had the authority.  I think the

2  investigator, Mr. Savoy, but I don't remember.  I

3  don't remember if he already had it or I gave it to

4  him.

5     Q  So, you did give a copy to him or he had a

6  copy?

7     A  Yeah.

8     Q  Do you recall sharing it with anyone else

9  at D.C. government?

10    A  No.

11    Q  You said Ricket would have had the

12  authority to share the report?

13    A  Yes.

14    Q  You wouldn't have had the authority to

15  share it?

16    A  Not without his permission.

17    Q  Do you know whether he ever shared the

18  report with anyone at D.C. government?

19    A  No.

20    Q  Did you ever tell anyone working for D.C.

21  government about the information or assistance Ms.

22  Clayton provided in connection with the report?

RONALD STAMPS - 01/23/2017                    Pages 150..153

Page 150

1    A   Yes; it was in my report.
2    Q   Only to the extent it was in the report,
3    though?
4    A   Yes.
5    Q   So, you never had any conversations with
6    anyone at D.C. government outside of the actual
7    document itself?
8    A   No, not that I remember.
9    Q   Do you know whether anyone else told
10   anyone at D.C. government about the assistance Ms.
11   Clayton provided in connection with the report?
12   A   No.
13   Q   How about the 2009 report; who did you
14   share that report with?  I believe it was Exhibit 7.
15   A   That would have been the same procedure.
16   It would have gone to the appointing official, which
17   was General Ricket.
18   Q   Did you share it with anyone else?
19   A   Not that I recall.
20   Q   But you said Mr. Savoy received a copy?
21   A   Yeah.
22   Q   Do you know whether anyone else at D.C.

Page 151

1    government received a copy?
2    A   I don't know if Ms. Clayton did or not.
3    Q   Again, the same: Ricket would have been
4    the only one with authority to share it outside?
5    A   Correct.
6    Q   Did you prepare any other Reports of
7    Investigations regarding allegations concerning the
8    government operations division?
9    A   Other than these two?
10   Q   Other than those two, Exhibits 6 and 7.
11   A   No, not that I remember.
12   Q   Do you know whether anyone else prepared
13   any reports or investigated anything regarding the
14   government operations division while you were there
15   in the 2008-2010 time period?
16   A   No.
17   Q   Earlier, Mr. Zaslow asked you some
18   questions about the commingling of funds for the
19   youth leadership program; do you remember that?
20   A   Yes.
21   Q   Did you ever share those allegations with
22   anyone at D.C. government?

Page 152

1    A   I don't remember.
2    Q   Would you have, normally?
3    A   Yes.
4    Q   But you don't recall whether or not you
5    did?
6    A   It would have been Ms. Clayton.
7    Q   It would have been Ms. Clayton?
8    A   Right.
9    Q   So, apart from the information Ms. Clayton
10   provided in terms of the two reports we just
11   discussed and the commingling of youth funds, did she
12   report any other allegations of wrongdoing to you?
13   MR. ZASLOW:  Objection.
14   BY MR. JOHNSON:
15   Q   You can answer.
16   A   Only in what was in the report, the
17   information she gave me for my reports.
18   Q   Could you take a look at Exhibit 2,
19   please?
20   A   Got it.
21   Q   Did you send that memorandum to Ms.
22   Clayton?

Page 153

1    A   I'm sure I did.
2    Q   Could you take a look at Exhibit 3,
3    please?  Did you receive that letter from Ms.
4    Clayton?
5    A   Yes.
6    Q   You mentioned earlier, you discussed the
7    Clipper investigation with Mr. Savoy?
8    A   Right.
9    Q   Did you discuss any other investigations
10   with Mr. Savoy?
11   A   No.
12   Q   Did you ever talk to Mr. Savoy about
13   anything unrelated to the Clipper investigation?
14   A   No.
15   Q   Do you remember earlier when you discussed
16   with Mr. Zaslow Ms. Brittingham?
17   A   Yes.
18   Q   You stated earlier, you wanted her
19   removed, is that correct, her employment terminated?
20   A   Yes.
21   Q   And did that happen?
22   A   As far as I know, no.