# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BETTY CLAYTON, | |
| *Plaintiff*, | |
| v. | Civil Action No. 11-1889 (RDM) |
| DISTRICT OF COLUMBIA, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OPINION AND ORDER

The matter is before the Court on Defendants' motions for summary judgment.  Dkt. 96; Dkt. 97.  Plaintiff Betty Clayton, the former Director of D.C. Government Operations of the District of Columbia National Guard ("DCNG"), is suing the District of Columbia ("the District") and the DCNG for unlawful retaliation and sex discrimination under Title VII of the Civil Rights Act of 1964, and for unlawful retaliation under D.C. law.  Clayton alleges that her career position was converted to at-will employment and that she was subsequently terminated because of her various whistleblowing activities, and she further alleges that she was terminated because of her sex.  Defendants counter that Clayton was fired because of her poor job performance.  Neither the District nor the DCNG, however, can identify the person who made the decision to terminate Clayton, anyone who can explain how the decision was made, or anyone who can offer a contemporaneous account of why the decision was made.

In light of that evidentiary lacuna and the fact that Clayton has adduced sufficient evidence for a reasonable jury to infer that her termination was in retaliation for reporting another employee's sexual harassment allegations against the Commanding General of the DCNG, the Court will deny both motions for summary judgment as to Clayton's Title VII

retaliation claims. The Court will, however, grant both motions as to Clayton's sex discrimination claims. With respect to Clayton's D.C. law claims, the Court will grant summary judgment in favor of the District as to Clayton's retaliation claim under the D.C. False Claims Act and will deny summary judgment as to Clayton's retaliation claim under the D.C. Whistleblower Protection Act. The following claims, accordingly, remain in the case: Clayton's Title VII retaliation claims against both defendants and Clayton's D.C. Whistleblower Protection Act claim against the District.

## I. BACKGROUND

This is not the Court's first opinion in this long-running employment discrimination and retaliation case. *See Clayton v. District of Columbia*, 931 F. Supp. 2d 192 (D.D.C. 2013) (Roberts, C.J.) ("*Clayton I*"); *Clayton v. District of Columbia*, 999 F. Supp. 2d 178 (D.D.C. 2013) (Roberts, C.J.) ("*Clayton II*"); *Clayton v. District of Columbia*, 117 F. Supp. 3d 68 (D.D.C. 2015) (Moss, J.) ("*Clayton III*"). Since the inception of her suit in 2011, Clayton has partially survived multiple motions to dismiss, Dkt. 34; Dkt. 72, twice amended her complaint, Dkt. 22; Dkt. 45, and engaged in extensive discovery, including taking over a dozen depositions, *see* Dkt. 115. For the purposes of resolving Defendants' pending motions for summary judgment, the Court will only briefly recount the relevant background before delving into the facts in the analysis of the parties' respective arguments.

### A. Factual Background

#### 1. *D.C. Government Operations Division*

On June 23, 2008, Clayton was appointed Director of the D.C. Government Operations Division (the "Division") of the DCNG, which was then classified as a career service position. Dkt. 96-1 at 3 (DCNG Statement of Undisputed Material Facts ("SUMF") ¶ 11); Dkt. 97 at 50

(District SUMF ¶ 1); Dkt. 106 at 83 (Clayton Statement of Material Facts ("SMF") ¶¶ 4–5).[1]

The Division "coordinate[s] operational programs so that the DCNG can efficiently respond to natural and civil emergencies in the District." Dkt. 96-1 at 1 (DCNG SUMF ¶ 2). Clayton interviewed with a panel of DCNG employees and Erroll Schwartz, then Adjunct General of the DCNG; she was formally appointed to her position by the District. Dkt. 106 at 82–83 (Clayton SMF ¶¶ 2–4). As the Director, Clayton supervised at least six employees, "mak[ing] sure they got their work done on time, mak[ing] sure [the Division was] coordinating properly with D.C. government downtown, and [managing] the budget for the agency." Dkt. 97 at 50–51 (District SUMF ¶¶ 2–3).

The parties dispute whether, at the time of Clayton's tenure as Director, the Division was an entity within the District government or within both the DCNG and the District government. *Compare* Dkt. 96-1 at 2 (DCNG SUMF ¶ 3) ("District Government Operations is a District

---

[1] Both the District and the DCNG contend that the Court should accept the facts set forth in their respective SUMFs as true because Clayton failed to file a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, . . . includ[ing] references to the parts of the record relied on to support the statement," as required by Local Civil Rule 7(h)(1), as well this Court's standing order, Dkt. 86 at 4 (Standing Order ¶ 10(b)), and Federal Rule of Civil Procedure 56(c)(1). Dkt. 109 at 3; Dkt. 110 at 7 n.2. Although Defendants are correct that Clayton's opposition fails to satisfy the requirement of offering a paragraph-by-paragraph response to Defendants' statements of undisputed material facts, with citations to the record demonstrating whether and how each asserted undisputed fact is disputed, the Court will not impose the extreme sanction of accepting all of Defendants' assertions of fact as true for purposes of resolving the pending motions.

As Local Civil Rule 7(h)(1) makes clear, the decision whether to treat any fact set forth in a SUMF, which is not controverted in the statement of genuine issues, resides in the sound discretion of the district court. *See* Local Civ. R. 7(h)(1) ("[T]he Court *may* assume that facts identified by the moving party in its statement of material facts are admitted." (emphasis added)). Although Clayton's submission omits the required, paragraph-by-paragraph response to Defendants' statements of undisputed material facts, it does include a substantial statement of disputed facts containing record citations, and the Court has been able to identify the relevant areas of genuine dispute. Counsel are advised, however, to ensure that they have familiarized themselves with—and that they *fully* comply with—all applicable rules going forward.

Division within the District City Administrator's Office."), *and id.* (DCNG SUMF ¶ 5) ("District Government Operations employees working at the Armory are District employees subject to District, not DCNG, policies procedures, and guidelines."), *with* Dkt. 106 at 83–84 (Clayton SMF ¶ 8) ("[F]rom the 2008–2010 timeframe[,] . . . the DC Government Operations [was] simultaneously a Directorate within Joint Force Head Quarters, DC National Guard[,] and an agency of the Government of the District of Columbia.").  They also dispute the nature of Clayton's reporting relationship with the City Administrator's Office and the Commanding General of the DCNG.  *Compare* Dkt. 96-1 at 2 (DCNG SUMF ¶ 4) ("Neil Albert, as District City Administrator, was . . . Clayton's supervisor."), *with* Dkt. 106 at 84 (Clayton SMF ¶ 10) ("Clayton reported to both the commanding general and the mayor and city administrator.").

The parties agree, however, that, on August 27, 2010, D.C. Attorney General Peter Nickels addressed the legal status of the Division in a memorandum to the Commanding General of the DCNG at the time, Erroll Schwartz.  *See* Dkt. 107-60 (Nickels Memo).  That memorandum stated, in relevant part: the "Division, a unit that supports the DCNG, is a subordinate agency of the Mayor of the District of Columbia."  *Id.* at 2 (Nickels Memo).  It further explained that "the Mayor shall exercise supervisory authority over the Director of the Division on matters that pertain to the personnel affairs of District employees," but that, "for matters that pertain exclusively to the National Guard, while the Division Director is in the chain of command of the Mayor and the City Administrator, she also has an informal, dotted-line reporting relationship with the Commanding General."  *Id.* at 3 (Nickels Memo).

2.    *Clayton's Alleged Whistleblowing Activities*

Clayton served as Director of the Division from June 2008 to October 2010.  *See* Dkt. 96-1 at 3 (DCNG SUMF ¶ 11) (June 23, 2008 appointment date); Dkt. 97-17 at 2 (Oct. 26, 2010

Separation Notice).  She alleges that, during her tenure, she reported numerous instances of "potential wrongdoing at the DCNG" and that, "[a]s a result . . . [,] [she] was terminated from employment by the District of Columbia and the District of Columbia National Guard."  Dkt. 45 at 2–3 (Second Amd. Compl. ¶¶ 11–12).  Her reports fell into three categories.

*First*, Clayton alleges that she reported the following instances of "misappropriation of funds . . . [,] fraud, waste, and abuse," *id.* at 7 (Second Amd. Compl.), within the District government and the DCNG:

- the improper restoration of leave for Charlotte Clipper, the District Government Operations Human Resources Manager, *id.* (Second Amd. Compl. ¶ 49);

- the improper release of incentive awards to District of Columbia employees, *id.* at 8 (Second Amd. Compl. ¶¶ 55–56);

- the improper "steering" of a District of Columbia bus contract, *id.* (Second Amd. Compl. ¶ 57);

- the inappropriate co-mingling of DCNG youth leader camp § 501(c)(3) funds and District of Columbia local funds, *id.* (Second Amd. Compl. ¶ 58);

- the undisclosed federal and local tax withholdings of a federal security guard contract, *id.* (Second Amd. Compl. ¶ 59);

- the improper use of District of Columbia credit cards by employees on numerous occasions, *id.* (Second Amd. Compl. ¶ 60);

- the un-inventoried furniture and equipment purchases from 2007, *id.* at 9 (Second Amd. Compl. ¶ 64);

- the creation of two federal positions by the DCNG for the purpose of "transferring two employees from the District of Columbia budget to the federal budget," *id.* (Second Amd. Compl. ¶ 65); and

- the "potential United States security risks" posed by her predecessor, Anthony Devassey, who had "ordered and saved certain military research," *id.*

Aside from her allegations in the Second Amended Complaint, *id.* at 7–9 (Second Amd. Compl. ¶¶ 49–65), and her responses to the District's interrogatories, Dkt. 97-18 (Pl. Resp. to District's Interrogs.), however, Clayton has pointed to no additional evidence in her SMF to corroborate the above reports, *see* Dkt. 106 at 82–104.

*Second*, Clayton alleges that, in addition to the incident involving Charlotte Clipper described above, she attempted to terminate Clipper on numerous occasions for serious violations of the Division's policies, but that DCNG staff, "on behalf of [the] General[,] . . . continuously attempted to block all proposed disciplinary action against . . . Clipper." Dkt. 45 at 6–7 (Second Amd. Compl. ¶¶ 36, 37, 43). In support of her claim, Clayton's SMF cites to her own deposition testimony. *See* Dkt. 106 at 86 (Clayton SMF ¶ 22) (citing Dkt. 107-14 at 8–9 (Clayton Dep.)). The DCNG disputes this assertion. It contends that the "DCNG, with the permission and coordination of the District, investigated all of . . . Clayton's allegations and reported the findings to the District City Administrator for appropriate action." Dkt. 96-1 at 4 (DCNG SUMF ¶ 19) (citing Dkt. 96-24 (Ex. W) (Comentale Email to Forrest) (Aug. 14, 2008)).

*Third*, and most significantly, Clayton reported Tamara Jones's sexual harassment allegations against General Schwartz to Linda Brown, the District of Columbia Human Resources Equal Employment Opportunity ("EEO") Officer in January 2010, who then referred

the matter to the D.C. Office of Human Rights ("OHR").  Dkt. 107-18 at 2 (Brown Email to Jones) (Jan. 14, 2010); Dkt. 107-44 at 2, 3 (Jan. 15, 2010 Notice to OHR).  It is undisputed that Jones, General Schwartz's administrative assistant, relayed to Clayton that she "had been a victim of sexual harassment/assault by [General Schwartz]" and that she "felt th[at] [she] had been intimidated and threatened by [General Schwartz] not to act/file a complaint," and that she had sought Clayton's counsel.  Dkt. 107-47 at 3 (Jones Email to Sharpe) (May 10, 2010) (listing witnesses and describing their involvement); *see also* Dkt. 107-14 at 12–13 (Clayton Dep.) (relaying same conversation).

The parties disagree about the ensuing events.  According to Clayton, she was approached by Sergeant Christopher Martin, the DCNG's EEO Officer, who informed her that he had discussed the allegations with General Schwartz and demanded to know her involvement in the case.  Dkt. 107-14 at 13 (Clayton Dep.).  As he left the office, he allegedly added: "I never lose a case," or words to that effect.  *Id.*  Clayton further testified that, in January 2010, April 2010, and September 2010, General Schwartz himself threatened her employment, stating, "We'll see who's still sitting in that chair come October 1."  *See id.* at 14 (Clayton Dep.).  General Schwartz also requested that Nickels clarify the legal status of the D.C. Government Operations Division and the DCNG Commanding General's authority over the Division's employees.  *See* Dkt. 107-60 at 2 (Nickels Memo).  The DCNG counters that it "was unaware of . . . Clayton's alleged involvement in Jones's discrimination complaint prior to . . . Clayton's filing [of] this lawsuit."  Dkt. 96-1 at 7 (DCNG SUMF ¶ 38); *see also* Dkt. 115-6 at 28 (Schwartz Dep.) (testifying that he was unaware of Clayton's involvement prior to the lawsuit).  For its part, the District does not dispute the occurrence of General Schwartz's threats, but contends that they were the result of interpersonal disputes with Clayton, *see* Dkt. 97 at 53

(District SUMF ¶¶ 17–19), including one that occurred in June or July 2009, before Clayton reported that General Schwartz had allegedly sexually harassed Jones, *see* Dkt. 45 at 10 (Second Amd. Compl. ¶ 68).

### 3. *Clayton's Loss of Career-Position Protections and Termination*

It is undisputed that, on September 27, 2010, Clayton received a letter from Brender Gregory, the Director of D.C. Office of Human Resources, notifying Clayton that her career position was being converted to the "Management Supervisory Service" ("MSS")—that is, at-will employment—effective October 10, 2010, "in accordance with the [MSS] transition provisions of D.C. official Code § 1-609.58(a); and legal opinion from Peter J. Nickels, Attorney General for the District of Columbia." Dkt. 107-35 at 2 (Sept. 27, 2010 Notice). The letter further advised that, if Clayton "decline[d] appointment to the [MSS]," she would "receive priority for appointment to a vacant Career Service position within [her] agency, if available," but that, "[i]f no such vacant position is available," she would receive 30-days' notice of separation and be terminated. *Id.* The next day, Clayton received further notice that "all other Career Service supervisory and managerial staff in [the Division]" at "grade level 11 and above" would be "transitioned into the MSS," and the letter asked Clayton to identify all positions that qualified for conversion within her division. Dkt. 97-10 at 2–3 (Sept. 28, 2010 Notice). Clayton elected to accept her MSS appointment on October 5, 2010. Dkt. 97-9 at 5 (Acceptance of MSS Appointment).

On October 26, 2010, Clayton received notice of her termination from the Office of the City Administrator. Dkt. 97-17 at 2 (Oct. 26, 2010 Separation Notice). The parties disagree about the reasons for Clayton's termination. The separation letter, signed by the City Administrator, Neil Albert, did not contain any reasons for Clayton's termination. *See id.* at 2–3

(Oct. 26, 2010 Separation Notice). He later testified at his deposition: "I didn't make the decision to remove . . . Clayton as far as I can recall." Dkt. 115-12 at 6 (Albert Dep.). Other potential decisionmakers—Gregory, General Schwartz, and the Mayor at the time, Adrian Fenty—likewise denied responsibility for making the decision to terminate Clayton and denied knowledge of who made that decision or why. *See* Dkt. 107-33 at 7 (Gregory Dep.); Dkt. 107-59 at 2 (Fenty Decl. ¶ 2); Dkt. 107-20 at 18 (Schwartz Dep.). The District nevertheless maintains that Clayton was terminated because of her job performance: specifically, because "the City Administrator . . . had expressed frustration with [her] lack of cooperation with [his office]," Dkt. 97 at 56 (District SUMF ¶ 36), and because he was "advised . . . about [Clayton's] unauthorized use of federal letterhead on or about September 17, 2010" with regards to an adverse personnel action against Clipper, *id.* at 57 (District SUMF ¶¶ 41–42), after receiving three prior directions or suggestions not to use DCNG letterhead, *see id.* at 56 (District SUMF ¶¶ 37–39). Clayton counters that that the District's inability to identify the actual decisionmaker—or anyone who can provide an account of how her termination actually came about—provides sufficient basis for a reasonable jury to find that the District's proffered, nondiscriminatory reason for her termination is pretextual. Dkt. 106 at 53–59; *id.* at 102–03 (Clayton SMF ¶ 113). She also disputes the District's characterization of her job performance, asserting that she had "no performance issues according to both General Schwartz and DC." *Id.* at 101 (Clayton SMF ¶ 110) (citing Dkt. 107-20 at 10–15 (Schwartz Dep.)).

## B.    Procedural Background

Clayton filed this lawsuit on October 21, 2011. Dkt. 1 (Compl.). In her initial complaint, she alleged violations of the D.C. Whistleblower Protection Act, D.C., Code § 1-615.51 *et seq.*, and the D.C. False Claims Act, D.C. Code § 2-381 *et seq.*, common law wrongful termination,

and due process violations. *Id.* at 10–12 (Compl. ¶¶ 60–81). Clayton was granted leave to file an amended complaint that included additional factual allegations on May 15, 2012. *See* Minute Order (May 15, 2012). On March 21, 2013, Chief Judge Roberts granted the DCNG's motion to dismiss for lack of subject matter jurisdiction and granted in part the District's motion to dismiss for failure to state a claim. *Clayton I*, 931 F. Supp. 3d at 196. Clayton then moved for leave to file a Second Amended Complaint, which re-alleged her prior claims and added claims for retaliation and sex discrimination under Title VII. Dkt. 40. The Court granted that motion in part and denied it in part, allowing Clayton to re-plead her D.C. Whistleblower Protection Act and D.C. False Claims Act counts and her as-applied due process challenge to her reassignment and termination against the District but denying her leave to re-allege those claims that the Court had previously dismissed. *Clayton II*, 999 F. Supp. 2d at 180.

On December 5, 2013, the District moved to dismiss Clayton's Title VII claims, as well as her as-applied due process claim, Dkt. 47, and, on February 24, 2014, the DCNG moved to dismiss all of Clayton's claims for lack of subject matter jurisdiction and for failure to state a claim, Dkt. 56. The Court granted the District's motion to dismiss Clayton's as-applied due process claim but denied the District's motion to dismiss her Title VII claims. *See Clayton III*, 117 F. Supp. 3d at 76, 81. The Court also converted in part the DCNG's motion to dismiss Clayton's Title VII claims to a motion under Rule 56 and denied it without prejudice. *Id.* at 71. Both defendants now move for summary judgment on Clayton's remaining claims. Dkt. 96; Dkt. 97.

## II. LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if she can "show[] that there is no genuine dispute as to any material fact and [that she] is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in her favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

### III. ANALYSIS

**A.      The District of Columbia's Motion for Summary Judgment**

Previously, the Court dismissed Clayton's declaratory judgment and as-applied due process claims against the District. *See Clayton I*, 931 F. Supp. 2d at 201; *Clayton III*, 117 F. Supp. 3d at 76. Accordingly, only four claims against the District remain: (1) sex discrimination and (2) retaliation under Title VII, and violations of (3) the D.C. Whistleblower Protection Act ("DC-WPA") and (4) the D.C. False Claims Act ("DC-FCA"). The Court will address each in turn.

   1.      *Title VII Claims*

      a.      Retaliation

Because Clayton's primary theory of discrimination under Title VII is one of retaliation, the Court will begin with that claim. To succeed, Clayton must establish that she engaged in protected conduct; that her employer took an adverse personnel action; and that "a causal connection" existed between the two. *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985). Where, as here, the plaintiff lacks direct evidence of retaliation, the burden shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides that the plaintiff must first make out a prima facie case of retaliation and that the burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its action. *See, e.g.*, *Thompson v. Sessions*, 278 F. Supp. 3d 227, 240–41 (D.D.C. 2017). Once an employer has offered a legitimate non-discriminatory reason for its action, however, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Sergeant at Arms*, 520 F.3d at 490, 494 (D.C. Cir. 2008) (emphasis in original). At that point, the only question for the Court is "whether the plaintiff produced

sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). The Court "evaluate[s] this question 'in light of the total circumstances of the case,' asking 'whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.'" *Nurriddin v. Bolden*, 818 F.3d 751, 758–59 (D.C. Cir. 2016) (alteration in original) (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012)).

Clayton alleges that the District "took[] prohibited personnel actions" against her by converting her career position to at-will employment and by terminating her shortly thereafter in retaliation for her protected activity. Dkt. 45 at 19 (Second Amd. Compl. ¶ 123); *see also* 42 U.S.C. § 2000e-3(a). She contends, in particular, that she was terminated for "refus[ing] to take illegal orders . . . to refrain from reporting sexual harassment" and for "receiving the complaint from . . . Jones and reporting the sexual harassment to Linda Brown, the District of Columbia Human Resources EEO Officer." *Id.* (Second Amd. Compl. ¶ 120). The District counters that Clayton was terminated because of her "lack of cooperation with" the Office of the City Administrator, Dkt. 97 at 55–56 (District SUMF ¶¶ 33–36), and due to her "unauthorized use of federal letterhead" in September 2010 "in direct defiance of longstanding, consistent, and repeated legal advice not to use it," Dkt. 110 at 17–18. Its corporate designee stated that Clayton had "estranged relationships with the Office of the City Administrator." Dkt. 107-38 at 10 (Thompson Dep.).

In support of its contention that Clayton was uncooperative with the City Administrator's Office, the District points to the deposition testimony of Brender Gregory, the Director of D.C. Office of Human Resources.  *See* Dkt. 97 at 55–56 (District SUMF ¶¶ 33–36).  In particular, Gregory stated that City Administrator Albert "had concerns about [Clayton's] cooperation." Dkt. 115-7 at 23 (Gregory Dep.).  When pressed about what concerns Albert had raised, however, Gregory admitted that she could not recall where his concerns came from, other than from General Schwartz.  *Id.* at 24 (Gregory Dep.).  Gregory also testified that Barry Kreiswirth, the designated city administrator liaison for the Division, had expressed "a general concern about the ability to work with . . . Clayton in a cooperative manner on day-to-day issues."  *Id.* at 25 (Gregory Dep.).  Gregory described Kreiswirth's concerns, as follows: "I don't recall the specifics, but I go back to an E-mail from Phil Lattimore requesting the official personnel folders" after the Nickels memorandum "and getting them or not or asking for information and not receiving it."  *Id.*  Gregory conceded, however, that Kreiswirth was not Clayton's supervisor, and that his concerns were different from those of the City Administrator.  *Id.* at 24 (Gregory Dep.).

In support of its contention that Clayton improperly used DCNG letterhead, the District points to an email from Phillip Lattimore, General Counsel of the D.C. Office of Human Resources, to Clayton, stating:

> The purpose of this email is to inform you that this office has received a complaint on September 11, 2010, that alleges that you, without authorization and prior knowledge of the Department of Defense and the National Guard, used D.C. National Guard stationary . . . .  [T]his office advised you on at least two occasions not to use DoD letterhead for District affairs.  As a result of your actions, the National Guard has filed a complaint with this agency about your conduct . . . .

Dkt. 97-12 at 3–4 (Lattimore Email to Clayton) (Sept. 15, 2010); *see also* Dkt. 97-13 (Lattimore Email to Clayton) (Sept. 28, 2010) (forwarding complaint from the Deputy Staff Judge Advocate of the DCNG, Lieutenant Colonel Thomas Forrest); Dkt. 97-16 at 2 (Lattimore Email to Forrest) (Sept. 17, 2010) ("I have communicated with . . . Clayton about the inappropriate use of your letterhead and alerted the City Administrator."). The District's corporate representative, LaTonya Thompson, also testified:

> Q. Why was [Clayton] terminated so close in time to after her position was converted?
> . . .
>
> A. There were complaints of her improper use of DoD letterhead for personnel actions, and as I mentioned earlier, there were estranged relationships with the Office of the City Administrator . . . .

Dkt. 107-38 at 10 (Thompson Dep.).

Because the District has proffered two nondiscriminatory reasons for Clayton's termination, the sole question for the Court is whether Clayton has "produced sufficient evidence for a reasonable jury to find" that the District's "asserted non-discriminatory reason[s] w[ere] not the actual reason[s]" for her termination and that the District "intentionally discriminated against" Clayton. *Adeyemi*, 525 F.3d at 1226. The Court concludes that there is a genuine dispute of material fact as to whether Clayton's lack of cooperation with the City Administrator's Office and misuse of DCNG letterhead were the real reasons for her termination, or whether she was, in fact, terminated for assisting Jones in reporting General Schwartz for sexual harassment. Because this dispute provides sufficient grounds to deny the District's motion for summary judgment, the Court need not address Clayton's other alleged adverse action: the conversion of her career position to at-will employment.

Clayton asserts that the District's reliance on her purported lack of cooperation and improper use of DCNG letterhead is pretextual. She stresses, in particular, that none of her supervisors testified that these reasons prompted her termination; rather, that explanation was devised by the District, after-the-fact. *See* Dkt. 97 at 55–56 (District SUMF ¶¶ 33–36). Clayton argues that the record is silent as to (1) who made the decision to terminate her, and (2) what his or her thinking was at the time, Dkt. 106 at 52–53, and that a reasonable jury could, accordingly, find that the District's proffered rationale is pretextual. The Court agrees.

*First*, the District has failed to identify a decisionmaker who can verify that Clayton's alleged non-cooperation and misuse of the DCNG's letterhead actually played any role in the decision to terminate her employment. City Administrator Albert, the person who signed Clayton's termination letter, testified that "[he] didn't make the decision to remove . . . Clayton as far as [he could] recall," and that "those decisions were made at the . . . D.C Office of Human Resources." Dkt. 115-12 at 6 (Albert Dep.). But the Director of the D.C. Office of Human Resources at the time, Brender Gregory, testified that she did not know who ordered Clayton's termination, and she "assume[d] that [it] was her supervisor . . . which would have been Neil Albert." Dkt. 107-33 at 7 (Gregory Dep.). General Schwartz likewise disclaimed any knowledge of why Clayton was terminated. *See* Dkt. 107-20 at 18 (Schwartz Dep.) (stating he had "no idea" why Clayton was terminated). The District's Corporate Designee, Thompson, testified that Mayor Fenty was the ultimate decisionmaker, Dkt. 107-38 at 7 (Thompson Dep.), but he, too, disclaimed any role in making the decision to terminate Clayton, Dkt. 107-59 at 2 (Fenty Decl. ¶¶ 2–3) ("I have no personal knowledge or recollection of Betty Clayton . . . . Similarly, I had no involvement in the conversion of . . . Clayton's position to the Management Supervisory Service or the decision to terminate her employment."). Finally,

Lieutenant Colonel Thomas Forrest, the DCNG's Corporate Designee, and the person who complained about Clayton's use of DCNG letterhead, stated that the DCNG had no position one way or the other as to the reason Clayton was terminated. Dkt. 107-58 at 4 (Forrest Dep.). Without identifying a decisionmaker or anyone with knowledge of the actual decisionmaking process, the District cannot carry its burden of demonstrating, beyond genuine dispute, that Clayton was terminated because she was uncooperative and used DCNG letterhead to notify Clipper of an adverse personnel action.

*Second*, aside from the testimony of D.C.'s corporate designee, LaTonya Thompson, who did not testify based on her personal knowledge, and a passing statement from Gregory, relaying her secondhand knowledge, none of the alleged decisionmakers identified any issues with Clayton's job performance. *See* Dkt. 115-8 at 26 (Thompson Dep.) (confirming that Clayton received no negative performance reviews from any supervisor). Contrary to Thompson's and Gregory's assertion that Clayton's non-cooperation with the City Administrator's Office contributed to her termination, the City Administrator himself testified that he "do[esn't] recall the specifics" of why Clayton was terminated or who was involved. Dkt. 115-12 at 6 (Albert Dep.). He further testified that he does not even "recall knowing . . . Clayton or knowing her work." *Id.* at 14 (Albert Dep.). General Schwartz's testimony, moreover, directly undermines the District's proffered rationale. He stated that Clayton "did a great job as the Director of the D.C. Government Operations" and that "[he] had no issue with her performance." Dkt. 107-20 at 11 (Schwartz Dep.). His performance review, in fact, awarded Clayton the highest score in every category. *See id.* at 11–15 (Schwartz Dep.). And, General Schwartz agreed that, until her dismissal, Clayton's performance continued to be at the "highest possible level." *Id.* at 11 (Schwartz Dep.). Finally, in any event, even if Clayton was terminated because General

Schwartz had communicated to City Administrator Albert that she was "uncooperative," that does not preclude the possibility that General Schwartz acted with retaliatory animus. To the contrary, a reasonably jury could conclude that the reason General Schwartz found Clayton "uncooperative"—despite his glowing remarks about her job performance—was because she assisted Jones in reporting her allegations of sexual harassment, rather than squelching her allegations. Accordingly, the Court concludes that there is a genuine dispute of fact as to whether the District's proffered reasons for Clayton's termination were pretextual.

Demonstrating pretext—or, more precisely, a genuine issue of material fact as to pretext—however, is insufficient. "The ultimate question is whether the employer intentionally discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146 (2000). Here, the Court concludes that Clayton has adduced sufficient evidence to establish a genuine dispute of fact as to whether she was, in fact, terminated for reporting Jones's claim of sexual harassment against General Schwartz. It is undisputed that Clayton reported Tamara Jones's sexual harassment complaint to Linda Brown, the District of Columbia Human Resources EEO Officer in January 2010. *See, e.g.*, Dkt. 107-18 at 2 (Brown Email to Jones) (Jan. 14, 2010) ("I spoke with . . . Clayton today referenc[ing] your situation."). What is disputed is whether General Schwartz knew of Clayton's involvement in the making the report, and whether that was the real reason for her termination.

General Schwartz testified that he was unaware—prior to this lawsuit—that Clayton had assisted Jones in making a sexual harassment complaint. Dkt. 115-6 at 28 (Schwartz Dep.). Two pieces of evidence, however, arguably cast doubt on this contention. First, the D.C. OHR served the DCNG with notice of Jones's complaint and its pending investigation, specifically addressing the letter to Sergeant Martin, the DCNG's EEO Officer. *See* Dkt. 107-46 (Apr. 26,

18

2010 Notice). According to Colonel Kenny Ricket, General Schwartz's Chief of Staff, Dkt. 115-2 at 16 (Ricket Dep.), "General Schwartz kept close counsel with Sergeant Martin," and Colonel Ricket thought that "Sergeant Martin spoke with" General Schwartz about the complaint, Dkt. 107-10 at 10 (Ricket Dep.). During the course of the investigation, moreover, Jones disclosed all potential witnesses and persons assisting with her claim, including Clayton. Dkt. 107-47 at 3–4 (Jones Email to Sharpe) (May 10, 2010) (listing witnesses and describing their involvement); *but see* Dkt. 107-43 at 7–8 (Sharpe Dep.) (denying that she shared Jones's witness list with General Schwartz or Sergeant Martin). Jones also alerted Melissa Sharpe, her assigned EEO investigator, that Sergeant Martin had approached her in January 2010 and questioned her about Clayton's involvement in the case:

> During the week of 11 January, DCNG EEO/SARC (Sexual Assault RC), SMSgt Dwight [Chris] Martin, called my office and requested that I see him in his office immediatel[y]. Up[on] arriving at his office . . . he proceeded to question me concerning allegations of assault made by my husband via email. . . . Despite my stating that I would not answer any questions[,] he proceeded to ask me a slew of questions . . . .
>
> At that point[,] *he proceeded to ask me whether I was being advised by Mrs. Clayton*, DC G[o]ver[n]ment Operations at the Armory. I responded no and that I have other Counsel.

Dkt. 107-48 at 2 (Jones Email to Sharpe) (May 10, 2010) (emphasis added).

Even more to the point, Clayton testified that, after reporting Jones's allegations to Linda Brown, she was approached by Sergeant Martin and Colonel Dickens, the DCNG Inspector General. Dkt. 107-14 at 13 (Clayton Dep.). Sergeant Martin informed her that he had discussed the allegations with General Schwartz and demanded to know if Jones had reported the incident to her. *Id.* Clayton testified as follows:

Q. And what was that conversation?

A. Well, SGT Martin walked in, asked me if I had a minute, could we sit down, talk to you. As I recall the conversation went something like: "We have been huddling with the general, Forest, Tall, Dickens, and I to see who would get to talk to you about an allegation of sexual harassment."

Q. That is it?

A. And I looked at him just like I'm looking at you, without saying a word.

Q. Okay. Did they just walk after that or—

A. No. He said, "I need to know if Ms. Jones reported an incident of sexual harassment to you."

Q. And who said that?

A. Martin.

Q. Did you ever respond?

A. I did.

Q. How was that?

A. He said, "Well, I'll be specific. Did she report that the – that [General] Schwartz had sexually harassed her?" And I replied, "I don't know what you're talking about."

Q. Was that the end of the conversation?

A. He said something on the way out, like "I never lose a case," something of that nature.

Q. Martin did?

A. Yeah.

Q. And he is the EEO rep?

A. Yep.

*Id.* Accepting this testimony as true and drawing all inferences in favor of Clayton, the

nonmoving party, the Court concludes that a reasonable trier of fact could find that General

Schwartz was aware of Jones's allegations and had participated in a discussion about approaching Clayton to determine whether Jones had reported the allegations to Clayton.  *See Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) ("To survive summary judgment . . . [a plaintiff] needn't provide direct evidence that [her] supervisors knew of [her] protected activity; [s]he need only offer circumstantial evidence that could reasonably support an inference that they did.").  Moreover, although Clayton denied knowledge of Jones's report to Sergeant Martin, a jury could reasonably infer from Clayton's initial refusal to answer and the fact that she, instead, simply "looked at" Martin "without saying a word," that Martin and Dickens understood—or at least suspected—that Clayton had in fact assisted Jones in reporting the alleged harassment, and that they passed this information along to General Schwartz.

There is also sufficient evidence for a reasonable jury to infer that General Schwartz played a role in Clayton's termination based on his knowledge or suspicions of her involvement in the Jones case.  Clayton alleges that General Schwartz threatened her employment on three separate occasions in close proximity to her report—in January 2010, April 2010, and September 2010.  *See id.* at 14 (Clayton Dep.) (noting that, each time, the General threatened, "[w]e'll see who is sitting in that chair come October 1"); *see also* 115-2 at 21 (Ricket Dep.) (corroborating that Clayton reported to him General Schwartz's threat in spring of 2010).  Clayton points out that "[t]he threat in or about January 2010 was shortly after . . . Jones initiated her sexual harassment complaint; the threat in or about April 2010 was shortly after DC OHR prepared and delivered the Charge to DCNG . . . ; and the September 2010 threat was after the DC OAG opinion and just prior to or after the change of . . . Clayton's employment from Career Service to [at-will]."  Dkt. 106 at 21.  Gregory also testified that City Administrator Albert had "raised the issue that the General had some concerns about his ability to gain [Clayton's] cooperation."  Dkt.

107-33 at 13 (Gregory Dep.). The District counters that the General's statements followed interpersonal disputes and were not motivated by retaliatory animus.[2] Dkt. 97 at 42. When viewing the evidence in the light most favorable to Clayton, and taking into account General Schwartz's testimony that he had no issues with Clayton's work during the course of her tenure, the Court concludes that there is a genuine dispute of material fact as to whether his threats were motivated by her protected activity.

The Court will, accordingly, deny the District's motion for summary judgment as to Clayton's retaliation claim under Title VII.

### b.   Sex Discrimination

Clayton also alleges that she was converted to at-will employment and terminated shortly thereafter because of her sex in violation of Title VII. Dkt. 45 at 20–21 (Second Amd. Compl. ¶ 128). Previously, the Court held that Clayton's allegations were sufficient to state a claim for sex discrimination at the motion to dismiss stage because she needed only to "alleg[e] that she was treated less favorably than a 'similarly situated male employee'" (her predecessor, Anthony Devassey) and that she "suffered a 'materially adverse consequence[]'" as a result (her career position was converted to at-will employment). *Clayton III*, 117 F. Supp. 3d at 79 (quoting *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004)). Neither those

---

[2]   As the DCNG notes in its motion for summary judgment, Clayton alleges in her Second Amended Complaint that General Schwartz also threatened to terminate Clayton in "June or July 2009," Dkt. 45 at 10 (Second Amd. Compl. ¶ 68), long before Jones spoke to Clayton about her allegations of sexual harassment. *See* Dkt. 96 at 15. When asked at her deposition about this earlier threat, however, Clayton could not recall what had happened. Dkt. 107-14 at 10 (Clayton Dep.). Although Clayton's allegation regarding an earlier threat might provide fodder for cross-examination, the Court must indulge all inferences in her favor for present purposes and thus concludes that a reasonable jury might place little weight on her unexplained allegation regarding the earlier threat.

allegations nor anything else that Clayton has offered, however, is sufficient to overcome the District's motion for summary judgment on her sex discrimination claim.

In response to the District's interrogatory requesting "all material facts and circumstances supporting [Clayton's] contention" that she was "'discriminated against' based on gender," Clayton responded:

> Plaintiff was performing satisfactorily in her job performance but received different treatment from similarly situated employees outside the protected class. By way of example, . . . Clayton's predecessor, Anthony Devassey, a male, continued in his tenure as a Career Service employee. . . . Clayton was forced to be reclassified as a Management Supervisory employee. As a result, unlike Clayton, Devassey could only be discharged for cause. Further, . . . Devassey was permitted to dictate his own incentive awards to employees, which was used to supplement income to employees. However, in the case of . . . Clayton, the employee incentive awards were dictated to her. Defendant selectively enforced policies against . . . Clayton—but not against . . . Devassey . . . . Clayton was treated less favorably than a similarly situated male employee and suffered a materially adverse consequence as a result.

Dkt. 97-18 at 14. Thus, Clayton pointed to only two disputed facts in support of her claim: The District allegedly treated her differently than her male predecessor, Anthony Devassey, because he was not converted from a career appointment to at-will employment during his tenure even though D.C. Code § 1-609.58(a) was in effect, and because he was allowed to "dictate" the incentive awards given to other employees. Neither contention is sufficient to survive summary judgment.

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Clayton's sex discrimination claim fails under this standard. First, and most significantly, the District did not simply reclassify

"*Clayton* . . . as a Management Supervisory employee," Dkt. 97-18 at 14 (emphasis added); it reclassified the *position* of Director of the D.C. Government Operations Division—along with all other "supervisory or managerial Career Service position[s] at a grade 11 level and above." Dkt. 97-10 at 2. As a result, Clayton's successor in the position, Herman Preston, assumed—and still holds—an "at-will" position, Dkt. 97-21 at 5 (Preston Dep.), and, to the extent a tenure-protected position ever existed, the District has eliminated that position. Clayton, moreover, does not contend that the reclassification was legally erroneous, *see* Dkt. 106 at 50, and she has offered no evidence that the District reclassified the position because of her sex. Her principal claim of sex discrimination, accordingly, reduces to the proposition that the District treated her and her male successor (along with other "supervisory and managerial" employees) less favorably than her male predecessor, when it correctly reclassified her position (along with other positions). In the absence of *any* other direct or indirect evidence of sex discrimination, that sequence of events—standing alone—is insufficient to permit a reasonable jury to find that the District's asserted reason for reclassifying the position was pretext for intentional discrimination based on Clayton's sex. *Adeyemi*, 525 F.3d at 1226.

Clayton's efforts to premise her sex discrimination claim on Devassey's greater discretion to award performance incentives fares no better. Even assuming that Devassey had greater discretion, that fact would not permit a reasonable jury to find that Clayton's position was reclassified, or that she was terminated, because of her sex.[3] It is undisputed that Clayton and

---

[3] Clayton does not appear to argue that her limited discretion to award performance incentives was itself an adverse employment action sufficient to sustain a Title VII claim, *see* Dkt. 45 at 20–21 (Second Amd. Compl. ¶¶ 126–133), nor could she. "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (citation omitted). Rather, to support a claim of employment discrimination based on a specific action, the plaintiff must show that she "experience[d] materially adverse

Devassey did not have the same direct supervisor. *See* Dkt 115-5 at 54 (Clayton Dep.) (acknowledging that General Wherley was Devassey's Commanding General). Accordingly, it is a stretch too far to contend that the fact Devassey's supervisor granted him greater discretion over incentive awards, while Clayton's supervisor took a more active role in deciding who should receive awards, would allow a reasonable jury to find that Clayton's job position was re-classified, and that she was subsequently terminated, because of her sex.

Clayton also argues in her brief in opposition that she has successfully stated a claim for sex discrimination because she was replaced by a man, Herman Preston, who "had far less experience than [her]." Dkt. 106 at 48–49. As Clayton herself seems to recognize, however, it is far from clear whether and to what extent Preston's qualifications bore on the District's decision to terminate her employment; the District does not contend that Clayton was terminated because she lacked the necessary experience or qualifications, and no one suggests that Preston was chosen over Clayton because of their respective experience or qualifications. Instead, Clayton contends that a reasonable jury could find that she was fired because of her sex based on the District's false assertion that Preston was chosen because he was "deputy director" of the Division, Dkt. 106 at 36, and because the District never explored whether he had the necessary qualifications for the job. But, as the District explains, it never relied on the fact that Preston was "deputy director" to justify his appointment. Dkt. 110-4 at 43 (District's Reply to Clayton's SMF) ("Preston was second in command at the Government Operations Division at the time of plaintiff's termination, and his position was 'somewhere along the lines of deputy director.'"

---

consequences affecting the terms, conditions, or privileges of employment or future employment opportunities," which, "in most cases," will involve "direct economic harm." *Id.* (citation and emphasis omitted). Clayton has not even attempted to make such a showing with respect to any limits on her discretion to award performance incentives.

(citing Dkt. 107-38 at 16 (Thompson Dep.))). Rather, the District cited to Preston's thirty years of experience at the DCNG. Preston "joined [the] DCNG as a budget clerk in 1978, . . . [and] gradually worked his way up the organization, receiving promotions to senior analyst, program manager, and senior program manager before assuming the position of interim director in 2010 and director in 2012." Dkt. 110 at 29 (citing Dkt. 110-3 at 3–6 (Ex. 31) (Preston Dep.)). Given this undisputed evidence, no reasonable jury could infer that Clayton was terminated because of her sex based on the purported inexperience of her successor.

The Court will, accordingly, grant summary judgment in favor of the District on Clayton's sex discrimination claim.

2. *D.C. Law Claims*

Clayton also contends that her reclassification and subsequent termination violated the D.C. Whistleblower Protection Act ("DC-WPA") and D.C. False Claims Act ("DC-FCA"). Dkt. 45 at 14–16 (Second Amd. Compl. ¶¶ 86–97). For the reasons below, the Court will deny summary judgment as to Clayton's DC-WPA claim and grant summary judgment as to her DC-FCA claim.

a. D.C. Whistleblower Protection Act

Clayton alleges that the District "threatened to take, and then took, prohibited personnel actions [against her], in violation of the Whistleblower Protection Act" because of her "protected disclosures and her refusal to take illegal orders." Dkt. 45 at 14 (Second Amd. Compl. ¶ 89). Under D.C. law, a plaintiff asserting a DC-WPA claim must establish a prima facie case that "(1) [s]he made a 'protected disclosure'" or refused to comply with an illegal order; "(2) h[er] supervisor took or threatened to take a 'protected personnel action' against h[er];" and (3) the protected disclosure or refusal to act was a "'contributing factor' to the prohibited personnel

action." *Bowyer v. District of Columbia*, 793 F.3d 49, 52 (D.C. Cir. 2015) (citing D.C. Code §§ 1-615.53(a), 1-615.54(b)); *see also Crawford v. District of Columbia*, 891 A.2d 216, 218–19 (D.C. 2006). Once the plaintiff establishes that her protected disclosure was a "contributing factor" to the alleged prohibited personnel action, the burden shifts to the defendant "to prove by clear and convincing evidence that the alleged . . . action would have occurred for legitimate, independent reasons." *Bowyer*, 793 F.3d at 52 (quoting D.C. Code § 1-615.54(b)). The statute defines a "protected disclosure" as "any disclosure of information" to a "supervisor" or "public body" that the employee "reasonably believes evidences . . . [g]ross mismanagement . . . [or] [a] violation of a federal state, or local law." D.C. Code § 1-614.52(a)(6). An "illegal order" is defined as "a directive to violate or to assist in violating federal, state, or local law, rule, or regulation." *Id.* § 1-615.52(a)(4).

Clayton's Second Amended Complaint alleges that she made a dozen or so "protected disclosures" that she "reasonably believed" to constitute "mismanagement, waste of public resources or funds, abuse of authority in connection with the administration of a public program, violations of federal, state and local law, rules, and regulations." Dkt. 45 at 14 (Second Amd. Compl. ¶ 87). Those instances included reporting (1) the restoration of Charlotte Clipper's annual leave; (2) General Schwartz's request that she approve incentive awards for certain District employees; (3) the improper steering of a District bus contract to a "minority-based company without a bid;" (4) the "inappropriate co-mingling of DCNG youth leader camp [§] 501(c)(3) funds and District of Columbia local funds prior to 2009;" (5) failure to disclose employee federal and local tax withholdings of a federal security guard contract; (6) various issues regarding the Division's management of credit cards; (7) un-inventoried furniture purchases from FY 2007 in excess of $250,000; (8) federal positions created by DCNG for

District employees; (9) "potential United States security risks," such as the fact that Devassey allegedly "ordered and saved certain military research;" and (10) General Schwartz's sexual harassment of Jones. *Id.* at 3–4, 6–9 (Second Amd. Compl. ¶¶ 18, 51–65); Dkt. 97-18 at 10–12 (Pl.'s Resp. to District's Interrogs. 5, 6). The Second Amended Complaint also alleges that Clayton "refused to take illegal orders when she refused to refrain from reporting sexual harassment, waste, abuse, and fraud." Dkt. 45 at 14 (Second Amd. Compl. ¶ 88); *see also* Dkt. 97-18 at 12 (Pl.'s Resp. to District's Interrog. 6).

As the District correctly observes, some of Clayton's alleged disclosures are not protected by the DC-WPA because they do not concern gross mismanagement or a violation of law. Although Clayton alleges that she reported the DCNG's unlawful co-mingling of funds, for example, her actual "report" in the form of an email to Ronald Stamps, then Deputy Human Resources Officer of the DCNG, Dkt. 115-1 at 5 (Stamps Dep.), only stated:

> Cancelled checks from the Youth Leaders Camp have been located that were signed by [Clipper] and I have been informed that she has signature authority on *the current checking account for the program*. With this fact in mind, I believe that it is time to audit this program's financial accounts with particular interest on FY 2008 expenditures.

Dkt. 97-22 at 2 (Ex. 22) (Clayton Email) (emphasis added). Thus, by its own terms, Clayton's email indicates that a separate "checking account" was maintained for the Youth Leaders Camp "program," and her email says nothing about the co-mingling of that account with the District's "local funds prior to 2009."

The Court need not consider the legal and factual adequacy of each of Clayton's many alleged "protected disclosures," however, because at least one of those disclosures indisputably qualifies for protection under the DC-WPA: reaching out to the D.C. EEO Officer about General Schwartz's alleged sexual harassment of Jones. *See* D.C. Code 1-615.52(a)(6)(D); *see also Byrd*

*v. District of Columbia*, 807 F. Supp. 2d 37, 73–74 (D.D.C. 2011) (holding that "allega[tions] [of] harassment and discrimination in violation of federal and state law . . . clearly fall under subsection (6)(D), as those disclosures [are] plainly based on [a plaintiff's] reasonable belief that laws were violated"). Clayton's DC-WPA claim, as a result, overlaps with her Title VII retaliation claim, and the Court will, for the same reasons, deny the District's motion for summary judgment as to that claim. *Cf. Williams v. District of Columbia*, 825 F. Supp. 2d 88, 99 (D.D.C. 2011) ("[I]n formulating the legal standard governing claims brought under the DC-WPA, the District of Columbia courts have consciously borrowed from case law interpreting Title VII . . . ."); *see also Johnson v. District of Columbia*, 935 A.2d 1113, 1118 (D.C. 2007). Indeed, if anything, the District faces a more substantial burden in seeking summary judgment on Clayton's DC-WPA claim because, once she proffered "admissible evidence that" her "'protected activity' . . . was a 'contributing factor' in" her termination, *id.*, the burden shifted to the District to "prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons," D.C. Code § 1-615.54(b).

   b.  <u>D.C. False Claims Act</u>

  Although Clayton has done enough to survive summary judgment on her DC-WPA claim, she has failed to offer any evidence that would allow a reasonable jury to find that she was terminated in violation of the DC-FCA. The DC-FCA prohibits retaliation against an "employee, contractor, or agent" of the District "because of lawful acts" she performed "in furtherance of an action under [the DC-FCA] or other efforts to stop one or more violations of [the Act]." D.C. Code § 2-381.04. The DC-FCA, notably, covers only "false or fraudulent claim[s]," as defined in § 2-381.02 of the D.C. Code. To establish a DC-FCA claim, then, "a plaintiff must show (1) that . . . she engaged in protected activity"—that is, she investigated or

otherwise attempted to prevent a false or fraudulent claim, "(2) that the defendant had knowledge that the plaintiff engaged in such protected activity, (3) that the defendant terminated the plaintiff's employment, and (4) that there was a causal connection between the protected activity and the defendant's termination of the plaintiff's employment." *Payne v. District of Columbia*, 773 F. Supp. 2d 89, 97 (D.D.C. 2011) (citations omitted); *see also United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998). Significantly, merely "[d]isclosing wasteful procedures or practices," *Payne*, 773 F. Supp. 2d at 98, or investigating an "employer's non-compliance with federal or state regulations"—unrelated to a false or fraudulent claim— does not fall under the protection of the DC-FCA, *Yesudian*, 153 F.3d at 740.

The District argues that none of Clayton's reports dealt with a false or fraudulent claim, as defined by the DC-FCA. *See* Dkt. 97 at 39. Clayton's opposition brief does not respond to the District's showing, and, instead, merely re-lists the various "reports" set forth in the Second Amended Complaint. *Compare* Dkt. 45 at 7–9 (Second Amd. Compl. ¶¶ 49–64), *with* Dkt. 106 at 60–62.[4] Indeed, her opposition brief includes only one citation to any record evidence, and that reference is to Clayton's own response to the District's interrogatories. *See* Dkt. 106 at 62. In her response, Clayton asserted that she had reported a "United States security risk to General Schwartz," but, when she "showed [him] her concerns," he "simply wiped his fingerprints from the publication and handed the information back to . . . [her] without comment." Dkt. 97-18 at

---

[4] "[I]t is well-understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and only addresses certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, 264 F. Supp. 3d 61, 72 (D.D.C. 2017) (citation omitted); *Davis v. Transp. Sec. Admin.*, 264 F. Supp. 3d 6, 10 (D.D.C. 2017) (quoting same); *see also Texas v United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) (Local Rule 7(b) "is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." (quoting *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014))).

11–12 (Pl.'s Resp. to District's Interrog. 5). Clayton fails to explain, however, how a purported "United States security risk" constitutes a false or fraudulent claim within the meaning of the DC-FCA.

The closest Clayton comes to stating a claim under the DC-FCA is her allegation that she alerted Derek Savoy, a criminal investigator from the D.C. Inspector General's Office, that DCNG credit cards may have been used to pay for her predecessor Anthony Devassey's immigration matters. *See* Dkt. 97-20 at 3, 5–6 (Savoy Dep.); Dkt. 97-23 at 2 (Invoice). But the only evidence the parties have identified relating to this report is an email that Clayton sent to Savoy asserting: "We received another Invoice from [the law firm of] Maggio & Kattar today. Please review because it appears that there may be two invoices involved. Betty," and a copy of an invoice for $34.00 for services provided over a year earlier. Dkt. 97-23 at 2–3 (Invoice). There is no evidence, however, that Savoy played any role in Clayton's termination or that he ever told anyone involved in that process that Clayton had flagged the $34.00 invoice for him. To the contrary, it appears that the matter was put to rest when Savoy concluded that "no DC purchase card was used for the transaction involving . . . Devass[e]y." Dkt. 97-20 at 56 (Savoy Dep.). As a result, even assuming that Clayton was "investigating matters that reasonably [might] [have] le[d] to a viable False Claims Act case," *Yesudian*, 153 F.3d at 740 (internal quotation marks omitted), she has failed to meet her burden of offering any evidence that would allow a reasonable jury to find "a causal connection between the protected activity and the defendant's termination of the plaintiff's employment," *Payne*, 773 F. Supp. 2d at 97.

The Court will, accordingly, enter summary judgment in favor of the District on Clayton's DC-FCA claim.

**B.      The DCNG's Motion for Summary Judgment**

As explained in the Court's prior opinion, only two claims remain against the DCNG: a claim for retaliation and a claim for sex discrimination, both of which are brought under Title VII. *Clayton III*, 117 F. Supp. 3d at 81. The DCNG moves for summary judgment on both claims. Dkt. 96. It argues that Clayton failed to exhaust her administrative remedies under Title VII, *id.* at 10–12; that the DCNG is not liable under Title VII because it was not Clayton's employer, *id.* at 7–10; and that Clayton's claims fail as a matter of law because she cannot demonstrate that the District's justifications for its employment actions were pretextual, *id.* at 16–21.

1.      *Administrative Exhaustion*

A Title VII plaintiff must consult with an EEO counselor within 45 days of the alleged discriminatory event giving rise to the claim. 29 C.F.R. § 1614.105(a)(1). Otherwise, "failure to comply with the time limits in [29 C.F.R. §]1614.105 is an affirmative defense to a Title VII action against the federal government." *Clayton III*, 117 F. Supp. 3d at 81. A plaintiff who demonstrates that she was unaware and did not receive adequate notice of the time limits, however, is "permitted to sue notwithstanding [her] failure to comply." *Id.*; *see also* 29 C.F.R. § 1614.105(a)(2). In *Harris v. Gonzales*, 488 F.3d 442 (D.C. Cir. 2007), the D.C. Circuit announced an objective test for assessing the adequacy of notice: "(1) whether notification of the time requirements was provided, and (2) whether the notification was reasonably geared to inform the complainant of the time limits." *Id.* at 445 (citation and internal quotation marks omitted).

In a prior opinion, this Court converted the DCNG's motion to dismiss for failure to exhaust to a motion for summary judgment and denied the motion, finding "a factual issue" as to

the adequacy of the DCNG's notice. *Clayton III*, 117 F. Supp. 3d at 81–82. The DCNG now

argues that, "[h]aving completed discovery, the record evidence shows that [the] DCNG's

notification of the EEO time limits was adequate." Dkt. 96 at 11. It points to three pieces of

evidence: (1) a declaration from Marilyn Holt, "a Classifications/Staffing Specialist" at the

DCNG Human Resources Office, attesting that the "DCNG posted flyers throughout the DCNG

Armory advising DCNG employees of their Equal Employment Opportunity rights and

responsibilities and identifying who to contact if they believe they have been subjected to

unlawful discrimination" during Clayton's tenure, Dkt. 96-8 at 1, 2 (Holt Decl. ¶¶ 2–3, 9); *see*

*also* Dkt. 96-31 at 4 (Preston Dep.) (stating that he "believe[s] there is [a poster] down in our

area"); (2) Clayton's admission that she "had one training class with the . . . D.C. CFO's

office . . . [in] 2006" on "EEO issues," Dkt. 96-5 at 30 (Clayton Dep.); and (3) Clayton's

admission that "Clipper was the assigned EEO person working under her supervision at the

Armory before [she] was removed," Dkt. 96 at 11 (citing Dkt. 96-5 at 29 (Clayton Dep.)).

Clayton counters in a sworn affidavit that, not only was she "unaware of any 45-day deadline to

contact an EEO counselor," she was never "provided . . . with any written or oral explanations of

any 45-day deadline," and that "[t]here were no posters displayed in any of the lunchrooms,

conference rooms, or common areas in the DCNG headquarters advising of any 45-day

deadline." Dkt. 69-1 at 1 (Clayton Aff. ¶¶ 2, 4, 5).

     In light of this evidence, the Court concludes that the DCNG is not entitled to summary

judgment on the grounds that Clayton failed to exhaust her administrative remedies. Clayton's

sworn statement that "there were no posters displayed" or any "written or oral explanations" of

the 45-day deadline, *id.* (Clayton Aff. ¶¶ 4, 5), creates a genuine issue of material fact as to

whether the DCNG provided *any* "notification of the time requirements," *Harris*, 488 F.3d at

445, let alone *adequate* notice.[5]  At this stage of the litigation, it is not the Court's role to make

"[c]redibility determinations" regarding Clayton's testimony.  *Robinson v. Pezzat*, 818 F.3d 1, 9

(D.C. Cir. 2006) (alteration in original) (quoting *Anderson*, 477 U.S. at 255).  Rather, "[t]he

evidence of the non-movant"—here, Clayton—"is to be believed."  *Id*.  Indeed, the D.C. Circuit

has cautioned that, even if "a jury might ultimately decide to credit the version of the events

described by the defendants over that offered by the plaintiff, this is not a basis upon which a

court may rest in granting a motion for summary judgment."  *Id.* at 8 (quoting *Arrington v.

United States*, 473 F.3d 329, 333 (D.C. Cir. 2006)).

    In any event, the DCNG's evidence is insufficient to satisfy the second prong of the

*Harris* test: "whether the notification was *reasonably geared* to inform the complainant of the

time limits."  488 F.3d at 445 (emphasis added) (internal quotation marks and citations omitted).

In *Harris*, the Court concluded that the defendant had failed to demonstrate that "no reasonable

jury, viewing the evidence in the light most favorable to [the plaintiff] and drawing all inferences

in her favor, could conclude that she lacked constructive notice of the 45-day requirement."  *Id.*

The Court reasoned that it "ha[d] no way of determining whether the posters were 'reasonably

geared' to notify [the plaintiff] of the time limit because "none of the [Defendant's] affidavits

include[d] the posters' actual language," attested to "the likelihood that [the plaintiff] herself was

ever in the[] rooms" where the posters were displayed, or stated "whether she should have seen

---

[5]  Clayton's admission that she received EEO training from the District in 2006 and supervised
an EEO officer does not support the DCNG's motion.  That evidence has no bearing on whether
*the DCNG* provided Clayton adequate notification of the 45-day time limit *under federal law*.
Without additional information about the substance of the training course or Clayton's
supervision of the EEO officer, a reasonable jury could believe that Clayton was never
"provided . . . with any written or oral explanations of any 45-day deadline," Dkt. 69-1 at 1
(Clayton Aff. ¶ 4), or find that the training was not "reasonably geared" to inform her of her
obligations under federal law, *Harris*, 448 F.3d at 45.

the posters." *Id.* at 45–46. The DCNG's evidence is similarly deficient. Its sole declaration fails to include the posters' actual language (including any reference to the 45-day requirement), to specify in which rooms of the DCNG Armory the posters were displayed, or to address whether Clayton should have seen them. Instead, Holt merely states that "DCNG posted flyers throughout the DCNG Armory" which advised employees of their EEO "rights and responsibilities" and "who to contact." Dkt. 96-8 at 2 (Holt Decl. ¶ 9). Accordingly, the Court cannot conclude that the DCNG is entitled to summary judgment on the grounds of Clayton's failure to exhaust.

### 2. *Joint Employment Doctrine*

The DCNG also argues that it is not liable to Clayton under Title VII because she was the District's "employee alone and *not* a DCNG employee." Dkt. 96 at 7. As the Court previously observed, Tile VII offers "no meaningful definition of 'employee' or 'employer.'" *Clayton III*, 117 F. Supp. 3d at 82. Rather, where, as here, Clayton claims that the DCNG was her "joint employer," Dkt. 106 at 62, the Court will apply the *Browning-Ferris* test to resolve her claim. *See Clayton III*, 117 F. Supp. 3d at 83 ("[T]he *Browning-Ferris* test is better suited than the *Spirides* test to resolve claims of joint employment."); *see also Nytes v. Trustify, Inc.*, 297 F. Supp. 3d 191, 204 (D.D.C. 2018) (applying *Browning-Ferris* to resolve claim of joint employment); *Coles v. Harvey*, 471 F. Supp. 2d 46, 50 (D.D.C. 2008) (same). Two recent D.C. Circuit cases have also approved of using the *Browning-Ferris* test to resolve joint-employment claims. *See Browning-Ferris Indus. v. NLRB*, 911 F.3d 1195, 1209 (D.C. Cir. 2018) (citing the *Browning-Ferris* test as "the governing framework for the joint-employer inquiry"); *Al-Saffy v. Vilsack*, 827 F.3d 85, 96–97 (D.C. Cir. 2016) (recognizing that, under the circuit's "two largely

overlapping articulations of the test for identifying a joint-status employer status"—*Spirides* and *Browning-Ferris*—"the touchstone is control").

Under the *Browning-Ferris* test, the Court must determine whether the DCNG "retained for itself sufficient control of the terms and conditions" of Clayton's employment even though she was employed by the District. *NLRB v. Browning-Ferris Indus.*, 691 F.2d 1117, 1124 (3d Cir. 1982). "This is 'essentially a factual issue.'" *Dunkin' Donuts Mid-Atl. Distribution Center v. NLRB*, 363 F.3d 437, 440 (D.C. Cir. 2004) (quoting *Boire v. Greyhound Corp.*, 76 U.S. 473, 481 (1964)). The D.C. Circuit has held that "[t]wo separate entities may be joint employers," for example, when they are, "to varying degrees, involved in decisions relating to employment tenure, discipline, assignment of work and equipment, recognition and awards, and day-to-day direction." *Id.* (citations omitted). Other decisions in this Circuit have also considered factors such as "[(1)] the alleged employer's authority to hire and fire the relevant employees; [(2)] the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation benefits, and work schedules, including the rate and method of payment; [(3)] the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and [(4)] the alleged employer's actual control of employee records, such as payroll, insurance, or taxes." *Nytes*, 297 F. Supp. 3d at 204 (alterations in original) (quoting *Miles v. Howard Univ.*, 83 F. Supp. 3d 105, 117 (D.D.C. 2015)).

Applying the *Browning-Ferris* test to the facts of this case, the Court concludes that the DCNG is not entitled to summary judgment on the issue of joint employment. The DCNG argues that Clayton has failed "to point to specific evidence in the record creating a material issue for trial on this front." Dkt. 109 at 5. Specifically, the DCNG asserts that Clayton has "proffer[ed] no evidence showing that [the] DCNG was involved in the decision to convert her

position and terminate her employment." *Id.* at 2. The Court is unpersuaded and concludes, instead, that Clayton has met her burden of showing that a genuine dispute of material fact exists with respect to (1) whether the DCNG was Clayton's joint employer, and (2) whether the DCNG was involved in the decision to terminate her employment.

With respect to the first element, Clayton points to testimony that suggests the DCNG exerted control over her incentive pay, that it reviewed her performance, and that General Schwartz had authority to initiate disciplinary measures against her. General Schwartz and personnel from both the District and the DCNG testified, for instance, that Clayton was in the General's chain of command. *See* Dkt. 107-20 at 10 (Schwartz Dep.) (testifying that he was Clayton's supervisor); Dkt. 107-10 at 10 (Ricket Dep.) (confirming that General Schwartz was Clayton's supervisor); Dkt. 107-33 at 17 (Gregory Dep.) (noting that Clayton reported to Neil Albert and General Schwartz); *see also* Dkt. 107-60 at 2 (Nickels Memo) ("[I]t appears that the Director of the Government division, a District employee, is in [the General's] chain of command."). General Schwartz, moreover, filled out Clayton's performance review, *see* Dkt. 107-21 (Perf. Eval.), and approved the incentive pay for District employees in the District of Columbia Government Operations Division, *see* Dkt. 107-28 (Memo to General Schwartz). The District's corporate designee, Thompson, also testified that the "commanding general [could] . . . initiate[] remedial or disciplinary measures against the Government Operations Division personnel" and "participate in administrative actions against [those] employees." Dkt. 107-38 at 15–16 (Thompson Dep.).

As such, the nature of Clayton's employment is similar that of the plaintiff in *Al-Saffy*. There, a Department of Agriculture employee stationed at a U.S. embassy abroad brought suit against both the Department of Agriculture and the State Department for employment

discrimination. *Al-Saffy*, 827 F.3d at 89. The district court granted summary judgment in favor of the State Department on the ground that Al-Saffy had failed to establish he was an employee of the State Department. *Id.* at 91–92. On appeal, the D.C. Circuit reversed, holding that "Al-Saffy [had come] forward with evidence creating a genuine dispute concerning the State Department's control over his work and employment." *Id.* at 97. In particular, although Al-Saffy was "not officially employed by" the State Department, the court found that there was evidence that he reported to State Department employees while stationed overseas. *Id.* "Indeed, [two State Department employees] had recommended Al-Saffy's removal" to the Department of Agriculture based on his conduct overseas. *Id.* Finally, the Court of Appeals found "further support[]" for Al-Saffy's "relationship with the Department of State" in the "federal chief of missions statute," which "grants the United States ambassador of a foreign country plenary authority over other executive branch employees in that country." *Id.*

As noted above, similar indicia of the DCNG's control over Clayton's employment are present in here: Multiple sources have confirmed that Clayton reported to General Schwartz, and, even the Nickels Memo acknowledges that, pursuant to the D.C. Code, Clayton has a "dotted-line reporting relationship with the Commanding General," Dkt. 107-60 at 3 (Nickels Memo). Accordingly, as in *Al-Saffy*, there is, at the very least, a genuine dispute as to whether the DCNG exerted sufficient control over Clayton's employment to satisfy the standard for joint employment in this circuit.

There is also a dispute of fact as to whether the DCNG was involved in Clayton's termination. On one hand, the DCNG argues that "there is no evidence that [General] Schwartz or anyone else at DCNG requested [Clayton's] termination or was even notified prior to the action being effected." Dkt. 96 at 9. As noted above, however, Clayton has pointed to multiple

pieces of circumstantial evidence that would permit a reasonable jury to infer that General Schwartz was involved in her termination. As such, the Court declines to enter summary judgment in favor of the DCNG on the basis that it was not Clayton's employer and will proceed to the merits of her claims.

      3.    *Merits*

One final issue remains: Whether Clayton's Title VII sex discrimination and retaliation claims against the DCNG pass muster under Federal Rules of Civil Procedure 12(b)(6) and 56. Because these claims are identical to the ones that Clayton alleged against the District, however, the Court need not conduct a separate analysis. Instead, the Court will, for the reasons stated above, grant the DCNG's motion for summary judgment as to Clayton's sex discrimination claim and deny summary judgment as to Clayton's retaliation claim.

## CONCLUSION

Defendants' motions for summary judgment, Dkt. 96; Dkt. 97, are **GRANTED** in part and **DENIED** in part. The Court hereby **GRANTS** Defendants' motions for summary judgment, Dkt. 96; Dkt. 97, with respect to Clayton's Title VII sex discrimination claims, and **DENIES** Defendants' motions with respect to Clayton's Title VII retaliation claims. The Court also **GRANTS** the District's motion for summary judgment, Dkt. 97, with respect to Clayton's DC-FCA claim and **DENIES** the motion with respect to Clayton's DC-WPA claim.

It is further **ORDERED** that the parties shall appear for a status conference on April 3, 2019, at 10:45 a.m. in Courtroom 21 to discuss further proceedings in this case.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 20, 2019